**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| CITY OF BRUNSWICK, by and through its MAYOR AND BOARD OF COMMISSIONERS, | ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | _____ |
| HONEYWELL INTERNATIONAL, INC., f/k/a ALLIED CHEMICAL CORPORATION and as ALLIEDSIGNAL, INC., and THE GEORGIA POWER COMPANY, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## NOTICE OF REMOVAL

**PLEASE TAKE NOTICE** that Defendants Honeywell International, Inc. f/k/a Allied

Chemical Corporation and as AlliedSignal, Inc. ("Honeywell") and Georgia Power Company

("Georgia Power") hereby remove this Action (Civil Action File No. CE22-01086) from the

Superior Court of Glynn County, State of Georgia, to the United States District Court for the

Southern District of Georgia pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1442(a), and 1446.  To

the extent any part of the City of Brunswick's causes of action can be construed as non-federal,

this Court has supplemental jurisdiction over them under 28 U.S.C. § 1367(a) because they form

part of the same case or controversy as those causes of action over which the Court has original

jurisdiction.[1]

---

[1] By filing this Notice of Removal, Defendants do not waive any right, defense, affirmative defense, or objection, including without limitation any challenges to personal jurisdiction, insufficient process, and/or insufficient service of process.

## TIMELINESS OF REMOVAL

1.      Plaintiff, the City of Brunswick, by and through its Mayor and Board of Commissioners ("Plaintiff" or "City"), filed this Action in the Superior Court of Glynn County, Georgia as Civil Case File No. CE22-01086, on October 20, 2022 (the "State Court Action").

2.      Honeywell was served with a copy of the Complaint in the State Court Action on October 21, 2022.  Georgia Power was served with a copy of the Complaint in the State Court Action on October 28, 2022.  No Defendant was served prior to October 21, 2022.

3.      This Notice of Removal is timely because it is filed within 30 days after the receipt by Defendants, through service or otherwise, of the Complaint.  *See* 28 U.S.C. § 1446(b).

## NATURE OF THE ACTION

4.      On July 27, 2017, the Honorable J. Randal Hall entered the Consent Decree for Remedial Design and Remedial Action at Operable Unit One of the LCP Chemicals Superfund Site ("Consent Decree") between Honeywell, Georgia Power, and the United States Environmental Protection Agency ("EPA"), pursuant to which "[t]his Court has jurisdiction over the subject matter of this action."  *See United States v. Honeywell Int'l Inc. & Georgia Power Co.*, Civil Action No. 2:16-cv-00112, Doc. No. 26, at 2 ¶ 1 (S.D. Ga. July 27, 2017), attached hereto as **Exhibit A**; *see also United States v. Honeywell Int'l Inc. & Georgia Power Co.*, Civil Action No. 2:16-cv-00112, Complaint, Doc. No. 1 (S.D. Ga. July 29, 2016) (hereinafter "EPA Complaint"), attached hereto as **Exhibit B**.

## HONEYWELL

5.      In this Action, the City alleges that Honeywell's operation of a chlor-alkalai plant in Brunswick, Georgia (the "Plant Site") from 1956 to 1979, as well as its role in keeping the Plant Site operational from 1979 to 1994 after the plant was sold to Linden Chemicals and

Plastics Corporation ("LCP"), resulted in discharges of mercury and poly-chlorinated byphenals ("PCBs") into the air and water that spread into waters, marshes, and property of the City of Brunswick.  *See* Compl. ¶¶ 7, 9, 11-13, 19-22, 34-35, 41-42, 66, 75.

### GEORGIA POWER

6.      In the mid-1930s, Georgia Power acquired certain parcels on the Plant Site.  *See* EPA Compl. ¶ 9.

7.      Georgia Power operated an oil-fired electric generating plant on portions of the Plant Site between 1937 and 1955.

8.      The City's Complaint fails to allege that Georgia Power emitted hazardous substances as a result of its operations on the Plant Site.

9.      In 1955, Allied Chemical & Dye Corporation, which later became Honeywell, acquired Georgia Power's parcels on the Plant Site.  *See* EPA Compl. ¶¶ 10-12.

10.      Additionally, Georgia Power owns a parcel of land bearing Parcel Number 03-06321 ("McManus Parcel").  The McManus Parcel is adjacent to, but entirely separate from, the Plant Site.  *See, e.g.*, The Glynn County GIS Department Website, available at https://qpublic.schneidercorp.com/Application.aspx?AppID=964&LayerID=19142&PageTypeID=4&PageID=8448&KeyValue=03-06321 [last visited November 17, 2022].

11.      In 1952, Georgia Power began operating the McManus Electric Generating Plant ("Plant McManus") as a coal-fired electric generating plant on the McManus Parcel.  *See* Plant McManus History of Construction, attached hereto as **Exhibit C**.

12.      The City alleges that mercury was emitted from Plant McManus because Plant McManus was coal-fired.  *See* Compl. ¶ 87 ("The Georgia Power Plant was coal fired, and emitted mercury into the air, the waters and the marshes of Glynn County.").

13.    In 1971, Georgia Power converted Plant McManus from a coal-fired electric generating plant to a fuel-oil electric generating plant. *See* Plant McManus History of Construction. Plant McManus ceased using coal in 1972. *See id.* As a result, the latest Plant McManus would have emitted the alleged mercury from burning coal is the year 1972. *See id.*

14.    Plant McManus is entirely separate from Georgia Power's operations on the Plant Site from 1937-1955, which were not coal-fired.

15.    The City's 134-paragraph Complaint includes only *three* paragraphs vaguely alleging Georgia Power's tortious conduct:

> 87.
> For many years, the Defendant Georgia Power Company owned and operated an electrical generator station that abutted the Turtle River known as Plant McManus. The Georgia Power Plant was coal fired, and emitted mercury into the air, the waters, and the marshes of Glynn County.

> 88.
> The mercury released by Georgia Power has, in part, migrated onto marshes and shoreline owned by the City of Brunswick thereby contributing to the pollution of property of the City of Brunswick.

> 89.
> The Defendant Georgia Power has acknowledged joint responsibility for the mercury pollution of the Marshes of Glynn, as evidenced by the Consent Decree agreed to by Georgia Power. *United States of America v. Honeywell International Inc. and Georgia Power Company*, Civil Action No. 2:16-CV-00112, U.S. District Court, S.D. GA, DKT. 3-1, 07-29-16.

16.    However, the Consent Decree and its directives, referenced in Paragraph 89 of the City's Complaint, did not result from Georgia Power's operation of Plant McManus. The Consent Decree resulted from alleged operations on the Plant Site, which were entirely separate from Plant McManus. *See* EPA Compl. ¶ 9. This fact makes the City's allegations regarding Georgia Power nonsense.

## DEFENDANTS' REMEDIAL ACTIONS

17.     The City's allegations are not limited to Honeywell's and LCP's operation of the
Plant Site prior to 1994 and Georgia Power's operation of Plant McManus.  Instead, and as
particularly relevant to this Notice of Removal, the City further alleges that Defendants failed to
take appropriate remedial action to remove from the environment the mercury and PCBs that
they and others allegedly discharged.  *See, e.g.*, Compl. ¶ 35 ("Defendant Honeywell took no
action to remove any of the tens of thousands of pounds of PCBs that it had already dumped on
its Site, into the marshlands and in the outfall canal that leads to Purvis Creek, the Turtle River
Estuary and beyond."); ¶ 108 ("[I]t was foreseeable to Defendants that their failure to
permanently remove their pollutants from property of the City of Brunswick could harm the City
of Brunswick and its property.").

18.     The City thus purports to assert two causes of action under state common law
(Continuing Trespass and Continuing Nuisance) arising out of this alleged misconduct, seeking
damages and other relief based on, *inter alia*:  (i) "Defendants' continuing failure and refusal to
permanently remove their pollution from property of the City of Brunswick," which the City
alleges "unreasonably and substantially interferes with the City's right to exclude others and the
pollutants of others from its property" and the "City's use and enjoyment of its property" (*id.*
¶¶ 111, 122); and (ii) "Defendants' failure and refusal to permanently abate their continuing
nuisances and damage" (*id.* ¶ 125).

19.     The City further alleges that it "owns properties containing hazardous and toxic
wastes that render the City of Brunswick potentially liable for the remediation of the waste on its
property" and "Defendants are liable for all such remediation costs and damages." *Id.* ¶ 100.

20.     As the City acknowledges, however, Defendants already are in the process of investigating and remediating mercury and PCB contamination pursuant to the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") under the authority and oversight of EPA.

21.     The City alleges, for example, that in or around 1994, EPA issued a "Unilateral Administrative Order" to Honeywell and others "ordering them to remove the chemicals remaining at the Plant, to determine the extent of contamination at the Plant, and to begin the environmental remediation of the Plant and the Plant Site." *Id.* ¶ 69.  And "[i]n 1998, U.S. EPA required Defendant Honeywell to remove one foot of soil from thirteen acres of the marsh and sediment in creeks in front of the old Honeywell trash dump." *Id.* ¶ 72.

22.     In fact, since 1994, EPA has been comprehensively directing and overseeing the investigation and remediation of environmental contamination at and around the Plant Site pursuant to its authority under CERCLA.

23.     On July 6, 1995, for example, Defendants commenced a Remedial Investigation and Feasibility Study for the area in and around the Plant Site pursuant to an Administrative Order of Consent with EPA.  *See* Administrative Order of Consent, attached hereto as **Exhibit D**;[2] *see also* Consent Decree at 1 ¶ G.

24.     In 1996, EPA formally designated the area in and around the Plant Site as a federal Superfund site (the "LCP Chemicals Superfund Site") by adding it to the National Priorities List.  *See* 61 Fed. Reg. 30,510 (June 17, 1996); *see also* Consent Decree at 1 ¶ F.

---

[2] Defendants entered into additional Administrative Orders of Consent with EPA in 1997 and 2007 relating to the remedial investigation.  *See* EPA LCP Chemicals Website, available at https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.schedule&id=0401 634 [last visited November 15, 2022].

25.     Defendants completed the Remedial Investigation for the Site in November 2012 and the Feasibility Study in August 2015.  *See* Consent Decree at 1 ¶ H.

26.     On December 1, 2014, and pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the Feasibility Study and of the proposed plan for remedial action at the Site in the *Brunswick News*, a major local newspaper of general circulation.  *Id.* at 1 ¶ I.  EPA issued a final Record of Decision ("ROD") for the remedial action to be implemented at the Site on September 22, 2015.  *Id.* at 2 ¶ J.

27.      In July 2016, Defendants entered into the Consent Decree with EPA pursuant to which Defendants agreed to undertake a remedial action at the LCP Chemicals Superfund Site.  *See* Ex. A; *see also* Compl. ¶¶ 89, 96 (referencing the Consent Decree and the LCP Chemicals Superfund Site).  This Court approved the Consent Decree on July 27, 2017 in an action filed by the United States (on behalf of EPA) pursuant to Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606, 9607.  *See* Ex. A; *see also* EPA Complaint at ¶ 1.

28.     Defendants are implementing the remedial action set forth in the ROD pursuant to the Consent Decree.  The obligations of the Consent Decree are ongoing and require Defendants to undertake remediation efforts under the authority and oversight of EPA.

29.     In short, for nearly 30 years, Defendants have been investigating and remediating mercury and PCB contamination in and around the Plant Site at the direction and under the oversight of EPA pursuant to a federal statute.  Because the City's lawsuit directly challenges the sufficiency of Defendants' remedial efforts under CERCLA, it should be heard in federal court.

**GROUNDS FOR REMOVAL**

30.     A defendant may remove "any civil action brought in State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a).[3] This action is removable on multiple independent grounds.

31.     *First*, this Action meets the elements of the federal officer removal statute, 28 U.S.C. § 1442, because the City's claims are "connected or associated with" Defendants' decades-long investigation and remediation of environmental contamination at and around the Plant Site under the direction and oversight of EPA.

32.     *Second*, this Action is removable because the City's state-law claims necessarily involve substantial and disputed federal questions over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1331, including because they constitute a challenge to a federally directed environmental cleanup under CERCLA and because they seek contribution for response costs under CERCLA. Accordingly, the City's claims are subject to removal as necessarily federal claims, under the artful-pleading and *Grable* doctrines.

33.     *Third*, this Action is removable because diversity jurisdiction exists under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000 and is between citizens of different states. The City fraudulently joined Georgia Power to this Action to defeat diversity

---

[3] Removal jurisdiction under 28 U.S.C. § 1441(a) is coextensive with original jurisdiction under 28 U.S.C. § 1331. *See Wis. Dep't of Corr. v. Schactz*, 524 U.S. 381, 390 (1998) ("Since a federal court would have original jurisdiction to hear this case had [the plaintiff] originally filed it there, the defendant may remove the case from state to federal court.") (citing 28 U.S.C. § 1441(a)); *see also* 14C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3711 (4th ed. Apr. 2020 Update) ("Generally, then, removal based on Section 1441(a) embraces the same class of cases as is covered by Section 1331, the original federal-question jurisdiction statute.").

jurisdiction under 28 U.S.C. § 1332(a).  *See, e.g.*, *Stillwell v. Allstate Ins. Co.*, 663 F.3d 1329, 1332 (11th Cir. 2011).

## I. This Action Is Removable Under the Federal Officer Removal Statute

34.     The federal officer removal statute allows removal of an action against "any officer (*or any person acting under that officer*) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1) (emphasis added).

35.     The federal officer removal statute is to be "liberally construed" in favor of a federal forum.  *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007).  Indeed, courts have held repeatedly that "defendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute."  *Leite v. Crane*, 749 F.3d 1117, 1122 (9th Cir. 2014); *see also In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2020 WL 365617, at *2 (N.D. Fla. Jan. 22, 2020) ("*In re 3M*") (distinguishing federal officer removal statute from general removal statute).  The Supreme Court has therefore emphasized that the policy of providing the protection of a federal forum to federal officers "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)."  *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *see also Florida v. Cohen,* 887 F.2d 1451, 1453 (11th Cir. 1989) ("This statute is an incident of federal supremacy and is designed to provide federal officials with a federal forum in which to raise defenses arising from their official duties.").  In short, courts must apply a "broad construction" of the statute—"particularly with respect to private parties who claim to be 'acting under' a federal officer."  *Agyin v. Razmzan*, 986 F.3d 168, 174 (2d Cir. 2021).

36.     "Not only must the words of § 1442 be construed broadly but a court also must 'credit [the d]efendants' theory of the case' when evaluating the relationship between the defendants' actions and the federal officer."  *Id.* at 175 (citing *Isaacson v. Dow Chem. Co.*, 517

F.3d 129, 137 (2d Cir. 2008)); *see also Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999)

("[W]e credit the [defendants]' theory of the case for purposes of [all] elements of our

jurisdictional inquiry.").  At this stage, a defendant's allegations "in support of removal" need

only be "facially plausible," and the defendant receives the "benefit of all reasonable inferences

from the facts alleged."  *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 947 (7th Cir. 2020).

37.     To remove an action under the federal officer removal statute (28 U.S.C. § 1442),

a defendant who is not itself a federal officer must demonstrate that it (1) "is a person within the

meaning of the statute who acted under a federal officer"; (2) "performed the actions for which it

is being sued under color of federal office"; and (3) has a "colorable federal defense."  *Caver v.

Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017) (internal citations omitted).

Defendants satisfy all three of these criteria here.

38.     First, Defendants are "persons" within the meaning of the statute who "acted

under" a federal officer.  Defendants are corporations, Compl. ¶¶ 3-4, which qualify as "persons"

within the meaning of 28 U.S.C. § 1442.  And Defendants "acted under" federal officers by

assisting a federal agency, EPA, in carrying out its statutory duty to investigate and remediate

environmental contamination at the LCP Chemicals Superfund Site (both of which EPA would

have performed itself without Defendants' assistance) under the "subjection, guidance, or

control" of EPA.  *Watson,* 551 U.S. at 151-54.  Second, the City's claims relate to actions that

Defendants performed "under color of federal office" because the claims are "connect[ed] or

associat[ed]" with Defendants' performance of a decades-long EPA-led cleanup.  Third,

Defendants have a "colorable federal defense" that the City's claims are preempted by CERCLA.

### A.     Defendants "Acted Under" Federal Officers.

39.     Defendants "acted under" federal officers because the federal government exerted

extensive "subjection, guidance, or control" over Defendants' remediation of the LCP Chemicals

Superfund Site and because Defendants engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 151-52 (emphasis in original).

40.     First, a federal agency, EPA, has plainly exerted "subjection, guidance, or control" over Defendants for several decades, closely supervising Defendants' cleanup activities.  *See Watson,* 551 U.S. at 151; *Caver,* 845 F.3d at 1143-44.  In 1994, EPA issued a Unilateral Administrative Order to Honeywell and others, "ordering them to remove the chemicals remaining at the Plant, to determine the extent of contamination at the Plant, and to begin the environmental remediation of the Plant and the Plant Site" pursuant to cleanup plans approved or to be approved by EPA.  Compl. ¶ 69.  In 1995, pursuant to an Administrative Order on Consent with EPA (Ex. D), Defendants commenced a Remedial Investigation and Feasibility Study under EPA's oversight and subject to EPA's approval.  In 2015, EPA issued a ROD setting forth the remedial action to be implemented at the Site to accomplish EPA's federal remediation objectives.  *See* Consent Decree at 2.  And in 2016, Defendants entered into a Consent Decree with EPA (Ex. A) pursuant to which Defendants agreed to implement the remedial action that EPA selected—subject to EPA's oversight and control.

41.     Second, if Defendants had not carried out the investigation and remediation of environmental contamination at the Site under EPA's supervision, the federal government would "at least arguably" have performed these tasks itself.  *Watson,* 551 U.S. at 154.  While "simply complying . . . with federal laws, rules, and regulations" does not constitute "acting under" a federal official, "the words 'acting under' are broad, and . . . the statute must be 'liberally construed.'"  *Id.* at 147, 152-53.  A private defendant crosses the threshold from mere compliance to assistance where, "at least arguably, [the entity] performed a job that . . . the Government itself would have had to perform."  *Id.* at 154.  Under CERCLA, EPA is required

"to compile and annually revise a prioritized list of contaminated sites for cleanup, commonly known as Superfund sites." *Atlantic Richfield Co. v. Christian*, 140 S.Ct. 1335, 1346 (2020) (citing 42 U.S.C. § 9605). "EPA may clean those sites itself or compel responsible parties to perform the cleanup." *Id.* (citing 42 U.S.C. §§ 9604, 9606). And here, under the Consent Decree, EPA retains authority to take over the remediation work. *See* Consent Decree at 27-28. Thus, had Defendants not performed the EPA-supervised remediation, those tasks "at least arguably" would fall to the federal government under CERCLA.

42.     For these reasons, federal appellate courts have concluded that private corporations "act[] under" federal authority when they perform EPA-directed cleanups. *See, e.g., Greene v. Citigroup, Inc.,* No. 99-1030, 2000 WL 647190, at *1-2 (10th Cir. May 19, 2000) (affirming § 1442 jurisdiction where plaintiff sought injunctive and declaratory relief related to site subject to ongoing EPA cleanup); *People State of Cal. v. H & H Ship Serv. Co.,* No. 94-10182, 1995 WL 619293, at *2 (9th Cir. Oct. 17, 1995) (holding corporation "acted under" federal officer when performing tasks "taken during the course of a removal action that was under the direction and control of the Coast Guard"). Indeed, faced with similar claims to Plaintiff's here, the Tenth Circuit in *Greene* squarely held that the private corporation "acted under the direction of a federal officer" by "implement[ing] a remedy selected by the EPA, a federal agency, pursuant to CERCLA." *Greene*, 2000 WL 647190, at *2.

43.     Put simply, in investigating and remediating the Site, Defendants "work[ed] hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Baker*, 962 F.3d at 942-43 (7th Cir. 2020) (finding jurisdiction under § 1442); *see also Carver*, 845 F.3d at 1143-44 (finding jurisdiction under § 1442 where defendants performed tasks under "close supervision" of government agency, pursuant to a federal statute "designed to

12

guide and control" an important and beneficial "public function conceived of and directed by the federal government"—there, bringing electricity to rural areas); *Ruppel,* 701 F.3d at 1181 (finding jurisdiction under §1442 where "the federal government use[d] a private corporation to achieve an end it would have otherwise used its own agents to complete").

44.     The City's claims seek to punish Defendants for activities conducted under the close supervision of the federal government to remediate environmental contamination.  The City's claims thus implicate precisely the type of "special relationship" between private entities and the federal government that supports federal officer removal.  *Watson,* 551 U.S. at 157.

**B.      The City's Claims Are "For or Relating to" Defendants' Acts Under Color of Federal Office**

45.     The City's claims are "for or relating to" acts Defendants performed "under color of federal office."  28 U.S.C. § 1442(a)(1).  To meet this prong, there need only be "a connection or association" between the act in question and the federal office."  *Caver*, 845 F.3d at 1144; *see also Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017); *In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 471 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*").  In this regard, the Removal Clarification Act of 2011 inserted the words "or relating to" into the federal officer removal statute, which "broaden[ed] the universe of acts that enable Federal officers to remove to Federal court."  *Def. Ass'n of Philadelphia*, 790 F.3d at 467 (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425). Thus, the Removal Clarification Act "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office."  *Latiolais*, 951 F.3d at 292 (emphasis in original).

46.     The Eleventh Circuit has held that "[t]he hurdle erected by this requirement is quite low."  *Carver*, 845 F.3d at 1144 (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)); *see also Ronald E. Sholes, P.A. v. Campbell*, No. 3:21-CV-494-MMH-PDB, 2022 WL 801117, at *2 (M.D. Fla. Feb. 17, 2022), *report and recommendation adopted,* No. 3:21-CV-494-MMH-PDB, 2022 WL 797404 (M.D. Fla. Mar. 16, 2022).  It is not necessary "that the complained-of conduct *itself* was at the behest of a federal agency"; rather, it is "sufficient" if the City's "allegations are directed at the relationship between the [Defendants] and the federal government" for at least some of the time frame relevant to the City's claims.  *Baker*, 962 F.3d at 944-45; *accord Def. Ass'n of Philadelphia*, 790 F.3d at 470-71; *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016).  In addition, "courts credit the defendant's theory of a case when determining whether a causal connection exists." *In re 3M*, 2020 WL 365617, at *4 (citing *Acker*, 527 U.S. at 432; *Leite*, 749 F.3d at 1124; *Isaacson*, 517 F.3d at 137.)  As the Supreme Court explained, any other rule would "defeat the purpose of the removal statute" by "demanding an airtight case on the merits in order to show the required causal connection." *Acker*, 527 U.S. at 432.

47.     Defendants readily satisfy the "under color of" federal office prong here.  In asserting claims for continuing trespass and nuisance, the City expressly challenges Defendants' remediation of the Plant Site and surrounding areas as insufficient to remove pollution from the property of the City of Brunswick.  *See* Compl. ¶¶ 111, 122 (alleging continuing trespass and continuing nuisance because of "Defendants' continuing failure and refusal to permanently remove their pollution from the property of the City of Brunswick").  Indeed, the City's Complaint is replete with allegations that Defendants failed to take appropriate remedial action to remove mercury and PCBs from the environment.  *See, e.g.*, *id.* ¶ 35 ("Defendant Honeywell

took no action to remove any of the tens of thousands of pounds of PCBs that it had already dumped on its Site, into the marshlands and in the outfall canal that leads to Purvis Creek, the Turtle River Estuary and beyond."); *id.* ¶¶ 57-58 (alleging that Honeywell kept the Brunswick Plant in operation to "delay environmental remediation costs"); *id.* ¶ 108 ("[I]t was foreseeable to Defendants that their failure to permanently remove their pollutants from property of the City of Brunswick could harm the City of Brunswick and its property.").

48.     This Action thus "relates to" (i.e., is "connected or associated" with) Defendants' actions under color of federal office—namely, Defendants' investigation and remediation of environmental contamination at the Site since 1994 under EPA's oversight and direction (which includes both those remedial actions EPA required and those it did not require).  Indeed, the City's claims are premised—at least in part—on the notion that the EPA-directed remediation activities were erroneous or otherwise insufficient to protect the City's property.

49.     Notably, CERCLA expressly prohibits remediation activities that are inconsistent with an EPA-directed remedial action, stating:  "When either the President, or a potentially responsible party pursuant to an administrative order or consent decree under [CERCLA], has initiated a remedial investigation and feasibility study for a particular facility under this chapter, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President."  42 U.S.C. § 9622(e)(6).[4]  That statute defines "facility," in turn, to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or place, or otherwise come to be located."  *Id.* § 9601(9).

---

[4] As relevant here, the functions vested in the President under CERCLA are delegated to EPA. *See* Executive Order 12580 (Superfund Implementation), *available at* https://www.archives.gov/federal-register/codification/executive-order/12580.html.

50.     Here, Defendants initiated a remedial investigation and feasibility study for the Plant Site in 1995 pursuant to an administrative order with EPA.  *See* para. 23, *supra*.  And in 2016, Defendants entered into a Consent Decree with EPA to implement the remedial action that EPA selected in the ROD based on that remedial investigation and feasibility study.  *See* paras. 26-28, *supra*.  As such, Defendants could not have undertaken additional remedial activities to remove pollution from the City's property (i.e., a site or area where pollution from the Plate Site allegedly came to be located) without EPA's authorization and approval.

51.     The City's claims thus have far more than the minimal "connection or association" to Defendants' EPA-led cleanup needed to satisfy the "for or relating to any act under color of [federal] office" requirement for jurisdiction under 28 U.S.C. § 1442.  *See Caver*, 845 F.3d at 1144.  The City's claims are a collateral attack on EPA's remediation prerogatives, seeking to divest the federal agency of jurisdiction over remediation at the Plant Site and surrounding areas.  Congress enacted § 1442 precisely to ensure a federal forum is available for disputes like these.  *See Watson*, 551 U.S. at 150 ("[T]he removal statute's 'basic' purpose is to protect the Federal Government from the interference with its 'operations.'").

### C.     Defendants Have a Colorable Federal Defense

52.     Finally, Defendants have a colorable federal defense.  "Courts have imposed few limitations on what qualifies as a colorable federal defense."  *Isaacson*, 517 F.3d at 138.  This element of the federal officer removal statute requires only that a defendant "raise a claim that is defensive and based in federal law."  *Id.* (internal quotation marks and citations omitted).  Further, a colorable federal defense need only be "plausible," *Carver*, 845 F.3d at 1145, meaning it cannot be "immaterial and made solely for the purpose of obtaining jurisdiction or . . . wholly insubstantial and frivolous," *In re 3M*, 2020 WL 365617, at *5 (quoting *Zeringue v. Crane Co.*, 846 F.3d 785, 792 (5th Cir. 2017)).  In other words, "a defendant's burden on this issue is

relatively low." *Id.* The defendant need not "virtually . . . win his case before he can have it removed," and removal is proper even if the federal defense is "ultimately reject[ed]." *Acker,* 527 U.S. at 431 (internal quotes omitted); *see also Mesa v. California*, 489 U.S. 121, 129 (1989) ("[T]he validity of the defense authorized to be made is a distinct subject . . . [and] has no connection whatever with the question of jurisdiction.").

53.     Here, Defendants intend to raise federal preemption as a defense. "Conflict preemption occurs either when it is physically impossible to comply with both the federal and the state laws or when the state law stands as an obstacle to the objective of the federal law." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1253 (11th Cir. 2022) (quoting *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008)). Here, the City's claims that Defendants' are liable because they failed to remove pollution from the Plant Site and surrounding areas are preempted because such claims conflict with Defendants' remedial obligations under EPA's CERCLA-based directives.

54.     *York v. Northrop Grumman Guidance & Elecs. Co., Inc.*, No. 21-03251-CV-S-BP, 2022 WL 3971283 (W.D. Mo. Aug. 31, 2022), is analogous. There, the district court explained that, under CERCLA, responsible parties are encouraged to "enter an agreement with the federal or state government to resolve the method for addressing a release of environmental contaminants." *Id.* at *3. These agreements have "the effect of federal law, and state laws (including state claims) that conflict with the agreement are preempted." *Id.* As such, "claims for damages resulting from (1) actions required by a consent decree or (2) the failure to do more than is required/permitted by the settlement are also preempted." *Id.* The court explained that "this feature of CERCLA derives from 42 U.S.C. § 9622(e)(6)" (which is addressed above in paragraph 49, *supra*). *Id.* Thus, the court concluded, the plaintiffs' claims were preempted to

the extent they sought:  (1) "equitable relief requiring Defendants to undertake 'remedial actions' different from or in addition to those set forth in the settlements"; (2) "damages because Defendants failed to undertake 'remedial actions' that were not required by the settlements"; or (3) "damages because Defendants did something required by the settlements, so long as there is not also a claim that Defendants performed that task improperly or negligently."  *Id.*

55.     The same analysis applies here.  The City seeks damages because Defendants allegedly failed to undertake remedial actions—that were not required by EPA—to remove pollution from City property or prevent pollution from migrating to City property.  *See* paras. 17-18, *supra*.  As the district court held in *York*, such claims are preempted by CERCLA.  As such, Defendants have raised a colorable federal defense to satisfy the third and final requirement for removal under 28 U.S.C. § 1442.

## II.     The City's Claims Necessarily Raise Substantial Federal Issues and Therefore Are Subject to Removal Under 28 U.S.C. §§ 1331 and 1441(a)

56.     Federal courts possess jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States," and such cases may thus be removed from state to federal court.  28 U.S.C. § 1331; *see also id.* § 1441(a) (providing for the removal of civil cases within the "original jurisdiction" of federal courts).

57.     Generally, courts determine "whether a claim arises under federal law" by evaluating "whether a federal question appears on the face of the plaintiff's well-pleaded complaint" (the so-called "well-pleaded complaint rule").  *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1251 (11th Cir. 2011) (citing *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152 (1908)).  However, federal questions can arise "even where a claim finds its origins in state rather than federal law."  *Gunn v. Minton*, 568 U.S. 251, 258 (2013).  Indeed, even if no federal questions appear on the face of a plaintiff's complaint, removal will nonetheless be proper where

the "state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Id.* (quoting *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314 (2005)).

58.     Thus, the Supreme Court has identified two situations in which federal-question jurisdiction is available even though a plaintiff bases its claims in state court on state law: (1) "when 'it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims,'" and (2) "when it appears that the plaintiff's claim is 'really one of federal law.'"  *W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 307 (4th Cir. 2022) (*quoting Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 13 (1983)).[5]

59.     Accordingly, in evaluating whether a plaintiff's claims have "a sufficient federal character to support removal," the court must "seek to determine whether the real nature of the claim is federal, regardless of plaintiff's characterization."  *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981).  In this way, "[c]ourts will not permit plaintiff to use artful pleading to close off defendant's right to a federal forum," *id.*, and "a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint," *Darden v. U.S. Steel Corp.*, 830 F.2d 1116, 1119 (11th Cir. 1987) (quoting *Franchise Tax Bd.*, 463 U.S. at 22).

---

[5] One example of when a plaintiff's state law claim is "really one of federal law" is where there is complete preemption.  *See, e.g.*, *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1343 (11th Cir. 2009) ("Complete preemption is a narrow exception to the well-pleaded complaint rule and exists where the preemptive force of a federal statute is so extraordinary that it converts an ordinary state law claim into a statutory federal claim.").

60.     Here, the City's claims necessarily raise disputed and substantial federal issues sufficient to support this Court's jurisdiction because (1) they constitute a challenge to a CERCLA cleanup, and (2) they seek contribution for response costs under CERCLA.

**A.     The City's Claims Constitute a Challenge to a CERCLA Cleanup and Thus Necessarily Raise Disputed and Substantial Federal Issues**

61.     Because plaintiff's claims will interfere with the implementation of a remedial plan being conducted under CERCLA, they necessarily raise federal questions sufficient to support this Court's jurisdiction under 28 U.S.C. § 1332.  The Eleventh Circuit has explained that a complaint constitutes a "challenge" to a remedial plan—within the meaning of CERCLA—"if it interferes with the implementation of a CERCLA remedy."  *Broward Gardens Tenants Ass'n v. EPA*, 311 F.3d 1066, 1072 (11th Cir. 2002).  In particular, "[t]o determine whether a suit interferes with, and thus challenges, a cleanup, courts look to see if the relief requested will impact the remedial action selected."  *Id.*  Where such an impact is found, courts have held that federal-question jurisdiction is present.  *See W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 308 (4th Cir. 2022) (collecting cases).

62.     For example, in *Bartlett v. Honeywell Int'l Inc.*, the plaintiffs argued, "on a state tort law theory, that Honeywell should have departed from [a] consent decree's terms by conducting additional or different remedial action than that mandated by CERCLA and the consent decree."  737 F. Appx. 543, 549 (2d Cir. 2018).  The Second Circuit affirmed that the issues implicated by the allegations, including whether Honeywell had complied with the consent decree and "the circumstances under which CERCLA might preempt the residents' state tort law claims," raised disputed and substantial federal issues that established federal-question jurisdiction.  *Id.* at 546.  As the court explained, "a contrary holding that the district court lacks

jurisdiction could allow litigants to use the state courts as a vehicle to undermine a federal court's ability to police its consent decrees." *Id.* (quotation omitted).

63.     In this case, the City's claims—alleging continuing trespass and nuisance— implicate and threaten to interfere with the ongoing implementation of a CERCLA cleanup that Defendants are performing under EPA's direction.  As the City's allegations reflect, Defendants have been investigating and remediating environmental contamination at the LCP Chemicals Superfund Site since 1994.  *See* Compl. ¶¶ 69, 72.  In 1995, Defendants entered into an agreement with EPA to undertake a Remedial Investigation and Feasibility Study at the Site; in 2015, EPA selected a remedy for the Site; and in 2016, Defendants entered into a Consent Decree with EPA to implement that remedy.  *See* paras. 23-28, *supra*.

64.     In its Complaint, the City effectively asks Defendants to go further than the terms of the Consent Decree and, in the process, seeks to use a state court "as a vehicle to undermine a federal court's ability to police its consent decrees." *Bartlett*, 737 F. Appx. at 546.  This is true irrespective of whether the City expressly seeks injunctive relief to alter or expand EPA's selected remedy.  *See, e.g.*, *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1249-50 (10th Cir. 2006) (recognizing that preemption was appropriate when plaintiffs' arguments "might place [defendants] in the unenviable position of being held liable for monetary damages because they are complying with an EPA-ordered remedy which [they] have no power to alter without prior EPA approval").  Under such circumstances, the substantial and disputed federal issues raised by the City's claims support this Court's jurisdiction under 28 U.S.C. § 1332.

65.     Further, and as a separate and independent basis for this Court's jurisdiction, Section 113(b) of CERCLA confers on the federal district courts "exclusive original jurisdiction over all controversies arising under [CERCLA]."  42 U.S.C. § 9613(b).  Here, the United States

(on behalf of EPA) already filed a civil action against Defendants in this Court pursuant to Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606, 9607, to address remediation of the Site. *See* EPA Complaint.  This Court approved the Consent Decree in that action and expressly "retain[ed] jurisdiction over both the subject matter of [the Consent Decree] and the Parties for the duration of the performance of the terms and provisions of [the Consent Decree]."  Consent Decree at 33 ¶ 84.  As such, this Court is the proper forum to address the City's claims challenging the sufficiency of Defendants' remedial efforts under the Consent Decree.

**B.    The City's Claim that It Is a Potentially Responsible Party Entitled to Contribution from Defendants Raises Substantial Questions of Federal Law**

66.    Separately, the City alleges that, "[a]s a direct result of Defendants' wrongful actions," it has been rendered "potentially liable for the remediation of the waste on its property."  Compl. ¶ 100.  It further contends that Defendants are "liable for all such remediation costs and damages."  *Id.*  The City thus effectively argues that it is a potentially responsible party ("PRP") under CERCLA and demands contribution from Defendants.  Such claims depend on federal law for resolution and therefore implicate substantial and disputed federal questions sufficient to support this Court's jurisdiction.

67.    A "potentially responsible party" is any person who "may be liable" under Section 107(a) of CERCLA.  40 C.F.R. § 304.12(m).  CERCLA intentionally defines such liability in broad terms.  *See* 42 U.S.C. § 9607(a).  "[E]ven parties not responsible for contamination may fall within the broad definitions of PRPs" under the statute.  *United States v. Atlantic Research Corp.*, 551 U.S. 128, 136 (2007).  That includes "'innocent' . . . landowner[s] whose land has been contaminated by another."  *Atlantic Richfield*, 140 S. Ct. at 1353 (quoting *Atlantic Research Corp.*, 551 U.S. at 136).  As the Supreme Court recently explained, broadly interpreting PRPs to "include owners of polluted property reflects the Act's objective to develop,

as its name suggests, a 'Comprehensive Environmental Response' to hazardous waste pollution." *Id.* CERCLA thus ensures "the careful development of a single EPA-led cleanup effort rather than tens of thousands of competing individual ones." *Id.*; *see also In re Acushnet River & New Bedford Harbor*, 675 F. Supp. 22, 31 (D. Mass. 1987) ("In attempting to eliminate the dangers of hazardous wastes, CERCLA presents a national solution to a nationwide problem."); *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 808 (S.D. Ohio 1983) ("The improper disposal or release of hazardous substances is an enormous and complex problem of national magnitude involving uniquely federal interests.").

68.     Assuming as true the City's allegations that it faces liability for remediation of pollution associated with the LCP Chemicals Superfund Site, CERCLA's national, uniform approach to addressing such issues is clearly implicated. That is particularly true here, where the United States (on behalf of EPA) already has filed a civil action under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606, 9607, to address remediation of the Site. *See EPA Complaint.*

69.     There are at least three questions presented by the City's allegations that turn on federal law: (1) whether the City is a PRP, (2) the extent to which the City is entitled to contribution from Defendants, and (3) the extent to which Defendants are entitled to contribution from the City, including but not limited to contribution for response costs incurred in relation to contamination released or discharged by the City. As to the latter two questions, deciding the precise scope of the City's liability for environmental contamination associated with the Site will involve the resolution of substantial questions under CERCLA. *See Atlantic Richfield*, 140 S. Ct. at 1353 (summarizing defenses regarding and limitations on the liability faced by PRPs). Moreover, the statute expressly provides for a means of seeking contribution from another PRP, such as Defendants. *See* 42 U.S.C. § 9613(f)(1) ("Any person may seek contribution from any

other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title."). At bottom, "[w]here contribution is sought by one who has had to pay damages for violating a federal statute, the scope and limitations of the right of contribution are invariably treated as questions of federal rather than state law." *Donovan v. Robbins*, 752 F.2d 1170 (7th Cir. 1985).

70. Courts have thus recognized that claims pled in state law may nonetheless remain "inextricably tied to CERCLA" and depend on the resolution of substantial questions of federal law. *New Mexico v. General Electric*, 335 F. Supp. 2d 1157, 1178 (D.N.M. 2003). For example, in *New Mexico*, plaintiffs sought damages based on contamination at a site that was already subject to ongoing remediation under CERCLA. *Id.* at 1177. Though these claims were brought under state law, the court found that plaintiff's claims "must be defined in terms of the CERCLA remedy and the scope and extent of the ongoing CERCLA remediation" given that they sought damages that were "residual at the end of the currently operated remediation system." *Id.* at 1177-78. The court thus recognized that, "in a limited respect, Congress has 'federalized' state law as it relates to recovery for injuries caused by the release of hazardous substances: such state environmental claims are 'controversies arising' under CERCLA, as well as state law, because it is the federal statute that defines when they accrue." *Id.* at 1178 (quoting *Bolin v. Cessna Aircraft Co.*, 759 F. Supp. 692, 716 (D. Kan. 1991)).

71. In this case, the City seeks damages for alleged contamination arising in connection with an ongoing remediation effort. The City does so, at least in part, because it recognizes that it is potentially liable for that contamination under CERCLA and seeks contribution from two other PRPs. The resolution of these claims necessarily implicates

substantial and disputed questions of federal law under the CERCLA statute.  These federal

questions are therefore sufficient to establish this Court's jurisdiction under 42 U.S.C. § 1332.

**III.    The City Fraudulently Joined Georgia Power and Therefore This Action Is Removable Under 28 U.S.C. §§ 1332(a) and 1441(b)**

72.     "To establish fraudulent joinder, 'the removing party has the burden of proving

[by clear and convincing evidence] that either: (1) there is no possibility the plaintiff can

establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently

pled jurisdictional facts to bring the resident defendant into state court.'"  *Stillwell v. Allstate Ins.

Co.*, 663 F.3d 1329, 1332 (11th Cir. 2011) (quoting *Crowe v. Coleman*, 113 F.3d 1536, 1538

(11th Cir. 1997)).

73.     There is no possibility that the City can establish a cause of action against Georgia

Power.

**A.     The Statute of Limitations Bars the City's Claims.**

74.     First, the City cannot establish a cause of action against Georgia Power because

Georgia Power last emitted the alleged mercury from combusting coal over fifty years ago – in

1972; therefore, the statute of limitations bars the City's claims.  *See, e.g.*, *Grancare, LLC v.

Thrower by & through Mills*, 889 F.3d 543, 548 (9th Cir. 2018) ("We have upheld rulings of

fraudulent joinder where a defendant demonstrates that a plaintiff is barred by the statute of

limitations from bringing claims against that defendant."); *Owens v. Life Ins. Co. of Georgia*,

289 F. Supp.2d 1319, 1326 (M.D. Ala. 2003) (finding fraudulent joinder due to expiration of the

statute of limitations.).

75.     Trespass and nuisance claims are subject to a four-year statute of limitation.

O.C.G.A. § 9-3-30(a).

76.     "[W]hether a nuisance is deemed to be continuing or permanent in nature determines the 'manner in which the statute of limitations will be applied.'"   *Oglethorpe Power v. Forrister*, 289 Ga. 331, 333 (2011) (quoting *City of Atlanta v. Kleber*, 285 Ga. 413, 416 (2009)).

77.     If a nuisance is not abatable, it is considered permanent.  *Forrister*, 289 Ga. at 333.  "A nuisance is deemed not abatable, even if possible to abate, if 'it is one whose character is such that, from its nature and under the circumstances of its existence, it presumably will continue indefinitely.'"  *Id.* (quoting *Bainbridge Power Co. v. Ivey*, 41 Ga. App. 193, 193 (1930)).  A permanent nuisance gives but one right of action which accrues immediately upon the creation of the nuisance.  *Kleber*, 285 Ga. at 416 (2009).

78.     Moreover, "'[i]n cases in which a public utility or governmental agency erects a harmful structure such as a bridge or conducts a harmful activity such as opening a sewer that pollutes a stream and the interference with the plaintiff's interests is not abatable by a proceeding in equity, the statutory period normally begins when the structure is completed or the activity is begun.'"  *Forrister*, 289 Ga. at 333 (quoting Restatement (Second) of Torts § 899, cmt. D).

79.     "[I]f the invasions are caused by some substantial and relatively enduring feature of the plan of construction or from an essential method of operation, then it will usually not be abatable by injunction. . . ."  *Forrister*, 289 Ga. at 334 (quoting Restatement (Second) of Torts § 930, cmt. D).

80.     Georgia Power is a public utility.

81.     Any alleged mercury emissions from Georgia Power's operations at the Site or from Plant McManus were not and are not abatable by a proceeding in equity because the alleged mercury emissions allegedly caused by burning coal to generate electricity resulted from the plan

of construction and essential method of operation of Plant McManus and/or Georgia Power's operation at the Plant Site.  Thus, the alleged trespass and/or nuisance by Georgia Power was not and is not considered abatable.

82.     The alleged trespasses and nuisances from Georgia Power's operations meet the definition of permanent nuisances – not continuing nuisances – as they are alleged in the City's Complaint.

83.     Because the City alleges the mercury was emitted from a coal-fired plant, the latest Georgia Power would have emitted the alleged mercury was 1972 – the year Georgia Power ceased combusting coal at Plant McManus.  Thus, the last alleged mercury emissions occurred more than fifty years ago.

84.     The statutory period under O.C.G.A. § 9-3-30(a) and/or its predecessor terminated, at the latest, in 1976 – four years after Plant McManus stopped allegedly emitting mercury.

85.     O.C.G.A. § 9-3-30(a) bars the City's claims against Georgia Power in their entirety because Georgia Power would have last emitted the alleged mercury over fifty years ago.

**B.     The City Has Failed to Sufficiently Allege Its Trespass and Nuisance Claims**

86.     As to the City's trespass claim, it cannot state a claim against Georgia Power because the City fails to state a prima facie claim of trespass.

87.     "'[T]he act of trespass must have been a voluntary, intentional act in that it intended the immediate consequences of the act, causing the trespass or invasion, i.e., an intended act as opposed to a negligent act.'"  *Rouse v. City of Atlanta*, 353 Ga. App. 542, 546 (2020) (quoting *Lanier v. Burnette*, 245 Ga. App. 566, 570 (2000)).

88. The City's Complaint fails to allege Georgia Power's actions were intentional for the purpose of pleading the intentionality requirement for trespass; therefore, the City cannot state a trespass claim against Georgia Power.

89. The City's Complaint fails to allege any mercury on the City's property was intentionally placed on the City's property by Georgia Power; therefore, the City cannot state a trespass claim against Georgia Power.

90. The City cannot prove any mercury on the City's property was intentionally placed by Georgia Power on the City's property; therefore, the City cannot state a trespass claim against Georgia Power.

91. Finally, the City cannot establish a nuisance claim against Georgia Power because "[t]hat which the law authorizes to be done, if done as the law authorizes, cannot be a nuisance. Thus, where the act is lawful in itself, it becomes a nuisance only when conducted in an illegal manner to the hurt, inconvenience or damage of another." *City of Douglasville v. Queen*, 270 Ga. 770, 773 (1999).

92. Georgia Power's alleged actions in Paragraphs 87 and 88 of the City's Complaint were authorized by law and done as the law authorizes. The statutes the City cites for the allegation that Georgia Power's alleged actions were illegal, O.C.G.A. §§ 12-5-29(a), (b) and 12-5-53, did not become effective until 1996 and 1986, respectively. Georgia Power could not have violated laws that did not exist at the time the alleged wrongful conduct occurred – 1937 through 1972. Accordingly, the City cannot establish a nuisance claim against Georgia Power.

93. In sum, the City fraudulently joined Georgia Power to this Action because (1) the statute of limitations bars the City's claims against Georgia Power; and, separately, (2) the City

fails to allege the elements required to state a claim for trespass against Georgia Power; and the City fails to allege Georgia Power's actions were illegal.

**C.      Diversity Jurisdiction Exists Because Georgia Power Was Fraudulently Joined**

94.      The City is a citizen of the State of Georgia.  Honeywell is a corporation incorporated under the laws of the State of Delaware.  Its principal place of business is 855 S. Mint Street, Charlotte, North Carolina 29201.  Honeywell is therefore a citizen of the States of Delaware and North Carolina.  Georgia Power is a citizen of the State of Georgia; however, as shown above, Georgia Power was fraudulently joined to this Action to defeat Diversity Jurisdiction under 28 U.S.C. § 1332(a).  Thus, all of the properly joined parties are citizens of different states under 28 U.S.C. § 1332(a)(1).

95.      The amount in controversy exceeds $75,000 under 28 U.S.C. 1332(a).  The City alleges more than fifty years of tortious conduct causing damage to hundreds or thousands of acres of the City's property – all allegations the Defendants dispute.

96.      Accordingly, because the properly joined parties to this Action have diversity of citizenship and this Action meets the amount in controversy requirement, this Action is removable under 28 U.S.C. 1441(b).

## COMPLIANCE WITH OTHER REMOVAL REQUIREMENTS

97.      Based on the foregoing, this Court has original jurisdiction of this Action under 28 U.S.C. §§ 1331, 1441, and 1442(a).

98.      The United States District Court for the Southern District of Georgia is the appropriate venue for removal under 28 U.S.C. § 1441(a) because it is the federal judicial district encompassing the Superior Court of Glynn County, Georgia, where this suit was originally filed.

99.     Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders from the State Court Action are attached hereto as **Exhibit E**.

100.    Pursuant to 28 U.S.C. § 1446(d), Honeywell will promptly file a copy of this Notice of Removal, as well as a Notice of Filing of this Notice of Removal, with the clerk of the Superior Court of Glynn County, Georgia, and serve a copy of the same on the City.

101.    Honeywell reserves all defenses and objections available under applicable law, and the filing of this Notice of Removal is subject to, and without waiver of, any such defenses or objections.

<u>**CONCLUSION**</u>

For the foregoing reasons, Honeywell and Georgia Power respectfully give notice that this Action is hereby removed from the Superior Court of Glynn County, Georgia, to the United States District Court for the Southern District of Georgia.

RESPECTFULLY SUBMITTED, this 18th day of November, 2022.

*/s/ Mark D. Johnson*
Mark D. Johnson
Georgia Bar No. 395041

*/s/ Amber M. Carter*
Amber M. Carter
Georgia Bar No. 631649

Gilbert, Harrell, Sumerford & Martin, P.C.
777 Gloucester St., Ste. 200
Brunswick, GA 31520
P: (912)265-6700
F: (912)264-0244
mjohnson@gilbertharrelllaw.com
acarter@gilbertharrelllaw.com

***Attorneys for Defendant***

30

**Honeywell International, Inc. f/k/a Allied Chemical Corporation and as AlliedSignal, Inc.**

/s/ Benjamin H. Brewton
Benjamin H. Brewton
Georgia Bar No. 002530

/s/ T. Joshua R. Archer
T. Joshua R. Archer
Georgia Bar No. 021208

Balch & Bingham LLP
801 Broad Street
Suite 800
Augusta, Georgia 30901
P: (706)842-3711
F: (866)258-8984
bbrewton@balch.com
jarcher@balch.com

**Attorneys for Defendant
The Georgia Power Company**

## CERTIFICATE OF SERVICE

I, Mark D. Johnson, certify that I have electronically filed the foregoing DEFENDANT

HONEYWELL INTERNATIONAL, INC. AND DEFENDANT THE GEORGIA POWER

COMPANY'S NOTICE OF REMOVAL with the Clerk of the Court using the CM/ECF system

which will automatically send electronic mail notification of such filing to counsel of record who

are CM/ECF participants; I have also emailed the pleading upon all parties to this matter; and I

have also deposited a true copy of the same in the United States Mail, proper postage prepaid as

follows:

John C. Bell, Jr
Pamela S. James
THE BELL FIRM
PO Box 1547
Augusta, Georgia 30903-1547
(706)722-2014
john@bellfirm.net
pam@bellfirm.net

Robert P. Killian
KILLIAN LAW FIRM LLC
47 Professional Drive
Brunswick, Georgia 31520
(912)263-9520
bob@killianlawfirm.com

Brian Donald Corry
McQUIGG SMITH & CORRY
504 Beachview Drive
Suite 3D
Saint Simons Island, Georgia 31522
(912)638-1174
brian@msclawga.com

*Attorneys for Plaintiff*

Respectfully submitted this 18th day of November, 2022.

*/s/ Mark D. Johnson*

Gilbert, Harrell, Sumerford & Martin, P.C.
777 Gloucester St., Ste. 200
Brunswick, GA 31520
P: (912)265-6700
F: (912)264-0244
mjohnson@gilbertharrelllaw.com

*Attorney for Honeywell International, Inc.*
*f/k/a Allied Chemical Corporation and as*
*AlliedSignal, Inc.*