# Exhibit A

Signed Consent Decree

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

UNITED STATES OF AMERICA,　　　　　　 )
　　　　　　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)　　Civil Action No. 2:16-cv-00112
HONEYWELL INTERNATIONAL INC.　　　　　)
and GEORGIA POWER COMPANY,　　　　　　)
　　　　　　　　　Defendants.　　　　　　　)

## CONSENT DECREE FOR REMEDIAL DESIGN AND REMEDIAL ACTION AT OPERABLE UNIT ONE OF THE LCP CHEMICALS SUPERFUND SITE



# TABLE OF CONTENTS

I.      BACKGROUND .................................................................................................. 1
II.     JURISDICTION ................................................................................................. 2
III.    PARTIES BOUND ............................................................................................. 2
IV.     DEFINITIONS .................................................................................................... 3
V.      GENERAL PROVISIONS ................................................................................. 6
VI.     PERFORMANCE OF THE WORK ................................................................... 7
VII.    REMEDY REVIEW ........................................................................................... 9
VIII.   PROPERTY REQUIREMENTS ........................................................................ 9
IX.     FINANCIAL ASSURANCE ............................................................................ 14
X.      PAYMENTS FOR RESPONSE COSTS .......................................................... 17
XI.     INDEMNIFICATION AND INSURANCE ...................................................... 19
XII.    FORCE MAJEURE .......................................................................................... 20
XIII.   DISPUTE RESOLUTION ................................................................................ 21
XIV.    STIPULATED PENALTIES ............................................................................. 23
XV.     COVENANTS BY PLAINTIFF ....................................................................... 26
XVI.    COVENANTS BY SDs ..................................................................................... 28
XVII.   EFFECT OF SETTLEMENT; CONTRIBUTION ............................................ 29
XVIII.  ACCESS TO INFORMATION ......................................................................... 30
XIX.    RETENTION OF RECORDS ........................................................................... 31
XX.     NOTICES AND SUBMISSIONS ..................................................................... 32
XXI.    RETENTION OF JURISDICTION ................................................................... 33
XXII.   APPENDICES ................................................................................................... 34
XXIII.  MODIFICATION .............................................................................................. 34
XXIV.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ....................... 34
XXV.    SIGNATORIES/SERVICE ............................................................................... 34
XXVI.   FINAL JUDGMENT ......................................................................................... 35

# I.   BACKGROUND

A.      The United States of America (United States), on behalf of the Administrator of the United States Environmental Protection Agency (EPA), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9606 and 9607.

B.      The United States in its complaint seeks, *inter alia*: (1) reimbursement of costs incurred by EPA and the Department of Justice (DOJ) for response actions at Operable Unit One of the LCP Chemicals Superfund Site in Brunswick, Glynn County, Georgia, together with accrued interest; and (2) performance of response actions by the defendants at Operable Unit One of the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 (NCP).

C.      In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of Georgia (State) on September 28, 2015, of negotiations with Atlantic Richfield Company, Inc., Georgia Power Company, and Honeywell International Inc.—the potentially responsible parties (PRPs)—regarding the implementation of the remedial design and remedial action (RD/RA) for Operable Unit One of the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree (CD).

D.      In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the U.S. Department of the Interior and the National Oceanic and Atmospheric Administration on September 28, 2015, of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustees to participate in the negotiation of this CD.

E.      The Settling Defendants (SDs) do not admit any liability to Plaintiff arising out of the transactions or occurrences alleged in the complaint, nor do they acknowledge that the release or threatened release of hazardous substance(s) at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

F.      Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List (NPL), set forth at 40 C.F.R. Part 300, Appendix B, by publication in the *Federal Register* on June 17, 1996, 61 Fed. Reg. 30,510.

G.      In response to a release or a substantial threat of a release of a hazardous substance(s) at or from the Site, SDs commenced on July 6, 1995, a Remedial Investigation and Feasibility Study (RI/FS) for the Site pursuant to 40 C.F.R. § 300.430.

H.      SDs completed a Remedial Investigation (RI) Report in November of 2012, and SDs completed a Feasibility Study (FS) Report on August 25, 2015.

I.      Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the FS and of the proposed plan for remedial action on December 1, 2014, in the *Brunswick News*, a major local newspaper of general circulation. EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting is available to the public as part of the

administrative record upon which the Director of the Superfund Division, EPA Region 4, based the selection of the response action.

     J.     The decision by EPA on the remedial action to be implemented at Operable Unit One of the Site is embodied in a final Record of Decision (ROD), executed on September 22, 2015, on which the State had a reasonable opportunity to review and comment/on which the State has given its concurrence. The ROD includes a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

     K.     Based on the information presently available to EPA, EPA believes that the Work will be properly and promptly conducted by SDs if conducted in accordance with this CD and its appendices.

     L.     Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD and the Work to be performed by SDs shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

     M.     The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated by the Parties in good faith and implementation of this CD will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

     NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.    JURISDICTION

     1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over SDs. Solely for the purposes of this CD and the underlying complaint, SDs waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. SDs shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD.

## III.    PARTIES BOUND

     2.     This CD is binding upon the United States and upon SDs and their successors and assigns. Any change in ownership or corporate or other legal status of a SD including, but not limited to, any transfer of assets or real or personal property, shall in no way alter such SD's responsibilities under this CD.

     3.     SDs shall provide a copy of this CD to each contractor hired to perform the Work and to each person representing any SD with respect to the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. SDs or their contractors shall provide written notice of the CD to all subcontractors hired to perform any portion of the Work. SDs shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Work in accordance with the terms of this CD. With regard to the activities undertaken pursuant to this CD, each contractor and subcontractor

shall be deemed to be in a contractual relationship with SDs within the meaning of
Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.    DEFINITIONS

4.        Unless otherwise expressly provided in this CD, terms used in this CD that are
defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning
assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in
this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

"Affected Property" shall mean all real property at Operable Unit One of the Site and any
other real property where EPA determines, at any time, that access, land, water, or other resource
use restrictions, and/or ICs are needed to implement the Remedial Action for Operable Unit One,
including, but not limited to, the area known as the LCP Chemicals marsh, which occupies
approximately 760 acres and is bordered by a former Glynn County land disposal facility and a
pistol firing range to the north, Ross Road to the east, the Turtle River and associated marshes to
the west, and the Brunswick Cellulose plant to the south. The Affected Property is in the
immediate vicinity of the facility at 4125 Ross Road, Brunswick, Georgia, and is depicted
generally on the map attached as *Appendix C*.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and
Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "CD" shall mean this consent decree and all appendices attached
hereto (listed in Section XXII). In the event of conflict between this CD and any appendix, this
CD shall control.

"Day" or "day" shall mean a calendar day. In computing any period of time under this
CD, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period
shall run until the close of business of the next working day.

"DOJ" shall mean the United States Department of Justice and its successor departments,
agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the approval of this CD is recorded on
the Court's docket.

"EPA" shall mean the United States Environmental Protection Agency and its successor
departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund
established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and
indirect costs, that the United States incurs in reviewing or developing deliverables submitted
pursuant to this CD, in overseeing implementation of the Work, or otherwise implementing,
overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs,
travel costs, laboratory costs, the costs incurred pursuant to ¶ 11 (Emergencies and Releases),
¶ 12 (Community Involvement) (including the costs of any technical assistance grant under
Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 27 (Access to Financial Assurance),

3

Section VII (Remedy Review), Section VIII (Property Requirements) (including the cost of attorney time and any monies paid to secure access and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XIII (Dispute Resolution), and all litigation costs. Future Response Costs shall also include: all Interim Response Costs; and all Agency for Toxic Substances and Disease Registry (ATSDR) costs paid at or in connection with the Site since August 25, 2015.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the RA; and/or (c) provide information intended to modify or guide human behavior at or in connection with the Site.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at http://www.epa.gov/ocfopage/finstatement/superfund/int_rate.htm.

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States in connection with the Site between August 25, 2015 and the Effective Date, or (b) incurred prior to the Effective Date but paid by the United States after that date.

"LCP Chemicals Superfund Site Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3), in the Administrative Settlement Agreement and Order on Consent for Removal Action, U.S. EPA Region 4 Docket No. CERCLA-04-2007-3760, which took effect on April 18, 2007.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Settling Owner" shall mean any person, other than a SD, that owns or controls any Affected Property, including the State of Georgia. The clause "Non-Settling Owner's Affected Property" means Affected Property owned or controlled by Non-Settling Owner.

"Operable Unit One" or "OU1" shall mean the LCP Chemicals marsh, which occupies approximately 760 acres immediately northwest of Brunswick, Glynn County, Georgia. Operable Unit One is bordered by a former Glynn County land disposal facility and a pistol firing range on the north, Ross Road on the east, the Turtle River and associated marshes to the west, and the Brunswick Cellulose plant to the south. The LCP Chemicals marsh consists of approximately 662 acres of flat, vegetated tidal marsh and 98 acres of tidal creeks. Operable Unit One is depicted generally on the map attached as *Appendix C*.

4

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the RA as specified in the SOW or any EPA-approved O&M Plan.

"Owner SD" shall mean any SD that owns or controls any Affected Property, including Honeywell International Inc. The clause "Owner SD's Affected Property" means Affected Property owned or controlled by Owner SD.

"Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States and SDs.

"Performance Standards" shall mean the cleanup levels and other measures of achievement of the remedial action objectives, as set forth in the ROD.

"Plaintiff" shall mean the United States.

"Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded in the appropriate land records office.

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to Operable Unit One of the Site signed on September 22, 2015, by the Regional Administrator, EPA Region 4, or his/her delegate, and all attachments thereto. The ROD is attached as *Appendix A*.

"Remedial Action" or "RA" shall mean the remedial action selected in the ROD.

"Remedial Design" or "RD" shall mean those activities to be undertaken by SDs to develop final plans and specifications for the RA as stated in the SOW.

"Section" shall mean a portion of this CD identified by a Roman numeral.

"Settling Defendants" or "SDs" shall mean Georgia Power Company and Honeywell International Inc.

"Site" shall mean the LCP Chemicals Superfund Site, located at 4125 Ross Road in Brunswick, Glynn County, Georgia, and depicted generally on the map attached as *Appendix C*. The Site has been organized into three operable units (OUs): OU1, the LCP Chemicals marsh; OU2, the Site's groundwater, including the surface and subsurface soil of a former mercury cell building area; and OU3, the remaining uplands, excluding the mercury cell building area.

"State" shall mean the State of Georgia.

"Statement of Work" or "SOW" shall mean the document describing the activities SDs must perform to implement the RD, the RA, and O&M regarding Operable Unit One of the Site, which is attached as *Appendix B*.

"Supervising Contractor" shall mean the principal contractor retained by SDs to supervise and direct the implementation of the Work under this CD.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any "hazardous substance" under Section 12-14-1(4) of the Georgia Code, O.C.G.A. § 12-14-1(4).

"Work" shall mean all activities and obligations SDs are required to perform under this CD, except the activities required under Section XIX (Retention of Records).

## V.    GENERAL PROVISIONS

5.    **Objectives of the Parties**. The objectives of the Parties in entering into this CD are to protect public health or welfare or the environment by the design and implementation of response actions at Operable Unit One of the Site by SDs, to pay response costs of Plaintiff, and to resolve the claims of Plaintiff against SDs as provided in this CD.

6.    **Commitments by SDs**.

a.    SDs shall finance and perform the Work in accordance with this CD and all deliverables developed by SDs and approved or modified by EPA pursuant to this CD. SDs shall pay the United States for its response costs as provided in this CD.

b.    SDs' obligations to finance and perform the Work, including obligations to pay amounts due under this CD, are joint and several. In the event of the insolvency of any SD or the failure by any SD to implement any requirement of this CD, the remaining SDs shall complete all such requirements.

7.    **Compliance with Applicable Law**. Nothing in this CD limits SDs' obligations to comply with the requirements of all applicable federal and state laws and regulations. SDs must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD and the SOW. The activities conducted pursuant to this CD, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

6

8. **Permits**.

a.    As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, SDs shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.    SDs may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and required for the Work, provided that they have submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

c.    This CD is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## VI.    PERFORMANCE OF THE WORK

9.    **Coordination and Supervision**.

a.    **Project Coordinators**.

(1)    SDs' Project Coordinator must have sufficient technical expertise to coordinate the Work. SDs' Project Coordinator may not be an attorney representing any SD in this matter and may not act as the Supervising Contractor. SDs' Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

(2)    EPA shall designate and notify the SDs of its Project Coordinator and Alternate Project Coordinator, if any. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3)    SDs shall meet regularly with EPA as directed or determined by EPA.

b.    **Supervising Contractor**. SDs' proposed Supervising Contractor must have a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c. **Procedures for Disapproval/Notice to Proceed**.

    (1)    SDs shall designate, and notify EPA, within 30 days after the Effective Date, of the name, contact information, and qualifications of the SDs' proposed Project Coordinator and Supervising Contractor.

    (2)    EPA, after a reasonable opportunity for review and comment by the State, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, SDs shall, within 30 days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. SDs may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of SDs' selection.

    (3)    SDs may change their Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

10.    **Performance of Work in Accordance with SOW**. SDs shall: (a) develop the RD; (b) perform the RA; and (c) operate, maintain, and monitor the effectiveness of the RA; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA in accordance with ¶ 6.6 (Approval of Deliverables) of the SOW.

11.    **Emergencies and Releases**. SDs shall comply with the emergency and release response and reporting requirements under ¶ 4.3 (Emergency Response and Reporting) of the SOW. Subject to Section XV (Covenants by Plaintiff), nothing in this CD, including ¶ 4.3 of the SOW, limits any authority of Plaintiff: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to SDs' failure to take appropriate response action under ¶ 4.3 of the SOW, EPA takes such action instead, SDs shall reimburse EPA under Section X (Payments for Response Costs) for all costs of the response action.

12.    **Community Involvement**. If requested by EPA, SDs shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator and implementation of a technical assistance plan. Costs incurred by the United States under this Section constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

13.    **Modification of SOW or Related Deliverables**.

    a.    If EPA determines that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the

8

Performance Standards or to carry out and maintain the effectiveness of the RA, and such modification is consistent with the Scope of the Remedy set forth in ¶ 1.3 of the SOW, then EPA may notify SDs of such modification. If SDs object to the modification they may, within 30 days after EPA's notification, seek dispute resolution under Section XIII.

    b.  The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if SDs invoke dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and SDs shall implement all work required by such modification. SDs shall incorporate the modification into the deliverable required under the SOW, as appropriate.

    c.  Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this CD.

  14.  Nothing in this CD, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by Plaintiff that compliance with the work requirements set forth in the SOW or related deliverable will achieve the Performance Standards.

## VII. REMEDY REVIEW

  15.  **Periodic Review**. SDs shall conduct, in accordance with ¶ 6.7(k) (Periodic Review Support Plan) of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the RA is protective of human health and the environment.

## VIII. PROPERTY REQUIREMENTS

  16.  **Notice Requirement**. The SDs shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure Non-Settling Owner's cooperation in placing signs around the Affected Property that designate the area as being subject to a commercial fishing ban and fish consumption advisory as determined by the Georgia Department of Natural Resources; and Owner SD shall, with respect to Owner SD's Affected Property, place signs around the Affected Property that designate the area as being subject to a commercial fishing ban and fish consumption advisory as determined by the Georgia Department of Natural Resources. This requirement shall continue until EPA certifies that the RA is complete according to ¶ 4.6 (Certification of RA Completion) of the SOW, or until such time that there are no longer any applicable fishing restrictions or fish consumption advisories, whichever is sooner.

  17.  **Proprietary Controls**. SDs shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure Non-Settling Owner's cooperation in executing and recording; and Owner SD shall, with respect to Owner SD's Affected Property, execute and record, in accordance with the procedures of this ¶ 17, Proprietary Controls that: (i) grant a right of access to conduct any activity regarding the CD, including those activities listed in ¶ 17.a; and (ii) grant the right to enforce the land, water, or other resource use restrictions set forth in ¶ 17.b.

    a.  **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

      (1)  Monitoring the Work;

(2)     Verifying any data or information submitted to the United States;

(3)     Conducting investigations regarding contamination at or near the Site;

(4)     Obtaining samples;

(5)     Assessing the need for, planning, or implementing additional response actions at or near the Site;

(6)     Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

(7)     Implementing the Work pursuant to the conditions set forth in ¶ 62 (Work Takeover);

(8)     Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by SDs or their agents, consistent with Section XVIII (Access to Information);

(9)     Assessing SDs' compliance with the CD;

(10)    Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD; and

(11)    Implementing, monitoring, maintaining, reporting on, and enforcing any Institutional Controls.

b.      **Land, Water, or Other Resource Use Restrictions**. Any activity that will disturb the caps to be built on segments of the Affected Property as part of the Remedial Action is prohibited because such activities could result in direct or indirect exposure to contaminants in sediments and surface water.

c.      **Grantees**. The Proprietary Controls must be granted to one or more of the following persons and their representatives, as determined by EPA: the United States, the State, SDs, Owner SDs, if any, and other appropriate grantees. Any Proprietary Controls in the nature of a restrictive covenant consistent with the requirements of the Uniform Environmental Covenants Act (UECA) granted to persons other than the United States must include: (1) a designation that EPA (and/or the State as appropriate) is an "agency" or a party expressly granted the right of access; and (2) the right to enforce the covenants allowing EPA and/or the State to maintain the right to enforce the Proprietary Controls without acquiring an interest in real property.

d.      **Initial Title Evidence**. SDs and Owner SD shall, within 180 days after the Effective Date:

(1)     **Record Title Evidence**. Submit to EPA a title insurance commitment or other title evidence acceptable to EPA that: (i) names the proposed insured or the party in whose favor the title evidence runs, or the party who will hold the

10

real estate interest, or if that party is uncertain, names the United States, the State, the SD, or "To Be Determined;" (ii) covers the Affected Property that is to be encumbered; (iii) demonstrates that the person or entity that will execute and record the Proprietary Controls is the owner of such Affected Property; (iv) identifies all record matters that affect title to the Affected Property, including all prior liens, claims, rights (such as easements), mortgages, and other encumbrances (collectively, "Prior Encumbrances"); and (v) includes complete, legible copies of such Prior Encumbrances; and

(2) **Non-Record Title Evidence.** Submit to EPA a report of the results of an investigation, including a physical inspection of the Affected Property, which identifies non-record matters that could affect the title, such as unrecorded leases or encroachments.

e. **Release or Subordination of Prior Liens, Claims, and Encumbrances.**

(1) SDs and Owner SD shall secure the release, subordination, modification, or relocation of all Prior Encumbrances on the title to the Affected Property revealed by the title evidence or otherwise known to the SDs or Owner SD unless EPA waives this requirement as provided under ¶¶ 17.e(2)-(4).

(2) SDs and Owner SD may, by the deadline under ¶ 17.d, submit an initial request for waiver of the requirements of ¶ 17.e(1) regarding one or more Prior Encumbrances, on the grounds that such Prior Encumbrances cannot defeat or adversely affect the rights to be granted by the Proprietary Controls and cannot interfere with the remedy or result in unacceptable exposure to Waste Material.

(3) SDs and Owner SD may, within 180 days after the Effective Date, or if an initial waiver request has been filed, within 45 days after EPA's determination on the initial waiver request, submit a final request for a waiver of the requirements of ¶ 17.e(1) regarding any particular Prior Encumbrance on the grounds that SDs or Owner SD could not obtain the release, subordination, modification, or relocation of such Prior Encumbrance despite best efforts.

(4) The initial and final waiver requests must include supporting evidence including descriptions of and copies of the Prior Encumbrances and maps showing areas affected by the Prior Encumbrances. The final waiver request also must include evidence of efforts made to secure release, subordination, modification, or relocation of the Prior Encumbrances.

(5) SDs and Owner SD shall complete their obligations under ¶ 17.e(1) regarding all Prior Encumbrances: within 270 days after the Effective Date; or if an initial waiver request has been filed, within 135 days after EPA's determination on the initial waiver request; or if a final waiver request has been filed, within 90 days after EPA's determination on the final waiver request.

f.     **Update to Title Evidence and Recording of Proprietary Controls**.

(1)     SDs and Owner SD shall submit to EPA for review and approval, by the deadline specified in ¶ 17.e(5), all draft Proprietary Controls and draft instruments addressing Prior Encumbrances.

(2)     Upon EPA's approval of the proposed Proprietary Controls and instruments addressing Prior Encumbrances, SDs and Owner SD shall, within 30 days, update the original title insurance commitment (or other evidence of title acceptable to EPA) under ¶ 17.d. If the updated title examination indicates that no liens, claims, rights, or encumbrances have been recorded since the effective date of the original commitment (or other title evidence), SDs and Owner SD shall secure the immediate recordation of the Proprietary Controls and instruments addressing Prior Encumbrances in the appropriate land records. Otherwise, SDs and Owner SD shall secure the release, subordination, modification, or relocation under ¶ 17.e(1), or the waiver under ¶¶ 17.e(2)-(4), regarding any newly-discovered liens, claims, rights, and encumbrances, prior to recording the Proprietary Controls and instruments addressing Prior Encumbrances.

(3)     If SDs submitted a title insurance commitment under ¶ 17.d(1), then upon the recording of the Proprietary Controls and instruments addressing Prior Encumbrances, SDs and Owner SD shall obtain a title insurance policy that: (i) is consistent with the original title insurance commitment; (ii) is for $100,000 or other amount approved by EPA; (iii) is issued to the United States, SDs, or other person approved by EPA; and (iv) is issued on a current American Land Title Association (ALTA) form or other form approved by EPA.

(4)     SDs and Owner SD shall, within 30 days after recording the Proprietary Controls and instruments addressing Prior Encumbrances, or such other deadline approved by EPA, provide to the United States and to all grantees of the Proprietary Controls: (i) certified copies of the recorded Proprietary Controls and instruments addressing Prior Encumbrances showing the clerk's recording stamps; and (ii) the title insurance policy(ies) or other approved form of updated title evidence dated as of the date of recording of the Proprietary Controls and instruments.

g.     SDs shall monitor, maintain, enforce, and annually report on all Proprietary Controls required under this CD.

h.     Owner SD shall not Transfer its Affected Property until it has executed and recorded all Proprietary Controls and instruments addressing Prior Encumbrances regarding such Affected Property in accordance with this ¶ 17.

18.     **Agreements Regarding Access and Non-Interference.**

a.     SDs shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by SDs and by Plaintiff, providing that such Non-Settling Owner, and Owner SD shall, with respect to Owner SD's Affected Property:

12

(1)     Provide Plaintiff and the other SDs, and their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the CD, including those listed in ¶ 17.a (Access Requirements); and

(2)     Refrain from using such Affected Property in any manner that EPA determines will: (i) pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or (ii) interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action. The restrictions include those listed in ¶ 17.b (Land, Water, or Other Resource Use Restrictions).

b.     Owner SD shall not Transfer its Affected Property without first securing EPA's approval of, and transferee's consent to, an agreement that: (i) is enforceable by SDs and Plaintiff; and (ii) requires the transferee to provide access to and to refrain from using the Affected Property to the same extent as is provided under ¶ 18.a.

19.     **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of SDs and Owner SD would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure Proprietary Controls, agreements, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. If SDs and Owner SD are unable to accomplish what is required through "best efforts" in a timely manner, they shall notify the EPA and include a description of the steps taken to comply with the requirements. If the United States deems it appropriate, it may assist SDs or Owner SD or take independent action in obtaining such Proprietary Controls, agreements, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. All costs incurred by the United States in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

20.     If EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are needed, SDs shall cooperate with EPA's efforts to secure and ensure compliance with such Institutional Controls.

21.     In the event of any Transfer of the Affected Property, unless the United States otherwise consents in writing, SDs shall continue to comply with their obligations under the CD, including their obligation to provide and/or secure access, to implement, maintain, monitor, and report on Institutional Controls, and to abide by such Institutional Controls.

22.     Notwithstanding any provision of the CD, Plaintiff retains all of its access authorities and rights, as well as all of its rights to require Institutional Controls, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statute or regulations.

13

## IX.   FINANCIAL ASSURANCE

23.     In order to ensure completion of the Work, SDs shall secure financial assurance, initially in the amount of $28,600,000.00 ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance must be one or more of the mechanisms listed in ¶ 23.a-g below, in a form substantially identical to the relevant sample documents available from the "Financial Assurance" category on the Cleanup Enforcement Model Language and Sample Documents Database at http://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. SDs may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, escrow accounts, and/or insurance policies.

a.     A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.     One or more irrevocable letters of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.     A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

d.     A policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

e.     A demonstration by one or more SDs that each such SD meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee, accompanied by a standby funding commitment, which obligates SDs to pay funds to or at the direction of EPA, up to the amount financially assured through the use of this demonstration in the event of a Work Takeover; or

f.     A guarantee to fund or perform the Work executed in favor of EPA by one of the following: (1) a direct or indirect parent company of a SD; or (2) a company that has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with a SD; provided, however, that any company providing such a guarantee must demonstrate to EPA's satisfaction that it meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

g.     An escrow account that provides EPA security and rights equivalent to those provided by a trust fund that meets the requirements of 40 C.F.R. § 264.151(a)(1) to finance the Work in accordance with this CD.  The escrow account shall provide that the funds placed therein are specifically and irrevocably reserved for the Work.  At EPA's request, SDs

14

shall make available to EPA any financial reports or other similar documents prepared by the escrow agent or other person responsible for approving payments out of the escrow account. Upon the issuance of the Certification of Work Completion under ¶ 4.7 (Certification of Work Completion) of the SOW, any funds remaining in the escrow account may be disbursed to SDs.

24.　　SDs have selected, and EPA has found satisfactory, as an initial financial assurance, a letter of credit pursuant to Paragraph 23.b. The letter of credit may be reduced in accordance with ¶ 28 (Modification of Financial Assurance) as the Work is performed. Within 30 days after the Effective Date, or 30 days after EPA's approval of the form and substance of SDs' financial assurance, whichever is later, SDs shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance. Within 60 days after the Effective Date, or 30 days after EPA's approval of the form and substance of SDs' financial assurance, whichever is later, SDs shall submit such mechanisms and documents to Paula V. Painter, Program Analyst, Superfund Enforcement & Community Engagement Branch, 61 Forsyth Street SW, Atlanta, Georgia, 30303, and to the United States and EPA as specified in Section XX (Notices and Submissions).

25.　　If SDs provide financial assurance by means of a demonstration or guarantee under ¶ 23.e or 23.f, the affected SDs shall also comply and shall ensure that their guarantors comply with the other relevant criteria and requirements of 40 C.F.R. § 264.143(f) and this Section, including, but not limited to: (a) the initial submission to EPA of required documents from the affected entity's chief financial officer and independent certified public accountant no later than 30 days after the Effective Date; (b) the annual resubmission of such documents within 90 days after the close of each such entity's fiscal year; and (c) the notification of EPA no later than 30 days, in accordance with ¶ 26, after any such entity determines that it no longer satisfies the relevant financial test criteria and requirements set forth at 40 C.F.R. § 264.143(f)(1). SDs agree that EPA may also, based on a belief that an affected entity may no longer meet the financial test requirements of ¶ 23.e or 23.f, require reports of financial condition at any time from such entity in addition to those specified in this Paragraph. For purposes of this Section, references in 40 C.F.R. Part 264, Subpart H, to: (1) the terms "current closure cost estimate," "current post-closure cost estimate," and "current plugging and abandonment cost estimate" include the Estimated Cost of the Work; (2) the phrase "the sum of the current closure and post-closure cost estimates and the current plugging and abandonment cost estimates" includes the sum of all environmental obligations (including obligations under CERCLA, RCRA, and any other federal, state, or tribal environmental obligation) guaranteed by such company or for which such company is otherwise financially obligated in addition to the Estimated Cost of the Work under this CD; (3) the terms "owner" and "operator" include each SD making a demonstration or obtaining a guarantee under ¶ 23.e or 23.f; and (4) the terms "facility" and "hazardous waste management facility" include the Site.

26.　　SDs shall diligently monitor the adequacy of the financial assurance. If any SD becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, such SD shall notify EPA of such information within 10 days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the affected SD of such determination. SDs shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure

15

and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for the affected SD, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 120 days. SDs shall follow the procedures of ¶ 28 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. SDs' inability to secure and submit to EPA financial assurance in accordance with this Section shall in no way excuse performance of any other requirements of this CD, including, without limitation, the obligation of SDs to complete the Work in accordance with the terms of this CD.

27. **Access to Financial Assurance.**

a. If EPA issues a notice of implementation of a Work Takeover under ¶ 62.b, then, in accordance with any applicable financial assurance mechanism and/or related standby funding commitment, EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with ¶ 27.c.

b. If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel such mechanism, and the affected SD fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 27.c.

c. If, upon issuance of a notice of implementation of a Work Takeover under ¶ 62.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism and/or related standby funding commitment, whether in cash or in kind, to continue and complete the Work; or (2) the financial assurance is provided under ¶ 23.e or 23.f, then EPA may demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. SDs shall, within 30 days of such demand, pay the amount demanded as directed by EPA.

d. Any amounts required to be paid under this ¶ 27 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the LCP Chemicals Superfund Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

e. All EPA Work Takeover costs not paid under this ¶ 27 must be reimbursed as Future Response Costs under Section X (Payments for Response Costs).

28. **Modification of Amount, Form, or Terms of Financial Assurance.** SDs may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with ¶ 24, and must include an

16

estimate of the cost of the remaining Work, an explanation of the basis for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify SDs of its decision to accept or reject a requested reduction or change pursuant to this Paragraph. SDs may reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution). Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall be made in EPA's sole and unreviewable discretion, and such decision shall not be subject to challenge by SDs pursuant to the dispute resolution provisions of this CD or in any other forum. Within 30 days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, SDs shall submit to EPA documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with ¶ 24.

29.    **Release, Cancellation, or Discontinuation of Financial Assurance**. SDs may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under ¶ 4.7 (Certification of Work Completion) of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under to Section XIII (Dispute Resolution).

## X.    PAYMENTS FOR RESPONSE COSTS

30.    **Payments by SDs for Future Response Costs**. SDs shall pay to EPA all Future Response Costs not inconsistent with the NCP.

a.    On a periodic basis, EPA will send SDs a bill requiring payment that includes a SCORPIOS Report, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ. EPA will endeavor to send such bills on an annual basis, but failure to send a bill annually shall not affect EPA's right to collect under this Section. SDs shall make all payments within 30 days after SDs' receipt of each bill requiring payment, except as otherwise provided in ¶ 32, in accordance with ¶ 31.a (instructions for future response cost payments).

b.    **Deposit of Future Response Costs Payments**. The total amount to be paid by SDs pursuant to ¶ 30.a shall be deposited by EPA in the LCP Chemicals Superfund Site Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the LCP Chemicals Superfund Site Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site. Any decision by EPA to deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund for this reason shall not be subject to challenge by SDs pursuant to the dispute resolution provisions of this CD or in any other forum.

17

31. **Payment Instructions for SDs: Future Response Costs Payments and Stipulated Penalties.**

       a.     For all payments subject to this ¶ 31.a, SDs shall make such payment by Fedwire EFT, referencing the Site/Spill ID and DJ numbers. The Fedwire EFT payment must be sent as follows:

> Federal Reserve Bank of New York
> ABA = 021030004
> Account = 68010727
> SWIFT address = FRNYUS33
> 33 Liberty Street
> New York NY 10045
> Field Tag 4200 of the Fedwire message should read
>       "D 68010727 Environmental Protection Agency"

       b.     For all payments made under ¶ 31.a, SDs must include references to the Site/Spill ID and DJ numbers. At the time of any payment required to be made in accordance with ¶ 31.a, SDs shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 83. All notices must include references to the Site/Spill ID and DJ numbers.

32.     **Contesting Future Response Costs.** SDs may submit a Notice of Dispute, initiating the procedures of Section XIII (Dispute Resolution), regarding any Future Response Costs billed under ¶ 30 (Payments by SDs for Future Response Costs) if they determine that EPA has made an accounting error or included a cost item that is not within the definition of Future Response Costs, or if they believe EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of Dispute shall be submitted in writing within 30 days after receipt of the bill and must be sent to the United States pursuant to Section XX (Notices and Submissions). Such Notice of Dispute shall specifically identify the contested Future Response Costs and the basis for objection. If SDs submit a Notice of Dispute, SDs shall pay all uncontested Future Response Costs to the United States within 30 days after SDs' receipt of the bill requiring payment. Simultaneously, SDs shall establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC), and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. SDs shall send to the United States, as provided in Section XX (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States prevails in the dispute, SDs shall pay the sums due (with accrued interest) to the United States within 10 days after the resolution of the dispute. If SDs prevail concerning any aspect of the contested costs, SDs shall pay that portion of the costs (plus associated accrued interest) for which they did not prevail to the United States within seven days after the resolution of the dispute. SDs shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶¶ 31.a

18

(instructions for future response cost payments). The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIII (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding SDs' obligation to reimburse the United States for its Future Response Costs.

33.    **Interest**. In the event that any payment for Future Response Costs required under this Section is not made by the date required, SDs shall pay Interest on the unpaid balance. The Interest on Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of SDs' payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiffs by virtue of SDs' failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to ¶ 49 (Stipulated Penalty Amounts – Work). EPA may waive payment of any accrued interest.

## XI.    INDEMNIFICATION AND INSURANCE

34.    **SDs' Indemnification of the United States**.

a.    The United States does not assume any liability by entering into this CD or by virtue of any designation of SDs as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). SDs shall indemnify, save, and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on SDs' behalf or under their control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from any designation of SDs as EPA's authorized representatives under Section 104(e) of CERCLA. Further, SDs agree to pay the United States all costs it incurs including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this CD. The United States shall not be held out as a party to any contract entered into by or on behalf of SDs in carrying out activities pursuant to this CD. Neither SDs nor any such contractor shall be considered an agent of the United States.

b.    The United States shall give SDs notice of any claim for which the United States plans to seek indemnification pursuant to this ¶ 34, and shall consult with SDs prior to settling such claim.

35.    SDs covenant not to sue and agree not to assert any claims or causes of action against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States arising from or on account of any contract, agreement, or arrangement between any one or more of SDs and any person for performance of Work on or relating to Operable Unit One of the Site, including, but not limited to, claims on account of construction delays. In addition, SDs shall indemnify, save and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of SDs and any person for

19

performance of Work on or relating to Operable Unit One of the Site, including, but not limited to, claims on account of construction delays.

36. **Insurance**. No later than 15 days before commencing any on-site Work, SDs shall secure, and shall maintain until the first anniversary after the RA has been performed in accordance with this CD and the Performance Standards have been achieved commercial general liability insurance with limits of $1,000,000.00, for any one occurrence, and automobile liability insurance with limits of $1,000,000.00, combined single limit, naming the United States as an additional insured with respect to all liability arising out of the activities performed by or on behalf of SDs pursuant to this CD. In addition, for the duration of this CD, SDs shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of SDs in furtherance of this CD. Prior to commencement of the Work, SDs shall provide to EPA certificates of such insurance and a copy of each insurance policy. SDs shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If SDs demonstrate by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, SDs need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. SDs may, on any anniversary of the Effective Date, or at any other time agreed to by the Parties, petition EPA in writing to request a reduction in the applicable insurance amount.

## XII.    FORCE MAJEURE

37. "Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of SDs, of any entity controlled by SDs, or of SDs' contractors that delays or prevents the performance of any obligation under this CD despite SDs' best efforts to fulfill the obligation. The requirement that SDs exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure: (a) as it is occurring; and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

38. If any event occurs or has occurred that may delay the performance of any obligation under this CD for which SDs intend or may intend to assert a claim of force majeure, SDs shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator, or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region 4, within three business days of when SDs first knew that the event might cause a delay. Within 10 days thereafter, SDs shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; SDs' rationale for attributing such delay to a force majeure; and a statement describing the anticipated impact of the delay. SDs shall include with any notice all available documentation supporting their claim that the delay was attributable to a force majeure. SDs shall be deemed to know of any circumstance of which SDs, any entity controlled by SDs, or SDs' contractors or

20

subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude SDs from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 37 and whether SDs have exercised their best efforts under ¶ 37, EPA may, in its unreviewable discretion, excuse in writing SDs' failure to submit timely or complete notices under this Paragraph.

39.    If EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify SDs in writing of its decision. If EPA agrees that the delay is attributable to a force majeure, EPA will notify SDs in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

40.    If SDs elect to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) regarding EPA's decision, they shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, SDs shall have the burden of demonstrating that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that SDs complied with the requirements of ¶¶ 37 and 38. If SDs carry this burden, the delay at issue shall be deemed not to be a violation by SDs of the affected obligation of this CD identified to EPA and the Court, and the schedules for the affected obligations shall be modified in accordance with the procedures set forth in to ¶ 13 (Modification of SOW or Related Deliverables).

41.    The failure by EPA to timely complete any obligation under the CD or under the SOW is not a violation of the CD, provided, however, that if such failure prevents SDs from meeting one or more deadlines in the SOW, SDs may seek relief under this Section.

### XIII.  DISPUTE RESOLUTION

42.    Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this CD. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of SDs that have not been disputed in accordance with this Section.

43.    A dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute. Any dispute regarding this CD shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 30 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

44.    **Statements of Position.**

a.    In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be

21

considered binding unless, within 30 days after the conclusion of the informal negotiation period, SDs invoke the formal dispute resolution procedures of this Section by serving on the United States a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by SDs. The Statement of Position shall specify SDs' position as to whether formal dispute resolution should proceed under ¶ 45 (Record Review) or 46.

      b.    Within 20 days after receipt of SDs' Statement of Position, EPA will serve on SDs its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 45 (Record Review) or 46. Within 20 days after receipt of EPA's Statement of Position, SDs may submit a Reply.

      c.    If there is disagreement between EPA and SDs as to whether dispute resolution should proceed under ¶ 45 (Record Review) or 46, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if SDs ultimately appeal to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 45 and 46.

      45.    **Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD. Nothing in this CD shall be construed to allow any dispute by SDs regarding the validity of the ROD's provisions.

      a.    An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

      b.    The Director of the Superfund Division, EPA Region 4, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 45.a. This decision shall be binding upon SDs, subject only to the right to seek judicial review pursuant to ¶¶ 45.c and 45.d.

      c.    Any administrative decision made by EPA pursuant to ¶ 45.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by SDs with the Court and served on all Parties within 15 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to SDs' motion.

d.   In proceedings on any dispute governed by this Paragraph, SDs shall have the burden of demonstrating that the decision of the Superfund Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 45.a.

46.   Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

a.   The Director of the Superfund Division, EPA Region 4, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 44. The Superfund Division Director's decision shall be binding on SDs unless, within 20 days after receipt of the decision, SDs file with the Court and serve on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to SDs' motion.

b.   Notwithstanding ¶ M (CERCLA § 113(j) record review of ROD and Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

47.   The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of SDs under this CD, except as provided in ¶ 32 (Contesting Future Response Costs), as agreed by EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 55. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that SDs do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties), subject to EPA's enforcement discretion to waive Stipulated Penalties pursuant to ¶ 49.

## XIV.   STIPULATED PENALTIES

48.   SDs shall be liable for stipulated penalties in the amounts set forth in ¶¶ 49 and 50 to the United States for failure to comply with the requirements of this CD specified below, unless excused under Section XII (Force Majeure). "Compliance" by SDs shall include completion of all activities and obligations, including payments, required under this CD, or any deliverable approved under this CD, in accordance with all applicable requirements of law, this CD, the SOW, and any deliverables approved under this CD and within the specified time schedules established by and approved under this CD.

49. <u>Stipulated Penalty Amounts - Work (Including Payments and Excluding Deliverables)</u>.

a.   The following stipulated penalties shall accrue per violation per day for any noncompliance with obligations identified in ¶ 49.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $750.00 |
| 15th through 30th day | $1,500.00 |
| 31st day and beyond | $3,000.00 |

b.   <u>Compliance Milestones</u>.

(1)   Designating a Project Coordinator and Supervising Contractor according to Paragraph 9;

(2)   Complying with emergency release response and reporting requirements according to Paragraph 11;

(3)   Conducting community involvement activities, including implementation of a technical assistance plan, according to Paragraph 12;

(4)   Paying Future Response Costs according to Paragraph 30;

(5)   Placing disputed costs in an escrow account as required by Paragraph 32;

(6)   Securing insurance as required by Paragraph 36; and

(7)   Establishment and maintenance of financial assurance in compliance with the timelines and other substantive and procedural requirements of Section IX (Financial Assurance).

50.   **Stipulated Penalty Amounts - Deliverables.**

a.   **Material Defects**. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under ¶ 6.6(a) (Initial Submissions) or 6.6(b) (Resubmissions) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of ¶ 48. The provisions of Section XIII (Dispute Resolution) and Section XIV (Stipulated Penalties) shall govern the accrual and payment of any stipulated penalties regarding SDs' submissions under this CD.

b.   The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables pursuant to the CD:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $500.00 |
| 15th through 30th day | $1,000.00 |
| 31st day and beyond | $2,500.00 |

51.     In the event that EPA assumes performance of a portion or all of the Work pursuant to ¶ 62 (Work Takeover), SDs shall be liable for a stipulated penalty in the amount of seven hundred thousand dollars ($700,000.00). Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 27 (Access to Financial Assurance) and 62 (Work Takeover).

52.     Except as otherwise provided in this Paragraph, all penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under ¶ 6.6 (Approval of Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies SDs of any deficiency; (b) with respect to a decision by the Director of the Superfund Division, EPA Region 4, under ¶ 45.b or 46.a of Section XIII (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that SDs' reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

53.     Following EPA's determination that SDs have failed to comply with a requirement of this CD, EPA may give SDs written notification of the same and describe the noncompliance. EPA may send SDs a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified SDs of a violation, subject to EPA's enforcement discretion to waive Stipulated Penalties pursuant to ¶ 49.

54.     All penalties accruing under this Section shall be due and payable to the United States within 30 days after SDs' receipt from EPA of a demand for payment of the penalties, unless SDs invoke the Dispute Resolution procedures under Section XIII (Dispute Resolution) within the 30-day period. All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 31.a (instructions for future response cost payments).

55.     Penalties shall continue to accrue as provided in ¶ 52 during any dispute resolution period, but need not be paid until the following:

        a.      If the dispute is resolved by agreement of the parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA within 15 days after the agreement or the receipt of EPA's decision or order;

        b.      If the dispute is appealed to this Court and the United States prevails in whole or in part, SDs shall pay all accrued penalties determined by the Court to be owed to EPA within 60 days after receipt of the Court's decision or order, except as provided in ¶ 55.c;

        c.      If the District Court's decision is appealed by any Party, SDs shall pay all accrued penalties determined by the District Court to be owed to the United States into an

interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA or to SDs to the extent that they prevail.

56.    If SDs fail to pay stipulated penalties when due, SDs shall pay Interest on the unpaid stipulated penalties as follows: (a) if SDs have timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 55 until the date of payment; and (b) if SDs fail to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 54 until the date of payment. If SDs fail to pay stipulated penalties and Interest when due, the United States may institute proceedings to collect the penalties and Interest.

57.    The payment of penalties and Interest, if any, shall not alter in any way SDs' obligation to complete the performance of the Work required under this CD.

58.    Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States to seek any other remedies or sanctions available by virtue of SDs' violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

59.    Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CD.

## XV.    COVENANTS BY PLAINTIFF

60.    **Covenants for SDs by United States**.

Except as provided in ¶ 61 (General Reservations of Rights), the United States covenants not to sue or to take administrative action against SDs pursuant to Sections 106 and 107(a) of CERCLA for the Work and Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by SDs of their obligations under this CD. These covenants extend only to SDs and do not extend to any other person.

61.    **General Reservations of Rights**. The United States reserves, and this CD is without prejudice to, all rights against SDs with respect to all matters not expressly included within Plaintiff's covenants. Notwithstanding any other provision of this CD, the United States reserves all rights against SDs with respect to:

      a.    liability for failure by SDs to meet a requirement of this CD;

      b.    liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

26

      c.     liability based on the ownership of the Site by SDs when such ownership commences after signature of this CD by SDs;

      d.     liability based on the operation of the Site by SDs when such operation commences after signature of this CD by SDs and does not arise solely from SDs' performance of the Work;

      e.     liability based on SDs' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by EPA, after signature of this CD by SDs;

      f.     liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

      g.     criminal liability;

      h.     liability for violations of federal or state law that occur during or after implementation of the Work; and

      i.     liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, but that cannot be required pursuant to ¶ 13 (Modification of SOW or Related Deliverables);

      j.     liability for additional operable units at the Site or the final response action; and

      k.     liability for costs that the United States will incur regarding the Site but that are not within the definition of Future Response Costs.

62.    **Work Takeover.**

      a.     In the event EPA determines that SDs: (1) have ceased implementation of any portion of the Work; (2) are seriously or repeatedly deficient or late in their performance of the Work; or (3) are implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to SDs. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide SDs a period of 15 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

      b.     If, after expiration of the 15-day notice period specified in ¶ 62.a, SDs have not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify SDs in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this ¶ 62.b. Funding of Work Takeover costs is addressed under ¶ 27 (Access to Financial Assurance).

c.      SDs may invoke the procedures set forth in ¶ 45 (Record Review), to dispute EPA's implementation of a Work Takeover under ¶ 62.b. However, notwithstanding SDs' invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 62.b until the earlier of: (1) the date that SDs remedy, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice; or (2) the date that a final decision is rendered in accordance with ¶ 45 (Record Review) requiring EPA to terminate such Work Takeover.

63.      Notwithstanding any other provision of this CD, the United States retains all authority and reserves all rights to take any and all response actions authorized by law.

## XVI.   COVENANTS BY SDs

64.      **Covenants by SDs**. Subject to the reservations in ¶ 66, SDs covenant not to sue and agree not to assert any claims or causes of action against the United States with respect to the Work, past response actions regarding the Site, Future Response Costs, and this CD, including, but not limited to:

a.      any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

b.      any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding the Work, past response actions regarding the Site, Future Response Costs, and this CD; or

c.      any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the Georgia Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

65.      Except as provided in ¶¶ 68 (Waiver of Claims by SDs) and 74 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States brings a cause of action or issues an order pursuant to any of the reservations in Section XV (Covenants by Plaintiff), other than in ¶¶ 61.a (claims for failure to meet a requirement of the CD), 61.g (criminal liability), and 61.h (violations of federal/state law during or after implementation of the Work), but only to the extent that SDs' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

66.      SDs reserve, and this CD is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on

28

EPA's selection of response actions, or the oversight or approval of SDs' deliverables or activities.

67. Nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

68. **Waiver of Claims by SDs.**

a. **De Micromis Waiver.** SDs agree not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that they may have for all response costs relating to the Site against any person where the person's liability to SDs with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials;

b. **Exceptions to Waiver.**

(1) The waiver under ¶ 68.a (De Micromis Waiver) shall not apply with respect to any defense, claim, or cause of action that a SD may have against any person otherwise covered by such waiver if such person asserts a claim or cause of action relating to the Site against such SD.

(2) The waiver under ¶ 68.a (De Micromis Waiver) shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines that: (i) the materials containing hazardous substances contributed to the Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration at the Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site; or if (iii) such person has been convicted of a criminal violation for the conduct to which the waiver would apply and that conviction has not been vitiated on appeal or otherwise.

## XVII. EFFECT OF SETTLEMENT; CONTRIBUTION

69. Except as provided in ¶ 68 (Waiver of Claims by SDs), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVI (Covenants by SDs), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons

29

to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

70.     The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially-approved settlement pursuant to which each SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this CD. The "matters addressed" in this CD are the Work and Future Response Costs.

71.     The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a judicially-approved settlement pursuant to which each Settling Defendant has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

72.     Each SD shall, with respect to any suit or claim brought by it for matters related to this CD, notify the United States in writing no later than 60 days prior to the initiation of such suit or claim.

73.     Each SD shall, with respect to any suit or claim brought against it for matters related to this CD, notify in writing the United States within 10 days after service of the complaint on such SD. In addition, each SD shall notify the United States within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

74.     **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, SDs shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XV (Covenants by Plaintiff).

## XVIII. ACCESS TO INFORMATION

75.     SDs shall provide to EPA, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within SDs' possession or control or that of their contractors or agents relating to activities at the Site or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. SDs shall also make available to EPA, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

30

76.     **Privileged and Protected Claims**.

a.      SDs may assert that all or part of a Record requested by Plaintiff is privileged or protected as provided under applicable law, in lieu of providing the Record, provided SDs comply with ¶ 76.b, and except as provided in ¶ 76.c.

b.      If SDs assert a claim of privilege or protection, they shall provide Plaintiff with the following information regarding such Record, to the extent known by the SD: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, SDs shall provide the Record to Plaintiff in redacted form to mask the privileged or protected portion only. SDs shall retain all Records that they claim to be privileged or protected until Plaintiff has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the SDs' favor.

c.      SDs may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evinces conditions at or around the Site; or (2) the portion of any Record that SDs are required to create or generate pursuant to this CD.

77.     **Business Confidential Claims**. SDs may assert that all or part of a Record provided to Plaintiff under this Section or Section XIX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). SDs shall segregate and clearly identify all Records or parts thereof submitted under this CD for which SDs assert business confidentiality claims. Records submitted to EPA determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA, or if EPA has notified SDs that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to SDs.

78.     If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this CD.

79.     Notwithstanding any provision of this CD, Plaintiff retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XIX.   RETENTION OF RECORDS

80.     Until five years after EPA's Certification of Work Completion under ¶ 4.7 (Certification of Work Completion) of the SOW, each SD shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, provided, however, that SDs who are potentially liable as owners or operators of the Site must retain, in addition, all Records that relate to the liability of

31

any other person under CERCLA with respect to the Site. Each SD must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that each SD (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

81.     At the conclusion of this record retention period, SDs shall notify the United States at least 90 days prior to the destruction of any such Records, and, upon request by the United States, and except as provided in ¶ 76 (Privileged and Protected Claims), SDs shall deliver any such Records to EPA.

82.     Each SD certifies individually that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XX.    NOTICES AND SUBMISSIONS

83.     All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

**As to the United States:**          EES Case Management Unit
                                      U.S. Department of Justice
                                      Environment and Natural Resources Division
                                      P.O. Box 7611
                                      Washington, DC  20044-7611
                                      eescdcopy.enrd@usdoj.gov
                                      Re: DJ # 90-11-2-1237/3

| | |
|---|---|
| **As to EPA:** | Director, Superfund Division<br>U.S. Environmental Protection Agency<br>Region 4<br>61 Forsyth Street, SW<br>Atlanta, GA  30303 |
| **and:** | Galo Jackson<br>EPA Project Coordinator<br>U.S. Environmental Protection Agency<br>Region 4<br>61 Forsyth Street, SW<br>Atlanta, GA  30303<br>jackson.galo@epa.gov<br>(404) 562-8937 |
| **As to EPA Cincinnati Finance Center:** | EPA Cincinnati Finance Center<br>26 W. Martin Luther King Drive<br>Cincinnati, OH  45268<br>cinwd_acctsreceivable@epa.gov |
| **As to Georgia Power Company:** | Douglas A. Henderson<br>Troutman Sanders LLP<br>Bank of America Plaza, Suite 5200<br>600 Peachtree Street, NE<br>Atlanta, GA  30308-2216<br>douglas.henderson@troutmansanders.com<br>(404) 885-3479 |
| **As to Honeywell International Inc.:** | Tom Byrne<br>Chief Environmental Counsel<br>Honeywell International Inc.<br>115 Tabor Road<br>Morris Plains, NJ  07950<br>tom.byrne@honeywell.com<br>(973) 455-2775 |
| **and:** | Adam G. Sowatzka<br>King & Spalding, LLP<br>1180 Peachtree Street, NE<br>Atlanta, GA  30309<br>asowatzka@kslaw.com<br>(404) 572-3508 |

## XXI.   RETENTION OF JURISDICTION

84.     This Court retains jurisdiction over both the subject matter of this CD and the
Parties for the duration of the performance of the terms and provisions of this CD for the purpose

of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIII (Dispute Resolution).

## XXII. APPENDICES

85.    The following appendices are attached to and incorporated into this CD:

"Appendix A" is the ROD.

"Appendix B" is the SOW.

"Appendix C" is a map of the Affected Property and the Site.

## XXIII. MODIFICATION

86.    Except as provided in ¶ 13 (Modification of SOW or Related Deliverables), material modifications to this CD, including the SOW, shall be in writing, signed by the United States and SDs, and shall be effective upon approval by the Court. Except as provided in ¶ 13, non-material modifications to this CD, including the SOW, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and SDs. A modification to the SOW shall be considered material if it implements a ROD amendment that fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before providing its approval to any modification to the SOW, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification. Schedules specified in this CD or the SOW for completion of the Work may be modified by agreement of the EPA Project Coordinator and the SDs. All such modifications shall be made in writing.

87.    Nothing in this CD shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this CD.

## XXIV. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

88.    This CD shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the CD disclose facts or considerations that indicate that the CD is inappropriate, improper, or inadequate. SDs consent to the entry of this CD without further notice.

89.    If for any reason the Court should decline to approve this CD in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXV. SIGNATORIES/SERVICE

90.    Each undersigned representative of a SD to this CD and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice

certifies that he or she is fully authorized to enter into the terms and conditions of this CD and to execute and legally bind such Party to this document.

91.     Each SD agrees not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified SDs in writing that it no longer supports entry of the CD.

92.     Each SD shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this CD. SDs agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. SDs need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this CD.

## XXVI. FINAL JUDGMENT

93.     This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the CD. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

94.     Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States and SDs. The Court enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS _____27th_____ DAY OF _____July_____, 2017

_____
United States District Judge

Signature Page for CD regarding the LCP Chemicals Superfund Site

**FOR THE UNITED STATES OF AMERICA:**

7/28/16
Dated

John C. Cruden
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, DC  20530

Leslie Coleman
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, DC  20044-7611

Signature Page for CD regarding the LCP Chemicals Superfund Site

**FOR THE UNITED STATES OF AMERICA:**

EDWARD J. TARVER
UNITED STATES ATTORNEY

7/29/16
_____
Dated

Bradford C. Patrick
Assistant United States Attorney
South Carolina Bar No. 102092
U.S. Attorney's Office
Post Office Box 8970
Savannah, GA  31412

Signature Page for CD regarding the LCP Chemicals Superfund Site

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:**

Franklin E. Hill
Director
Superfund Division
U.S. Environmental Protection Agency, Region 4
61 Forsyth Street, SW
Atlanta, GA 30303

Stacey A. Haire
Senior Attorney
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 4
61 Forsyth Street, SW
Atlanta, GA 30303

Signature Page for CD regarding the LCP Chemicals Superfund Site

**FOR HONEYWELL INTERNATIONAL INC.:**

5/17/2016
Dated

Name (print): D. Evan van Hook
Title: VP HSESP
Address: 115 Tabor Road
Morris Plains, NJ 07950

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

| | |
|---|---|
| Name: | Adam G. Sowatzka |
| Company: | King & Spalding, LLP |
| Address: | 1180 Peachtree Street, NE |
| | Atlanta, GA 30309 |
| Phone: | (404) 572-3508 |
| Email: | asowatzka@kslaw.com |

Signature Page for CD regarding the LCP Chemicals Superfund Site

**FOR GEORGIA POWER COMPANY:**

May 19, 2016
Dated

Name (print): Christopher Cummiskey
Title: Executive Vice-President
Address:

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name (print): Keith T. Hill
Title: Managing Attorney
Company: Georgia Power Co.
Address: 241 Ralph McGill Blvd. NE
BIN 2-6026 ATLANTA, GA 30308
Phone: 404-506-7807
Email: KTHill@Southernco.com

# Exhibit B

## Complaint for Consent Decree

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. ___2:16-cv-112___ |
| ) | |
| v. ) | |
| ) | |
| HONEYWELL INTERNATIONAL INC. and ) | |
| GEORGIA POWER COMPANY, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States, and at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), through the undersigned attorneys, files this Complaint and alleges as follows:

## NATURE OF THE ACTION

1.　　This is a civil action for injunctive relief and recovery of costs against Honeywell International Inc. and Georgia Power Company ("Defendants") pursuant to Sections 106 and 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. §§ 9606 and 9607(a).

2.　　The United States seeks: (a) performance of response actions by Defendants at Operable Unit 1 of the LCP Chemicals Superfund Site (the "Site"), located in Glynn County, Georgia, consistent with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300 (as amended) ("NCP"); (b) reimbursement of response costs incurred by EPA and the Department of Justice related to Operable Unit 1, together with any accrued interest; and (c) a declaratory judgment of liability for response costs that will be incurred related to the Site.

1

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action and over Defendants, pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. §§ 9606(a), 9607(a), and 9613(b).

4.      Venue is proper in this district pursuant to 42 U.S.C. §§ 9606(a) and 9613(b) and 28 U.S.C. § 1391(b) and (c), because the Site is located, the claims arose, and the threatened and actual releases of hazardous substances that gave rise to these claims occurred, within this judicial district.

## DEFENDANTS

5.      Defendant Honeywell International Inc. ("Honeywell"), a Delaware corporation, is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21). Honeywell is an "owner" of the Site within the meaning of Sections 101(20) and 107(a)(1) of CERCLA, 42 U.S.C. §§ 9601(20) and 9607(a)(1). Honeywell is also a successor to the liabilities of AlliedSignal Inc., whose predecessors-in-interest owned and operated the Site at the time of disposal of hazardous substances within the meaning of Sections 101(20) and 107(a)(2) of CERCLA, 42 U.S.C. §§ 9601(20) and 9607(a)(2).

6.      Defendant Georgia Power Company, an investor-owned electric utility incorporated in Georgia, is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21). Georgia Power Company owned and operated the Site at the time of disposal of hazardous substances within the meaning of Sections 101(20) and 107(a)(2) of CERCLA, 42 U.S.C. §§ 9601(20) and 9607(a)(2).

## GENERAL ALLEGATIONS

7.      The Site is located at 4125 Ross Road, immediately northwest of the City of Brunswick in Glynn County, Georgia. It comprises approximately 850 acres, 760 of which are

saltwater marshlands. EPA has organized the Site into three operable units: Operable Unit 1 covers the marsh; Operable Unit 2 covers the surface and subsurface soil around two former mercury cell buildings, along with all contaminated groundwater emanating from the Site; and Operable Unit 3 covers the upland areas not contained within Operable Unit 2.

8. From approximately 1919 through 1994, Defendants and/or their predecessors-in-interest, along with other entities, conducted varied industrial activities at the Site, including petroleum refining, electric power generation, paint and varnish manufacturing, and chlor-alkali manufacturing. As a result of these industrial processes, numerous hazardous substances within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), were disposed at the Site.

9. Georgia Power Company purchased tracts of land within the Site in 1937, 1942, and 1950. The company utilized the Site primarily for electric power generation and petroleum product storage. As a result of these operations, hazardous substances, including lead, polychlorinated biphenyls ("PCBs"), and polycyclic aromatic hydrocarbons ("PAHs"), were disposed at the Site.

10. In the mid-1950s, Allied Chemical & Dye Corporation ("Allied") acquired most of Georgia Power's land, as well as additional property, within the Site. Allied built and operated a chlor-alkali facility at the Site, principally for the production of chlorine gas, hydrogen gas, and caustic solution. These operations led to the disposal of hazardous substances, including mercury and PCBs, within the Site. Allied sold its property in 1979.

11. Allied Chemical & Dye Corporation subsequently changed its name to Allied Chemical Corporation and then again to Allied Corp. In 1985, Allied Corp. merged with the Signal Companies to create AlliedSignal Inc.

12. In 1999, AlliedSignal Inc. merged with Honeywell Inc., creating Honeywell International Inc.

3

13. Honeywell International Inc. currently owns the Site.

14. Investigations conducted by EPA and the Georgia Environmental Protection Division have found extensive contamination of the Site's structures, impoundments, soils, surface water, sediments, and groundwater.

15. On June 17, 1996, EPA placed the Site on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register. 61 Fed. Reg. 30,510.

16. On September 22, 2015, EPA issued a final Record of Decision ("ROD") setting forth the remedial action to be implemented at Operable Unit 1 of the Site. The ROD identifies lead, mercury, the PCB Aroclor 1268, and PAHs as contaminants of concern. The major components of the remedy include dredging approximately seven acres in the LCP Ditch and Eastern Creek; backfilling dredged areas with clean material; capping approximately six acres in Domain 3 Creek and Purvis Creek; placing thin-layer cover on approximately 11 acres of marsh; restoring disturbed areas; conducting short-term and long-term monitoring; and securing institutional controls to prevent exposure to contaminants.

17. The ROD is not inconsistent with CERCLA and the National Contingency Plan, 40 C.F.R. Part 300.

18. Mercury, lead, Aroclor 1268, and PAHs are hazardous substances within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

19. Mercury, lead, Aroclor 1268, and PAHs have come to be located at Operable Unit 1.

20. The Site and Operable Unit 1 are each a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

21. There has been a "release" or a "threatened release" of "hazardous substances" into the environment at or from Operable Unit 1, within the meaning of Sections 101(8), 101(14),

101(22), 104(a) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(8), 9601(14), 9601(22), 9604(a), and 9607(a).

22.     As a result of the release or threatened release of hazardous substances at or from Operable Unit 1, the United States has incurred costs authorized by Section 104 of CERCLA, 42 U.S.C. § 9604, as defined by Sections 101(23), (24) and (25) of CERCLA, 42 U.S.C. §§ 9601(23), (24) and (25).

23.     As stated in the ROD, EPA estimates that the remedial action for Operable Unit 1 will cost approximately $28.6 million.

24.     EPA's response actions taken at or in connection with Operable Unit 1 and the costs incurred incident thereto are not inconsistent with the NCP.

25.     The United States will continue to incur response costs in connection with the Site.

**FIRST CLAIM FOR RELIEF**
**(Injunctive Relief for Operable Unit 1)**

26.     Paragraphs 1 through 25 are realleged and incorporated herein by reference.

27.     Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), provides in pertinent part:

> [W]hen the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat . . . .

28.     The Regional Administrator of EPA Region 4, through delegated authority, has determined that there is or may be an imminent and substantial endangerment to the public health or welfare or the environment because of actual or threatened releases of hazardous substances into the environment at or from Operable Unit 1.

29.     Pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), Defendants are liable to the United States for injunctive relief to abate and remedy the conditions at Operable Unit 1 that may present an imminent and substantial endangerment to the public health or welfare or the

environment because of an actual or threatened release of hazardous substances at or from Operable Unit 1.

### SECOND CLAIM FOR RELIEF
#### (Recovery of United States' Response Costs)

30.     Paragraphs 1 through 25 are realleged and incorporated herein by reference.

31.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section-

*        *        *

(1)     the owner and operator of a vessel or a facility, [and]

(2)     any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of

*        *        *

shall be liable for - -

(A)     all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan; . . . .

The amounts recoverable under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D) . . . .

32.     Pursuant to Section 107(a)(1), 42 U.S.C. § 9607(a)(1), Honeywell is liable as the current owner and operator of the Site.

33.     Honeywell is also liable pursuant to Section 107(a)(2), 42 U.S.C. § 9607(a)(2), because Honeywell, though its merger with AlliedSignal Inc., is a successor to the liabilities of Allied, which was liable as the owner and operator of the Site when disposal of hazardous substances occurred at the Site.

34.     Pursuant to Section 107(a)(2), 42 U.S.C. § 9607(a)(2), Georgia Power Company is liable as the owner and operator of the Site when disposal of hazardous substances occurred at the Site.

35.     Defendants are liable to the United States pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for unrecovered response costs not inconsistent with the NCP incurred by the United States in connection with Operable Unit 1, plus any applicable interest on the response costs incurred.

36.     Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides in pertinent part that in any action for recovery of costs, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

37.     Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the United States is entitled to a declaratory judgment that Defendants are liable to the United States under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all further response costs not inconsistent with the NCP incurred by the United States in connection with the Site.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, respectfully requests that this Court:

A.      Order Defendants to abate the conditions at Operable Unit 1 that may present an imminent and substantial endangerment to the public health or welfare or environment, pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), by performing the remedy selected by EPA in the ROD;

B.      Award the United States a judgment against Defendants, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for response costs not inconsistent with the NCP incurred by the United States in connection with Operable Unit 1, plus any accrued interest on the costs;

C.      Award the United States a declaratory judgment, pursuant to Section 113(g)(2) of

CERCLA, 42 U.S.C. § 9613(g)(2), that Defendants are liable to the United States for all response

costs not inconsistent with the NCP to be incurred by the United States at the Site; and

D.      Grant such other and further relief as the Court deems just and proper.


Respectfully submitted,


JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


LESLIE COLEMAN
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
leslie.coleman@usdoj.gov
Phone: (202) 514-1032
Facsimile: (202) 514-0097

EDWARD J. TARVER
UNITED STATES ATTORNEY


BRADFORD C. PATRICK
Assistant United States Attorney
South Carolina Bar No. 102092
U.S. Attorney's Office
Post Office Box 8970
Savannah, GA 31412
(912) 652-4422
bradford.patrick@usdoj.gov



OF COUNSEL:

STACEY A. HAIRE
Senior Attorney
U.S. EPA Region 4
61 Forsyth Street, S.W.
Atlanta, GA 30303

# Exhibit C

## Plant McManus Construction History

**HISTORY OF CONSTRUCTION FOR EXISTING CCR SURFACE IMPOUNDMENT REVISION 1**
**PLANT MCMANUS ASH POND A (AP-1)**
**40 CFR 257.73(c)(1)(i)-(xii)**


***(i) Site Name and Ownership Information:***

Site Name:                    Clifford B. McManus Power Plant

Site Location:                Brunswick, Georgia
Site Address:                 One Crispen Island Drive
                              Brunswick, GA  31523


Owner:                        Georgia Power Company
Address:                      241 Ralph McGill Boulevard
                              Atlanta, GA  30308


CCR Impoundment Name:         Plant McManus Ash Pond A (AP-1)
NID ID:                       NA


EPA's "Disposal of Coal Combustion Residuals from Electric Utilities" Final Rule (40 C.F.R. Part 257 and Part 261), §257.73(c)(1), requires the owner or operator of an existing CCR surface impoundment to compile a history of construction. To the extent feasible, the following information is provided:

***(ii) Location of CCR Unit:***

N 31.2186°, W 81.5422°
See Location Map in the Appendix

***(iii) Purpose of CCR Impoundment:***

The Clifford B. McManus Power Plant (Plant McManus) was once a two-unit power generation facility. Construction of Unit 1 began in 1951 and the initial startup and commercial operation began in November 1952. Unit 1 was originally designed to operate as an oil-fired generator.  Construction on Unit 2 began in 1957 and was declared commercial in 1959.  Unit 2 was originally designed with coal as the primary fuel.  Unit 1 was converted to coal in 1960.  In 1971, both Units 1 and 2 were converted to oil-fired and the use of coal ceased after 1972.  In 1972, nine (9) diesel-fired simple cycle combustion turbines were installed and which currently operate.  Units 1 and 2 have been retired and demolished as of 2017.

AP-1 was designed to receive and store coal combustion residuals and process water produced by Units 1 and 2 during the electric power generating process at Plant McManus.  AP-1 has not received ash since the early 1970's.

***(iv) Watershed Description:***

Plant McManus and AP-1 are located within the Turtle River – South Brunswick River HUC 12 watershed which has a total area of 51,891 acres.  The Turtle River – South Brunswick River watershed is part of the larger Cumberland-St. Simons HUC 8 watershed which has an area of 609,980 acres. The inflow into AP-1 consists of the rainfall that falls within the limits of the surface impoundment and runoff from the adjoining 68-acre watershed.

***(v) Description of physical and engineering properties of CCR impoundment foundation/abutments:***

AP-1 is located in the Barrier Island sequence of the Coastal Plain physiographic province.  The Barrier Island sequence is characterized by its marshes and sea islands.  According to the Geologic Map of Georgia, 1976, Plant McManus is located in the Southeast Georgia Embayment, a depositional basin formed during the subsidence of the continental margin and episodic rise and fall of sea levels.  The area has unconsolidated and semi-consolidated sedimentary rocks.  These sedimentary rocks are Cretaceous age and younger and are comprised of two facies: clastic sediments with minor limestone components and shallow-water platform carbonate units.

The foundations generally consist of natural loose, fine sand and soft to medium stiff sandy clay. Laboratory strength testing of foundation soils encountered at a depth of approximately 12 feet below the crest of the embankment indicated an effective cohesion value of approximately 100 psf and an effective angle of internal friction of about 17 degrees.

***(vi) Summary of Site Preparation and Construction Activities:***

AP-1 was constructed in 1957 by Georgia Power Company by placing a dike embankment across an upland marsh area north of the plant's main access road.  The pond was constructed in parallel with Unit 2.  Unit 2, unlike dual fuel rated Unit 1, was designed with coal as its primary fuel.   Units 1 and 2 were converted to #6 fuel oil in 1971 and 1972, respectively.  AP-1 did not receive CCR after 1972 but continued to support plant operations with low volume waste treatment.

The Plant McManus AP-1 is in the process of being closed through removal of the CCR from the CCR unit.  As of October 2019, all CCR has been removed.  AP-1 was dewatered as required to facilitate excavation of ash for removal.  All excavated CCR was transported and disposed of in an offsite Solid Waste permitted landfill authorized to accept CCR material.  CCR removal activities are anticipated to be completed 4th Quarter 2019.   The pond dike and primary spillway are intact and continue the ability to impound water. During ash pond closure, accumulated water is managed by a temporary water treatment system in accordance with a dewatering plan approved by the Georgia Environmental Protection Division.  The treated water is then discharged via the NPDES permitted outfall located at the westernmost corner of AP-1.  When discharged, the treated water is sampled and monitored in accordance with the approved dewatering plan.

Drawings showing the topography and location of AP-1 are included in the appendix as engineering diagrams.

*(vii) Engineering Diagram:*

The following drawings relevant to the location and topography of Plant McManus AP-1 can be found in

Appendix A:

- 1976 USGS Topography Map
- ATC Site Map – November 1996
- Plant McManus – Ash Pond Spillway Repair – drawing C68 dated May 1979
- Plant McManus – Ash Pond Dike Construction – drawing D-302 dated April 1957
- Plant McManus – Site Aerial Photo

*(viii) Description of Instrumentation:*

There is no instrumentation at AP-1 used for dam safety or operational monitoring purposes.

*(ix) Area-capacity curves:*

See Appendix B for Stage Storage Curve

*(x) Spillway/Diversion design features and capacity calculations:*

The impoundment was designed and constructed to use a primary discharge spillway in the westernmost pond corner.  The spillway consists of a rectangular (4 feet tall by 8 feet wide) concrete channel with a 120 ° "V"-notch weir and discharges into Burnette Creek, a brackish water tributary of the Turtle River.

Evaluation of the capacity of the entire ash pond site indicates that runoff from a 1000-year, 24-hour storm event can be completely stored within the Ash Pond.  Capacity calculations were based on topographic and bathymetric survey information performed in January 2018.  Based on the 1000-year flood routing, the peak outflow discharge is 4.88 cubic feet per second at a peak water surface elevation of 5.88 feet leaving a freeboard of 0.12 feet.  Normal pool is 3.00 feet (Mean Sea Level).

*(xi) Provisions for surveillance, maintenance and repair:*

Inspections of dikes are critical components and are conducted on a regular basis—at least annually by professional dam safety engineers and at least every 7 days by trained plant personnel.  In addition, inspections are performed after significant events such as storms.  The inspections provide assurance that the structures are sound and that action is taken, as needed, based on the findings.  Safety inspections include numerous checklist items.  Specific items vary from site to site but may include observations of such things as pond levels, weather conditions, rainfall since the prior inspection, conditions of slopes and drains, erosion, animal damage, ant hills and more.  Dam safety engineers inspect any maintenance or remediation performed since the previous inspection, check the status of work recommended at prior inspections, ensure that emergency notification information is current and evaluate any items noted during plant personnel inspections.

*(xii) Known record of structural instability:*

There are no known instances of structural instability at the CCR unit.

# Appendix A



2/15/2018, 5:02:52 PM

1:24,000

0    0.225    0.45                0.9 mi

0   0.225  0.45            0.9 km

Plant McManus Ash Pond

USGS Topo -- 1976



FIGURE 1
SITE MAP WITH CROSS-SECTION
LOCATIONS







**Appendix B**



Storage Area Volume Curves

# Exhibit D

1995 Administrative
Order by Consent

**LCP/ Brunswick**
**On Site Library**
**Bookshelf**

Library File No.
**LCPB95041L**

Consent Order
June 1995

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

REGION IV

| | |
|---|---|
| IN THE MATTER OF: ) | Proceeding under Sections 104, |
| ) | 122(a), and 122(d)(3) |
| LCP CHEMICALS - GEORGIA ) | of the Comprehensive, |
| Brunswick, Glynn County, ) | Environmental Response, |
| Georgia ) | Compensation and Liability Act |
| ) | 1980, as amended, 42 U.S.C. |
| AlliedSignal, Inc., ) | §§ 9604 and 9622. |
| Atlantic Richfield Co., ) | |
| and Georgia Power Company, ) | |
| ) | |
| Respondents ) | |
| ) | EPA Docket No.: 95-17-C |

ADMINISTRATIVE ORDER BY CONSENT
FOR REMEDIAL INVESTIGATION/FEASIBILITY STUDY

## I.   JURISDICTION

This Administrative Order by Consent (Consent Order) is entered into by the United States Environmental Protection Agency (EPA) with AlliedSignal, Inc., ("Allied") Atlanta Richfield, Co, ("ARCO") and Georgia Power Company, ("GPC") (hereinafter collectively, "Respondents"), pursuant to the authority vested in the President of the United States by Sections 104, 122(a), and 122(d)(3) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), as amended, 42 U.S.C. §§ 9604, 9622(a) and 9622(d)(3).  This authority was delegated by the President to the Administrator of the EPA by Exec. Order No. 12580, dated January 23, 1987, 52 Fed. Reg. 2923 (Jan. 29, 1987), and was further delegated to the Regional Administrator of Region IV EPA and redelegated to the Director, Waste Management Division and redelegated to the Chief, South Superfund Remedial Branch.

Respondents agree to undertake all actions required by the terms and conditions of this Consent Order for the conduct and implementation of the Remedial Investigation and Feasibility Study (RI/FS).  The Respondents consent to and will not contest EPA jurisdiction regarding this Consent Order.

2

## II.  PARTIES BOUND

This Consent Order shall apply to and be binding upon EPA and the
Respondents, their agents, successors, assigns, officers,
directors, and principals.  Respondents Allied, ARCO, and GPC are
each responsible for carrying out all actions required of them by
this Consent Order provided, however, that Respondents ARCO and
GPC are not responsible under this Consent Order for performance
of work in the marsh under Section VII of this Consent Order.  It
is EPA's position that ARCO and GPC are responsible for work in
the marsh, and EPA reserves all its authorities to require ARCO
and GPC to perform work in the marsh, but ARCO and GPC have not
agreed to perform work in the marsh under this Consent Order and
therefore cannot be required under this Consent Order to perform
work in the marsh.  Each Respondent to this Consent Order hereby
agrees that execution of this Consent Order shall not under any
circumstances or for any purpose constitute an admission,
statement, opinion, or conclusion by EPA that the hazardous
substances at the Site pose a distinct or divisible harm or form
a reasonable basis for determining, dividing, or apportioning
contributions to the harm.  Further, the parties hereby agree
that this Consent Order (i) shall not be construed by any party
to this Consent Order to diminish the rights of any other party
to this Consent Order to seek contribution, recovery of costs, or
injunctive relief (including but not limited to EPA's authority
under CERCLA § 106), or any other relief pursuant to CERCLA; and
(ii) shall not preclude any party from raising any otherwise
pertinent defense to any action for contribution, recovery of
costs, injunctive relief, or other relief under CERCLA.  The
signatories to this Consent Order certify that they are
authorized to execute and legally bind the parties they represent
to this Consent Order.  No change in the ownership or corporate
status of the Respondents shall alter its responsibilities under
this Consent Order.

The Respondents shall provide a copy of this Consent Order to any
subsequent owners or successors before ownership rights are
transferred.  The Respondents shall provide a copy of this
Consent Order to all contractors, subcontractors, laboratories,
and consultants which are retained to conduct any work performed
under this Consent Order, within fourteen (14) calendar days
after the effective date of this Consent Order or the date of
retaining their services, whichever is later.  Respondents shall
condition any such contracts upon satisfactory compliance with
this Consent Order.  Notwithstanding the terms of any contract,
Respondents are responsible for compliance with this Consent
Order and for ensuring that their subsidiaries, employees,
contractors, consultants, subcontractors and agents comply with
this Consent Order.

3

### III.   STATEMENT OF PURPOSE

In entering into this Consent Order, the mutual objectives of EPA and Respondents are: (A) with respect to the Remedial Investigation (RI), to determine fully the nature and extent of the threat to the public health or welfare or the environment caused by the release or threatened release of hazardous substances, pollutants, or contaminants at or from the Site into the environment; and (B) with respect to the Feasibility Study (FS), to develop and evaluate alternatives for remedial action to prevent, mitigate or otherwise respond to the migration or the release or threatened release of hazardous substances, pollutants, or contaminants from the Site; and (C) to recover response and oversight costs incurred by EPA with respect to this consent order.

The activities conducted pursuant to this Consent Order will be consistent with the National Contingency Plan (NCP), 40 C.F.R. Part 300, et seq., and will be subject to the express EPA approvals as set forth below.

### IV.   EPA's FINDINGS OF FACTS

The following constitutes EPA's outline of the facts upon which this Consent Order is based:

A.   1.   The LCP Chemicals-Georgia Site (the "Site") is a former chemical manufacturing facility; it currently encompasses approximately 550 acres of land just outside the northwest section of Brunswick, in Glynn County, Georgia.  Specifically, the Site is located at 31°11'22" north latitude, 81°30'30" west longitude.  The Site is currently bordered to the east by Ross Road, on the south by the Brunswick Pulp and Paper/Georgia-Pacific mill, and on the north and west by the Turtle River and associated creeks and marshes; the full Site area is located in a one hundred (100) year flood plain.  About 500 of the Site's approximately 550 acres of land consists of marshland ("marsh"); the former manufacturing operations of LCP Chemicals - Georgia, Inc., was situated on the remaining 50 acres.

2.   The Site's roughly 50 acres of land that is not marshland has contained industry since at least the early 1920's when Atlantic Refining Company built an oil refinery at the Site.  In 1937, 1942, and 1950 Georgia Power Company acquired portions of the Site-property, including two (2) parcels of land and two (2) 750 kilowatt (kw) electric generators from Atlantic Refining Company; Georgia Power Company subsequently added an additional 4.0 megawatts of electric generation capacity at the Site.  From 1941 until 1955, the Dixie Paint and Varnish Co. manufactured paint on a portion of the Site-property to the south of the Georgia Power Co. parcel.  Dixie Paint and Vanish Co. became the

4

Dixie O'Brien Corporation and eventually a wholly owned subsidiary of The O'Brien Corporation. In the mid-1950's, after acquiring almost all the land constituting what is now known to be the Site, the Allied Chemical & Dye Corporation established and operated a chlor-alkali (Solvay) chemical manufacturing process at the Site, principally for the production of chlorine gas, hydrogen gas, and caustic solution. This chlor-alkali process continued at the Site after the 1979 acquisition of the Site property from AlliedSignal, Inc.by the LCP Chemicals - Georgia, Inc., division of the Hanlin Group, Inc. which is the current owner of the Site (with the exception of the approximately 2.9 acre parcel owned by Georgia Power Company. The Hanlin Group, Inc,. operated the chlor-alkali (Solvay) facility at the Site initially using the same manufacturing process and waste handling procedures that had previously been used at the Site by Allied-Signal, Inc. On July 10, 1991, Hanlin filed for protection from creditors under Chapter 11 of the U.S. Bankruptcy Code. In February 1994, industrial production at the Site ceased just before EPA issued a CERCLA § 106 Unilateral Administrative Order (UAO) for Removal.

B.   Current and former owners and operators of the Site include:

1.   AlliedSignal Inc. (Allied): Respondent Allied is the corporate successor to the Allied Chemical & Dye Corporation. In about 1955, the Allied Chemical & Dye Corporation purchased all but a small portion of the land currently known to constitute the Site. Between 1955 and 1979 Allied produced chlorine and sodium hydroxide at the Site using a chlor-alkali (Solvay) process.

2.   Atlantic Richfield Co. (ARCO): Respondent ARCO is a Delaware Corporation resulting from the merger of the Richfield Oil Corporation into the Atlantic Refining Company (Atlantic) on January 3, 1966, and is Atlantic's corporate successor. Between 1918 and 1935 Atlantic purchased about 627 acres of land on and near the Site. During this period the company constructed and operated an oil refinery at the Site; it also built associated structures for employee support and housing. ARCO conveyed various parcels of Site-related property to others between about 1937 and 1955.

3.   Georgia Power Company (GPC): Respondent GPC produces electricity throughout the State of Georgia; it purchased parcels of land at the Site in 1937, 1942, and 1950 for operation of its power generation facilities. The 1937 conveyance to GPC from the Atlantic Refining Company included two (2) oil-fired 750 kilowatt (kw) steam turbine generators. In 1941 another 4,000 kw oil-fired steam turbine generator was added. In 1955, GPC conveyed the bulk of its Site-related

5

property to the Allied Chemical & Dye Corporation, but retained several easements and a roughly 2.9 acre tract of land at the Site.

    4.   <u>Hanlin Group, Inc. (Hanlin)</u>:  Hanlin, through its wholly-owned LCP Chemicals-Georgia, Inc. Division, is the current owner of the Site (with the exception of the roughly 2.9 acre parcel owned by Georgia Power Company), and until 1994 operated a chemical manufacturing plant located thereupon.  In 1979, Hanlin purchased the Site and the associated chlor-alkali (Solvay) manufacturing plant from Allied-Signal, Inc.  Between its purchase of the Site in 1979 and until 1994 when industrial activity at the Site was terminated, Hanlin operated the chlor-alkali (Solvay) facility at the Site using the same manufacturing process that had previously been used at the Site by AlliedSignal, Inc.  On July 10, 1991, Hanlin filed for protection from creditors under Chapter 11 of the U.S. Bankruptcy Code.  In February 1994, Hanlin ceased its manufacturing activity at the Site.  On March 31, 1994, EPA issued a CERCLA § 106 Unilateral Administrative Order for Removal.

    5.   <u>The O'Brien Corporation (O'Brien)</u>:  O'Brien is the corporate successor to the Dixie Paint and Vanish Co. ("Dixie") which owned and operated a paint manufacturing facility at the Site starting in about 1941.  Dixie conveyed its roughly 10.5 acre parcel to Allied in about 1955.  Dixie became the Dixie O'Brien Corporation and subsequently a wholly owned subsidiary of O'Brien following its purchase by O'Brien in about 1966.

  C.  1.   EPA has determined that Respondent AlliedSignal, Inc. owned or operated the Site at the time of disposal of hazardous substances, within the meaning of section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), and as defined by section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

    2.   EPA has determined that Respondent Atlantic Richfield Co., Inc. owned or operated the Site at the time of disposal of hazardous substances, within the meaning of section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), and as defined by section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

    3.   EPA has determined that Respondent Georgia Power Company is a current owner of the Site, within the meaning of section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), and owned or operated the Site at the time of disposal of hazardous substances, within the meaning of section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), as defined by section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

    4.   EPA has determined that Hanlin Group, Inc., is a current owner and operator of the Site, within the meaning of

6

section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), and as defined by section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

5.   EPA has determined that The O'Brien Corporation owned or operated the Site at the time of disposal of hazardous substances, within the meaning of section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), and as defined by section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

D.   The LCP Chemicals - Georgia Site has not yet been proposed by EPA for inclusion on the National Priority List ("NPL"), as defined in Section 105 of CERCLA, as amended, 42 U.S.C. § 9605.  However, the State of Georgia, in exercise of its authority under Section 105(a)(8)(B) of CERCLA, 42 U.S.C. § 9605 (a)(8)(B), has designated this Site for establishment on the NPL as its highest priority facility among the known facilities in the State of Georgia.

E.   1.   Mercury has been detected at the Site in soil, sediment, groundwater, and air samples at elevated levels. Mercury has also been detected in aquatic life captured in the Turtle River and in birds taken from the nearby estuarine area.

2.   Lead has been detected at the Site in soil, sediment, and groundwater samples at elevated levels.

3.   Polychlorinated biphenyls (PCBs) have been detected at the Site in soil, sediment, and groundwater samples at elevated levels.  PCB's have also been detected in aquatic life captured in the Turtle River area.

4.   Polycyclic aromatic hydrocarbons (PAHs) have been detected at the Site in soil, sediment, and groundwater samples at elevated levels.

F.   Residential neighborhoods exist to the southeast and northeast of the Site.  Some nearby residences draw potable water from an aquifer located beneath the Site; initial sampling has not revealed contamination.  In addition, several federally designated endangered or threatened species, (examples include the manatee, wood stork, brown pelican, and loggerhead turtle) utilize the waters or land in or around the Site.

G.   The non-marsh area of the Site is underlain by a Mandarin-Urban Land Complex soil type; it is a deep, somewhat poorly drained, moderately permeable soil that formed in a thick, sandy, marine environment.  The marsh area of the Site is underlain by a Bohicket-Capers Association soil type; it is a deep, very poorly drained, very permeable soil that formed in thick, clayey, marine sediment.  The surficial aquifer underlying the Site is comprised of Pleistocene to Recent age sediments which consist primarily of sand, gravel, and thin layer of clay.

7

At the non-marsh area of the Site, the water table, on average, is encountered at about three (3) feet below land surface (bls).

## V.   EPA'S CONCLUSIONS OF LAW

A.   The Site is a facility within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

B.   The Respondents are persons as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

C.   Respondents are appropriate parties under Section 104 of CERCLA, 42 U.S.C. § 9604, to conduct the RI/FS in accordance with Section 122 of CERCLA, 42 U.S.C. § 9622.

D.   Contaminants found at the Site are hazardous substances within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), or constitute a pollutant or contaminant that may present an imminent and substantial danger to the public health or welfare under Section 104(a)(1) of CERCLA, 42 U.S.C. 9604(a)(1).

E.   The hazardous substances described have been released into the environment and their potential migration pathways constitute both an actual release and threatened release within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

## VI.   DETERMINATIONS

Based on the Findings of Fact and Conclusions of Law set out above, EPA has determined that:

A.   The actual and/or threatened release of hazardous substances from the Site may present an imminent and substantial endangerment to the public health or welfare or the environment.

B.   The actions required by this Consent Order are necessary to protect the public health and/or welfare and/or the environment.

C.   In accordance with Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1), EPA has determined that the work to be performed pursuant to this Consent Order, if performed according to the terms of this Consent Order, will be done properly and promptly by the Respondents.  EPA has also determined that the Respondents are qualified to conduct such work.

8

## VII.   WORK TO BE PERFORMED

A.   All aspects of the Work to be performed by Respondents pursuant to this Consent Order ("Work") shall be under the direction and supervision of a qualified contractor who shall be a qualified professional engineer or geologist with expertise in hazardous site cleanup, the selection of which shall be subject to approval by EPA.   Within fifteen (15) calendar days after the effective date of this Consent Order, Respondents shall submit to EPA in writing the name, title, and qualifications of any supervising contractor(s) proposed to be used in carrying out the RI/FS, the Baseline Risk Assessment, and the Ecological Risk Assessment to be performed pursuant to this Consent Order.   EPA will notify the Respondents of its approval or disapproval in writing, within twenty (20) days of its receipt of this submission(s) by the Respondents.

If EPA disapproves of the selection of any contractor, Respondents shall submit a list of alternate contractors to EPA within fifteen (15) calendar days of receipt of EPA's disapproval of the contractor previously selected.   EPA will, within twenty (20) days of receipt of the list, provide written notice of the names of the contractors that it approves.   The Respondents may at their election select any one from that list.   Respondents shall notify EPA of the name of the contractor selected within fifteen (15) calendar days of EPA's notice of the approved contractors.

If, at any time thereafter, Respondents propose to change any contractor, Respondents shall give written notice to EPA and shall obtain approval from EPA before the new contractor performs any work under this Consent Order.

Based on the foregoing, it is hereby AGREED TO AND ORDERED that the following work will be performed:

Within sixty (60) calendar days of the effective date of this Consent Order, Respondents shall submit to EPA a plan for a complete Remedial Investigation and Feasibility Study (RI/FS Work Plan).   The RI/FS Work Plan shall be developed and submitted in conjunction with a Sampling and Analysis Plan and a Health and Safety Plan, although each plan may be delivered under separate cover.   These plans shall be developed in accordance with the National Contingency Plan and the attached Scope of Work (Statement of Work or SOW) (Attachment 1) which is hereby made a part of this Consent Order as if fully set forth herein.   The RI/FS Work Plan shall include a comprehensive description of the work to be performed, the biota and media to be investigated (i.e., air, groundwater, surface water, surface and subsurface soils and sediments, etc.), the methodologies to be utilized, and the rationale for the selection of each methodology.   A comprehensive schedule for completion of each major activity

required by this Consent Order and including the submission of each deliverable listed in the RI/FS Scope of Work shall also be included.  Such schedule shall reflect submittal of a Draft Feasibility Study within five hundred forty (540) calendar days of the effective date of this Consent Order.

The Sampling and Analysis Plan (SAP) shall include procedures to ensure that sample collection and analytical activities are conducted in accordance with technically acceptable protocols and that the data generated will meet the Data Quality Objectives (DQOs) established.  The SAP provides a mechanism for planning field activities and consists of a Field Sampling and Analysis Plan (FSAP) and a Quality Assurance Project Plan (QAPP).

The FSAP shall define in detail the sampling and data-gathering methods that shall be used on the project.  It shall include sample objectives, sample location (horizontal and vertical) and frequency, sampling equipment and procedures, and sample handling and analysis.  The QAPP shall describe the project objectives and organization, functional activities, and quality assurance and quality control (QA/QC) protocols that shall be used to achieve the desired DQOs.

A Health and Safety Plan shall be prepared in conformance with the Respondents' health and safety program and OSHA regulations and protocols.

   B.    Respondents will perform the Baseline Risk Assessment and an Ecological Risk Assessment.  The major components of the Baseline Risk Assessment include contaminant identification, exposure assessment, toxicity assessment, and human health and ecological risk characterization.  The major tasks necessary for Respondents to conduct an Ecological Risk Assessment, and that shall be followed by Respondents are outlined in "<u>Ecological Risk Assessment Guidance for Superfund  Process for Designing and Conducting Ecological Risk Assessments</u>," Review Draft dated September 26 ,1994.  Respondents will use a "food web model" to aid EPA in determining cleanup goals based on the Ecological Risk Assessment.

The Baseline Risk Assessment and the Ecological Risk Assessment will provide sufficient information concerning the risks such that Respondents can draft a Feasibility Study (FS) Report. Respondents will prepare a Baseline Risk Assessment Report and an Ecological Risk Assessment Report based on the data collected during the Site Characterization.  EPA will respond in the Responsiveness Summary of the Record of Decision to all significant comments on the Baseline Risk Assessment and Ecological Risk Assessment that are submitted during the Proposed Plan's formal comment period.

10

C.    Respondents will implement the RI/FS Work Plan approved by EPA.  The EPA approved RI/FS Work Plan and any EPA approved amendments thereto will be attached to and incorporated in this Consent Order as Attachment 2.  The RI/FS will be conducted in accordance with the schedule contained in the RI/FS Work Plan as approved by EPA.

D.    Within seven (7) calendar days of the approval of the RI/FS Work Plan by EPA, Respondents will commence work on Task 1 of the RI/FS Work Plan.

E.    Respondents shall submit to EPA written monthly progress reports which: (1) describe the actions which have been taken toward achieving compliance with this Consent Order during the previous month; (2) include all results of sampling and tests and all other data received by Respondents during the previous month; (3) include all plans and procedures completed under the Work Plan during the previous month; (4) describe all actions, data, and plans which are scheduled for the next month, and provide other information relating to the progress of the work as deemed necessary by EPA; and (5) include information regarding percentage of completion, unresolved delays, encountered or anticipated, that may affect the future schedule for implementation of the Scope of Work and/or RI/FS Work Plans, and a description of efforts made to mitigate those delays or anticipated delays.  These progress reports are to be submitted to EPA by the fifteenth (15th) calendar day of every month following the effective date of this Consent Order.

F.    Deliverables, including reports, plans or other correspondence to be submitted pursuant to this Consent Order, shall be sent by regular certified mail, express mail or overnight delivery, to the following address, or to such other addresses as the EPA hereafter may designate in writing:

> Alan W. Yarbrough
> Remedial Project Manager
> EPA - Region IV
> Waste Management Division
> 345 Courtland Street, N.E.
> Atlanta, Georgia  30365

The number of copies to be submitted to EPA for each deliverable is identified in the RI/FS Scope of Work.

For informational purposes documents (two copies) shall be sent to:

> Mr. Jim McNamara
> Georgia Department of Natural Resources
> Georgia Environmental Protection Division
> Floyd Tower East, Suite 1154

11

205 Butler Street, S.E.
Atlanta, Georgia 30334

Documents to be submitted to the Respondents' Project Coordinator
should be sent to:

Mr. Louis Palladino
c/o LCP Chemicals
P.O. Box 1558
Ross Road
Brunswick, Georgia 31521

G.   EPA may determine that other tasks, including remedial
investigatory work and/or engineering evaluation, are necessary
as part of an RI/FS in addition to EPA-approved tasks and
deliverables, including reports, which have been completed
pursuant to this Consent Order.  EPA will offer Respondents an
opportunity to discuss the necessary additional tasks.  The
Respondents shall thereafter implement any additional tasks which
EPA determines are necessary as part of the RI/FS and which are
in addition to the tasks detailed in the RI/FS Work Plan.  The
additional work shall be completed in accordance with the
standards, specifications, and schedule determined or approved by
EPA.

VIII.   SUBMISSIONS REQUIRING AGENCY APPROVAL

A.   EPA reserves the right to comment on, modify and direct
changes for all deliverables.  Upon initial receipt of any plan,
report or other item which is required to be submitted for
approval pursuant to this Consent Order, EPA shall either: (1)
approve the submission; or (2) disapprove the submission,
notifying Respondents of deficiencies.  If such submission is
disapproved, EPA shall either: (1) notify the Respondents that
EPA will modify the submission to cure the deficiencies, provide
Respondents with an opportunity to discuss the deficiencies, and
then modify the submission; or (2) direct the Respondents to
modify the submission to cure the deficiencies and the manner in
which Respondents are to cure said deficiencies.  Initial
submission by Respondents of a deliverable which is not approved
by EPA pursuant to this subparagraph "A" does not constitute a
violation under this Consent Order.

B.   Upon receipt of a notice of disapproval and notification
directing modification of the submission, Respondents shall,
within thirty (30) calendar days or such other shorter period
that EPA reasonably deems appropriate under the circumstances,
cure the deficiencies and resubmit the plan, report, or other
item for approval.  Notwithstanding the notice of disapproval,
Respondents shall proceed to take any action required by any
nondeficient portion of the submission.

C.    In the event of approval or modification of the
submittal by EPA, Respondents shall proceed to take any action
required by the plan, report, or other item, as approved or
modified by EPA.   Following EPA approval or modification of a
submittal or portion thereof, Respondents shall not thereafter
alter or amend such submittal or portion thereof unless directed
by EPA to so do.

D.    If, upon resubmission, the plan, report, or item is not
approved, EPA will invoke the process of approval, disapproval,
and/or modification in accordance with subparagraph "A" of this
Section VIII.   If EPA disapproval or modification of any
resubmission is due to a material defect in the resubmission,
Respondents shall be deemed to be in violation of this Consent
Order and stipulated penalties shall begin to accrue pursuant to
Section XVI of this Consent Order from the date of such
resubmission.   EPA retains the right to seek stipulated or
statutory penalties, to amend or require the amendment of the
document, to perform additional studies, to conduct a complete
RI/FS pursuant to its authority under CERCLA, and to take any
other action, including, but not limited to, enforcement action
to recover its costs pursuant to its authority under CERCLA.
Correspondingly, Respondents reserve all rights pertaining to
such penalties sought and/or action(s) taken by EPA.

E.    Neither failure of EPA to expressly approve or
disapprove of Respondents' deliverables within a specified time
period, nor the absence of comments, shall be construed as
approval by EPA.   Respondents are responsible for preparing and
submitting deliverables acceptable to EPA.

F.    Respondents shall make presentations at, and participate
in, meetings at the request of EPA during the initiation, conduct
and completion of the RI/FS.   In addition to the discussion of
the technical aspects of the RI/FS, topics will include
anticipated problems or new issues.   Meetings will be scheduled
at EPA's discretion but with reasonable notice to be given to
Respondents.

G.    The provisions of this Consent Order shall govern all
proceedings regarding the RI/FS work conducted pursuant to this
Consent Order.   In the event of any inconsistency between this
Consent Order and any required deliverable submitted by
Respondent, the inconsistency will be resolved in favor of this
Consent Order.

IX.   DESIGNATED PROJECT COORDINATORS

A.    On or before the effective date of this Consent Order,
EPA and Respondents will each designate a Project Coordinator and
an Alternate Project Coordinator.   The "Project Coordinator" for

13

EPA will be the Remedial Project Manager (RPM) or the On-Scene
Coordinator (OSC) responsible for this Site.  Respondents shall
submit Respondents' designated Project Coordinator's name,
address, telephone number, and qualifications to EPA.  The
Respondents' Project Coordinator shall be subject to disapproval
by EPA and shall have the technical expertise sufficient to
adequately oversee all aspects of the Work.  If EPA disapproves
of a Project Coordinator designated by the Respondents, the
Respondents shall designate a different Project Coordinator and
shall notify EPA of that person's name and qualifications within
seven (7) days following EPA's disapproval.  The Respondents'
Project Coordinator shall not serve as an attorney.  Each Project
Coordinator will be responsible for overseeing the implementation
of this Consent Order.  The EPA Project Coordinator will be EPA's
designated representative at the Site.  To the maximum extent
possible, communications between Respondents and EPA, including
all documents, reports, approvals, and other correspondence
concerning the activities performed pursuant to the terms and
conditions of this Consent Order, will be directed through the
Project Coordinators.

     B.   EPA and Respondents each have the right, subject to the
terms and conditions in paragraph A of this Section, to change
their respective Project Coordinator.  Such a change will be
accomplished by notifying the other party in writing at least
five (5) calendar days prior to the change.

     C.   The EPA designated Project Coordinator will have the
authority vested in an RPM or OSC by the National Contingency
Plan, 40 C.F.R. Part 300, as amended.  This includes the
authority to halt, conduct, or direct any work required by this
Consent Order, or any response actions or portions thereof when
he or she determines that conditions may present an immediate
risk to public health or welfare or the environment.

     D.   The absence of the EPA Project Coordinator from the Site
shall not be cause for the stoppage or delay of work.

     E.   EPA shall arrange for a qualified person to assist in
its oversight and review of the conduct of the RI/FS, as required
by Section 104(a) of CERCLA, 42 U.S.C. 9604(a).  The oversight
assistant may observe work and make inquiries in the absence of
EPA, but is not authorized to modify the work plan.

                X.   QUALITY ASSURANCE, SAMPLING AND DATA ANALYSIS

     A.   Respondents shall use quality assurance, quality
control, and chain of custody procedures in accordance with EPA's
"Interim Guidelines and Specifications For Preparing Quality
Assurance Project Plans" (QAMS-005/80) and the "EPA Region IV
Engineering Support Branch Standard Operating Procedures and

14

Quality Assurance Manual (U.S. EPA Region IV, Environmental
Services Division, February 1, 1991), and subsequent amendments
to such guidelines.  Prior to the commencement of any monitoring
project under this Consent Order, Respondents shall submit for
review, modification and/or approval by EPA, a Quality Assurance
Project Plan ("QAPP") that is consistent with applicable
guidelines.  Sampling data generated consistent with the QAPP(s)
and reviewed and approved by EPA shall be admissible as evidence,
without objection, in any proceeding under this Consent Order.
Respondents shall assure that EPA personnel or authorized
representatives are allowed access to any laboratory utilized by
Respondents in implementing this Consent Order.

     B.   Respondents shall make available to EPA the results of
all sampling and/or tests or other data generated by Respondents
with respect to the implementation of this Consent Order and
shall submit these results in monthly progress reports as
described in Section VII.E. of this Consent Order.

     C.   At the request of EPA, Respondents shall allow split or
duplicate samples to be taken by EPA, and/or their authorized
representative, of any samples collected by Respondents pursuant
to the implementation of this Consent Order.  Respondents shall
notify EPA not less than fourteen (14) days in advance of any
sample collection activity.  In addition, EPA shall have the
right to collect any additional samples that EPA deems necessary.
Upon reasonable request by Respondents, EPA shall allow split or
duplicate sample(s) to be taken by Respondents.

     D.   Respondents shall ensure that the laboratory utilized by
Respondents for analyses participates in a EPA quality
assurance/quality control program equivalent to that which is
followed by EPA and which is consistent with EPA document
QAMS-005/80.  In addition, EPA may require submittal of data
packages equivalent to those generated in the EPA Contract
Laboratory Program (CLP) and may require laboratory analysis of
performance samples (blank and/or spike samples) in sufficient
number to determine the capabilities of the laboratory.

     E.   Notwithstanding any provision of this Consent Order, the
EPA hereby retains all of its information gathering, inspection
and enforcement authorities and rights under CERCLA, RCRA, and
any other applicable statute or regulation.


                         XI.  ACCESS

     A.   From the date of execution of this Consent Order until
EPA provides written notice of satisfaction of the terms of the
Consent Order, the EPA and its authorized representatives and
agents shall have access at all times to the Site and any
property to which access is required for the implementation of

15

this Consent Order, to the extent access to the property is
controlled by or available to Respondents, for the purposes of
conducting any activity authorized by or related to this Consent
Order, including, but not limited to:

     1.   Monitoring the RI/FS work or any other activities
taking place on the property;

     2.   Verifying any data or information submitted to the
United States;

     3.   Conducting investigations relating to contamination
at or near the Site;

     4.   Obtaining samples;

     5.   Evaluating the need for or planning and
implementing additional remedial or response actions at or near
the Site; and

     6.   Inspecting and copying records, operating logs,
contracts, or other documents EPA deems is required to assess
Respondents' compliance with this Consent Order.

    B.   To the extent that the Site or any other area where work
is to be performed under this Consent Order is owned or
controlled by persons other than Respondents, Respondents shall
secure from such persons access for Respondents, as well as for
EPA and authorized representatives or agents of EPA, as necessary
to effectuate this Consent Order.  Copies of such access
agreements will be provided to EPA prior to Respondents'
initiation of field activities.  If access is not obtained within
the latter of thirty (30) calendar days of the effective date of
this Consent Order or thirty (30) days prior to the date on which
such access may be required, Respondents shall promptly notify
the EPA.  The United States may thereafter assist Respondents in
obtaining access.  Respondents shall, in accordance with Section
XVII herein, reimburse the United States for all costs incurred
by it in obtaining access, including but not limited to,
attorneys' fees and the amount of just compensation and costs
incurred by the United States in obtaining access.

    C.   Notwithstanding any provision of this Consent Order, the
EPA retains all of its access authorities and rights under
CERCLA, RCRA and any other applicable statute or regulations.

## XII.  CONFIDENTIALITY OF SUBMISSIONS

    A.   Respondents may assert a confidentiality claim, if
appropriate, covering part or all of the information requested by
this Consent Order pursuant to 40 C.F.R. § 2.203(b).  Such an

16

assertion shall be adequately substantiated when the assertion is made.  Analytical data shall not be claimed as confidential by Respondents.  Information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B.  If no such claim accompanies the information when it is submitted to EPA, it may be made available to the public by EPA without further notice to Respondents.

B.   Respondents waive any objection to the admissibility into evidence (without waiving any objection as to weight) of the results of any analyses of sampling conducted by or for them at the Site or of other data gathered pursuant to this Consent Order that has been verified by the quality assurance/quality control procedures established pursuant to Section X.

C.  Respondents may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Respondents assert such a privilege in lieu of providing documents, they shall provide EPA with the following:  (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a brief description of the contents of the document, record, or information: and (6) the privilege asserted by Respondents. However, no documents, reports or other information created or generated pursuant to the requirements of this Consent Order shall be withheld on the grounds that they are privileged.

## XIII.   RECORD PRESERVATION

Respondents agree that each will preserve, during the pendency of this Consent Order and for a minimum of six (6) years after its termination, all records and documents in their possession or in the possession of their divisions, employees, agents, accountants, contractors, or attorneys which relate in any way to the RI/FS, despite any document retention policy to the contrary. After this six year period, Respondents will notify EPA within ninety (90) calendar days prior to the destruction of any such documents.  Upon request by EPA, Respondents will make available to EPA such records or copies of any such records.  Additionally, if EPA reasonably requests that documents be preserved for a longer period of time, Respondents will comply with that request.

## XIV.   DISPUTE RESOLUTION

Any disputes arising under this Consent Order shall be resolved as follows:  If the Respondents object to any EPA notice of disapproval or decision made pursuant to this Consent Order, the

17

Respondents shall notify EPA's Project Coordinator in writing of their objections within fourteen (14) calendar days after receipt of the decision. Respondents' written objection(s) shall define the objection(s), state the basis of Respondents' objection(s), and be sent certified mail, return receipt requested, or other similar manner. EPA and the Respondents then have an additional fourteen (14) calendar days to reach agreement. If agreement cannot be reached within the fourteen (14) calendar day period, the Chief, South Superfund Remedial Branch, EPA Waste Management Division, shall provide a written statement of the decision and the reasons supporting that decision to Respondents. The Branch Chief's determination is EPA's final decision. If Respondents do not agree to perform or do not actually perform the task(s) in dispute as determined by the Chief, South Superfund Remedial Branch, EPA Waste Management Division, EPA reserves the right to conduct the work itself, to seek reimbursement from the Respondents, and/or to seek other appropriate relief. Correspondingly, Respondents reserve all rights pertaining to the reimbursement and/or other appropriate relief sought by EPA.

Respondents are not relieved of their obligations to perform and conduct any work required by this Consent Order while a matter is pending in dispute resolution.

## XV.   FORCE MAJEURE

A.   "Force Majeure" is defined for the purposes of the Consent Order as an event arising from causes entirely beyond the control of Respondents and of any entity controlled by Respondents including their contractors and subcontractors, which could not have been overcome by the exercise of best efforts which delays or prevents the performance of any obligation under this Consent Order. Such "exercise of best efforts" shall include the use of best efforts to anticipate any potential force majeure event and the use of best efforts to address the effects of any potential force majeure event (1) as it is occurring and (2) following the potential force majeure event, such that the delay or prevention of performance is minimized to the greatest extent possible. Examples of events which may constitute force majeure events include, but are not necessarily limited to, extraordinary weather events, natural disasters, and national emergencies. Examples of events that are not force majeure events include, but are not limited to, normal inclement weather, increased costs or expenses of the Work to be performed under this Consent Order, the financial difficulty of Respondents to perform such tasks, the failure of one or more of Respondents to satisfy their obligation under this Consent Order, acts or omissions not otherwise force majeure attributable to Respondents' contractors or representatives, and the failure of Respondents or Respondents' contractors or representatives to

18

make complete and timely application for any required approval or permit.

B.   When circumstances occur which may delay or prevent the completion of any phase of the Work or access to the Site or to any property on which part of the Work Plan is to be performed, whether or not caused by a _force majeure_ event, Respondents shall notify the EPA Project Coordinator orally of the circumstances within forty-eight (48) hours of when Respondents first knew or should have known that the event might cause delay.  If the EPA Project Coordinator is unavailable, Respondents shall notify the designated alternate or the Director of the Waste Management Division, EPA Region IV.  Within seven (7) calendar days after Respondents first became aware of such circumstances, Respondents shall supply to EPA in writing: (1) the reasons for the delay; (2) the anticipated duration of the delay; (3) all actions taken or to be taken to prevent or minimize the delay; (4) a schedule for implementation of any measures to be taken to mitigate the effect of the delay; and (5) a statement as to whether, in the opinion of the Respondents, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Respondents shall exercise best efforts to avoid or minimize any delay and any effects of a delay.  Failure to comply with the above requirements shall preclude Respondents from asserting any claim of _force majeure._

C.   If EPA agrees that a delay is or was caused by a _force majeure_ event, the time for performance of the obligations under this Consent Order that are directly affected by the _force majeure_ event shall be extended by agreement of the parties, pursuant to Section XXIII, for a period of time not to exceed the actual duration of the delay caused by the _force majeure_ event. An extension of the time for performance of the obligation directly affected by the _force majeure_ event shall not necessarily justify an extension of time for performance of any subsequent obligation.

D.   If EPA does not agree that the delay or anticipated delay has been or will be caused by a _force majeure_ event, or does not agree with Respondents on the length of the extension, the issue shall be subject to the dispute resolution procedures set forth in Section XIV of the Consent Order.  In any such proceedings, to qualify for a _force majeure_ defense, Respondents shall have the burden of proof that the delay or anticipated delay was or will be caused by a _force majeure_ event, that the duration of the delay was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Respondents complied with the requirements of paragraph B of this Section.  Should Respondents carry this burden, the delay at issue shall be deemed not to be a violation by Respondents of the affected obligation of the Consent Order.

19

## XVI.   STIPULATED PENALTIES

Unless excused under the provisions of Sections XIV or XV, the Respondents shall pay into the Hazardous Substance Superfund administered by EPA, the sums set forth below as stipulated penalties.

Stipulated penalties shall accrue as follows:

A.   For each day during which Respondents fail to perform, in accordance with the schedules contained in this Consent Order and in the various plans and reports required under this Consent Order incorporated by reference herein, any of the following activities:

1.   for failure to timely submit the RI/FS Work Plan, Sampling and Analysis Plan, draft Baseline Risk Assessment, draft Ecologicial Risk Assessment, draft RI Report and/or draft FS Report required under this Consent Order;

2.   for failure to timely submit any modifications requested by EPA or its representatives to the RI/FS Work Plan, Sampling and Analysis Plan, draft Baseline Risk Assessment, draft Ecological Risk Assessment, draft RI Report and/or draft FS Report as required under this Consent Order; and

3.   for failure to timely submit payment of oversight and other costs as provided in Section XVII;

Respondents shall be liable to EPA for stipulated penalties in the following amounts:

| Period of Failure to Comply | Penalty Per Violation Per Day |
|---|---|
| 1st through  7th day | $  500 |
| 8th through 14th day | $1,000 |
| 15th through 44th day | $3,000 |
| 45th day and beyond | $7,500 |

B.   If Respondents fail to submit a monthly progress report by its due date, Respondents shall be liable to EPA for stipulated penalties in the amount of $500 per violation for each day during which Respondents fail to submit and, if necessary, modify monthly reports.

C.   Respondents shall be liable to EPA for stipulated penalties in the amount of $500 per violation for each day during which Respondents fail to comply with all other requirements of this Consent Order including, but not limited to, any implementation schedule, other payment requirement, notification requirement or completion deadline.  Respondents will be provided by EPA with a brief period appropriate to the circumstances to

comply with such requirement(s) prior to the assessment of stipulated penalties under this paragraph "C".

All stipulated penalties begin to accrue on the earlier of the day the violation occurs or the day following Respondents' failure to comply with any schedule or deadline or the terms, conditions, or requirements contained in this Consent Order and/or Work Plan. Stipulated penalties shall continue to accrue until Respondents' violation ends or until Respondents comply with the particular schedule or deadline.

Payment of stipulated penalties shall be due and owing within fifteen (15) calendar days from the receipt of a written notice from EPA notifying Respondents that penalties have been assessed. Interest shall accrue on any unpaid amounts, beginning at the end of the fifteen (15) calendar day period, at the rate established by the Department of Treasury under 31 U.S.C. § 3717. Respondents shall pay a six percent (6%) per annum penalty charge, to be assessed if the penalty is not paid in full within 90 calendar days after it is due. The check and transmitted letter shall identify the Name of the Site, the Site identification number and the title of this Order. A copy of the transmittal letter should be sent simultaneously to the EPA Project Coordinator.

Payment shall be made to:

        U. S. Environmental Protection Agency
        Region IV
        Superfund Accounting
        P. O. Box 100142
        Atlanta, Georgia  30384
        ATTENTION: Collection Officer for Superfund

Respondents may dispute EPA's right to the stated amount of penalties by invoking the Dispute Resolution procedures under Section XIV of this Consent Order. Penalties shall accrue but need not be paid during the dispute resolution period. If Respondents do not prevail upon resolution, all penalties shall be due to EPA within thirty (30) calendar days of resolution of the dispute. EPA and Respondents hereby agree that in a judicial action initiated by EPA against Respondents to collect stipulated penalties determined by EPA during the Dispute Resolution procedure to be owing, the judicial standard of review for evaluating the determination shall be whether said determination was arbitrary or capricious based on the administrative record developed by EPA during the dispute resolution process. If Respondents prevail upon resolution, such penalties shall not be paid.

In the event that EPA provides for corrections to be reflected in the next deliverable and does not require resubmission of that

21

deliverable, stipulated penalties for that interim deliverable shall cease to accrue on the date of such decision by EPA.

Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Order.

The stipulated penalties set forth in this Section do not preclude EPA from electing to pursue any other remedies or sanctions which may be available to EPA by reason of the Respondents' failure to comply with any of the requirements of this Consent Order. Such remedies and sanctions may include a suit for statutory penalties up to the amount authorized by law, a federally-funded response action, and a suit for reimbursement of costs incurred by the United States.

## XVII.   REIMBURSEMENT OF OVERSIGHT AND RESPONSE COSTS

In accordance with Section 104(a)(1) of CERCLA, as amended, 42 U.S.C. § 9604(a)(1), Respondents agree to reimburse the Hazardous Substance Superfund for all response and oversight costs incurred by EPA or its authorized representatives in oversight of Respondents' performance of work under the Consent Order. EPA nevertheless reserves its right to pursue reimbursement of all costs from any party not a signatory to this Consent Order, including, but not limited to, a party determined by EPA in Section IV of this Consent Order to be an owner or operator of the Site either currently or at the time of disposal of hazardous substances.

At the end of each fiscal year, EPA will submit to Respondents an accounting of all response and oversight costs incurred by the U.S. Government with respect to this Consent Order. Oversight costs shall include all direct and indirect costs of EPA's oversight arrangement for the RI/FS, including, but not limited to, time and travel costs of EPA personnel and associated indirect costs, contractor costs, compliance monitoring, including the collection and analysis of split samples, inspection of RI/FS activities, site visits, interpretation of Consent Order provisions, discussions regarding disputes that may arise as a result of this Consent Order, review and approval or disapproval of reports, the costs of redoing any of Respondents tasks, and any assessed statutory interest.

EPA's certified Agency Financial Management System Summary data (SPUR or SCORES Reports) and any other necessary documents shall serve as the basis for payment demands.

Failure to submit an accounting in one fiscal year does not prevent EPA from submitting an accounting for that year in a subsequent fiscal year. Respondents shall, within thirty (30) calendar days of receipt of each accounting, remit a certified or

22

cashiers check made payable to the Hazardous Substance Superfund
for the amount of those costs not disputed by Respondents.
Interest shall begin to accrue on the unpaid balance from that
date.  Checks should specifically reference the identity of the
Site and should be sent to:

>  U. S. Environmental Protection Agency
>  Region IV
>  Superfund Accounting
>  P. O. Box 100142
>  Atlanta, Georgia  30384
>  ATTENTION: Collection Officer for Superfund

A copy of the transmittal letter and a copy of the check should
be sent simultaneously to both the EPA Project Coordinator and
to:

>  U. S. Environmental Protection Agency
>  Region IV
>  345 Courtland Street, N.E.
>  Atlanta, Georgia  30365
>  ATTENTION: Cost Recovery Specialist

Respondents agree to limit any disputes concerning costs to
accounting errors and the inclusion of costs outside the scope of
this Consent Order.  Respondents shall identify any disputed
costs and the basis of the objection.  All undisputed costs shall
be remitted by Respondents in accordance with the schedule set
out above.  Disputed costs shall be paid by Respondents into an
escrow account while the dispute is pending.  Respondents bear
the burden of establishing an EPA accounting error and the
inclusion of costs outside the scope of this Consent Order.

EPA reserves the right to bring an action against the Respondents
pursuant to Section 107 of CERCLA to enforce the response and
oversight cost reimbursement requirements of this Consent Order
and to collect stipulated penalties assessed pursuant to section
XVI of this Consent Order.

## XVIII.   RESERVATION OF RIGHTS

Notwithstanding compliance with the terms of this Consent Order,
the Respondents are not released from liability, if any, for any
actions beyond the terms of this Consent Order taken by EPA
regarding this Site.  EPA reserves the right to take any
enforcement action pursuant to CERCLA or any other available
legal authority, including the right to seek injunctive relief,
monetary penalties, and punitive damages for any violation of law
or this Consent Order.  Correspondingly, Respondents reserve all
rights pertaining to such claims or actions.

Except as otherwise provided herein, EPA and Respondents
expressly reserve all rights and defenses that they may have,

23

including EPA's right both to disapprove of work performed by Respondents and to require that Respondents perform tasks in addition to those detailed in the RI/FS Work Plan, as provided in this Consent Order.  In the event that Respondents decline to perform any additional or modified tasks, EPA will have the right to undertake any RI/FS work.  In addition, EPA reserves the right to undertake removal actions and/or remedial actions at any time. In either event, EPA reserves the right to seek reimbursement from Respondents thereafter for such costs which are incurred by the United States and Respondents reserve all rights to contest or defend against such claims or actions.

Following satisfaction of the requirements of this Consent Order, Respondents shall have resolved its liability to EPA for the performance of the RI/FS that is the subject of this Order.  The Respondents are not released from liability, if any, for any actions taken beyond the terms of this Order regarding removals, other operable units, remedial design/remedial action (RD/RA), or activities arising pursuant to section 121(c) of CERCLA.

## XIX.  <u>OTHER CLAIMS</u>

Nothing in this Consent Order constitutes a release from any claim, cause of action or demand in law or equity against any person, firm, partnership, or corporation for any liability it may have arising out of or relating in any way to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous substances, hazardous wastes, pollutants, or contaminants found at, taken to, or taken from the Site.

EPA reserves the right to bring an action against the Respondents pursuant to Section 107 of CERCLA for recovery of all response and oversight costs incurred by the United States related to this Consent Order and not reimbursed by Respondents, as well as any other past and future costs incurred by the United States in connection with response activities conducted pursuant to CERCLA at this site.

This Consent Order does not constitute a preauthorization of funds under Section 111(a)(2) of CERCLA, 42 U.S.C. § 9611(a)(2).

In entering into this Consent Order, Respondents waive any right to seek reimbursement under Section 106(b)(2) of CERCLA, 42 U.S.C. § 9606(b)(2), for any costs incurred in complying with this Consent Order.

Respondents shall bear their own costs and attorney fees.

24

## XX.   OTHER APPLICABLE LAWS

All actions required to be taken pursuant to this Consent Order
will be undertaken in accordance with the requirements of all
applicable local, state, and federal laws and regulations unless
an exemption from such requirements is specifically provided in
this Consent Order, or made a part of this Consent Order by being
incorporated herein at some later date.

## XXI.   INDEMNIFICATION OF THE UNITED STATES GOVERNMENT

Respondents agree to indemnify and save and hold harmless the
United States, its agencies, departments, officials, agents,
employees, contractors, or representative, from any and all
claims or causes of action arising from or on account of acts or
omissions of Respondents, their officers, employees, receivers,
trustees, agents, or assigns, in carrying out the activities
pursuant to this Consent Order.   The United States Government or
any agency or authorized representative thereof shall not be held
to be a party to any contract involving Respondents at or
relating to the Site.

## XXII.   PUBLIC COMMENT

Following submittal to EPA of the Feasibility Study Final Report,
EPA will make both the Remedial Investigation Final Report and
the Feasibility Study Final Report and EPA's Proposed Plan
available to the public for review and comment for, at a minimum,
a thirty (30) calendar day period, pursuant to EPA's Community
Relations Plan and the NCP.   Following the public review and
comment period, EPA will notify Respondents of the remedial
action alternative selected for the Site.

## XXIII.   EFFECTIVE DATE AND SUBSEQUENT MODIFICATION

In consideration of the communications between Respondents and
EPA prior to the issuance of this Consent Order concerning its
terms, Respondents agree that there is no need for a settlement
conference prior to the effective date of this Consent Order.
Therefore, the effective date of this Consent Order will be the
date on which it is signed by EPA.   This Consent Order may be
amended by mutual agreement of EPA and Respondents.   Such
amendments will be in writing and will have, as the effective
date, that date on which such amendments are signed by EPA.   EPA
Project Coordinators do not have the authority to sign amendments
to the Consent Order.

Any reports, plans, specifications, schedules, and attachments
required by this Consent Order are, upon approval by EPA,

25

incorporated into this Consent Order.  Any noncompliance with
such EPA approved reports, plans, specifications, schedules, and
attachments will be considered a failure to achieve the
requirements of this Consent Order and will subject the
Respondent to the provisions included in the "Force Majeure" and
"Stipulated Penalties" sections (Sections XV and XVI,
respectively) of this Consent Order.

No informal advice, guidance, suggestions, or comments by EPA
regarding reports, plans, specifications, schedules, and any
other writing submitted by Respondents will be construed as
relieving Respondents of their obligation to obtain such formal
approval of EPA as may be required by this Consent Order.

## XXIV.  NOTICE TO THE STATE

EPA has notified the State of Georgia regarding the requirements
of this Consent Order.

Upon completion of the RI/FS, pursuant to the requirements of
Section 104(c)(2) of CERCLA, 42 U.S.C. § 9604(c)(2), EPA will
notify the State of Georgia before determining the appropriate
remedial action to be taken at the Site.

## XXV.  TERMINATION AND SATISFACTION

This Consent Order shall terminate when the Respondents
demonstrate in writing and certify to the satisfaction of EPA
that all activities required under this Consent Order, including
any additional work, payment of past costs, response and
oversight costs, and any stipulated penalties demanded by EPA,
have been performed and EPA has approved the certification.  This
notice shall not, however, terminate Respondents' obligation to
comply with Sections XIII, XVII, and XVIII of this Consent Order.

The certification shall be signed by a responsible official
representing each Respondent.  Each representative shall make the
following attestation:  "I certify that the information contained
in or accompanying this certification is true, accurate, and
complete."  For purposes of this Consent Order, a responsible
official is a corporate official who is in charge of a principal
business function.

## XXVI DISCLAIMERS

Respondents have entered into this Consent Order to further the
public interest and avoid unnecessary conflict or litigation
between the parties to this Consent Order.  Respondents do not
admit to any liability under CERCLA, other State or Federal
statute, or the common law for the release or threatened release

TOTAL P.02

26

of any hazardous substance.  By entering into this Consent Order
or taking any action in accordance with it, Respondents do not
admit any of the Findings of Fact, Conclusions of Law, or
Determinations contained herein. Nevertheless, Respondents agree
not to challenge said Findings, Conclusions or Determinations or
their bases for purposes of enforcing this Consent Order by EPA.
The participation of Respondents in this Consent Order shall not
be admissible against any Respondent; nevertheless, such
participation of Respondents shall be admissible in any action by
EPA in any judicial or administrative proceeding to enforce the
terms of this Consent Order against any Respondent.  In any
action to enforce this Consent Order, Respondents agree not to
challenge the basis for this Consent Order or its applicability
to Respondents.  Nothing in this Consent Order shall be construed
as prohibiting, altering, or in any way limiting the ability of
the United States to seek any remedy or sanction available by
virtue of Respondents' violation of this Consent Order or of the
statutes and regulations upon which it is based, including but
not limited to, penalties pursuant to Section 122(l) of CERCLA.


IN THE MATTER OF: LCP CHEMICALS - GEORGIA, Brunswick, Glynn
County, Georgia,;


IT IS SO AGREED:

RESPONDENT:    ALLIEDSIGNAL INC
                    (Please Type)


        BY: _____ _____    June 29, 1995
                    (Signature)                   Date
            James A. Schutt
                (Please Type Your Name)


            Director, Manufacturing Services
                    (Title)

26

of any hazardous substance.  By entering into this Consent Order
or taking any action in accordance with it, Respondents do not
admit any of the Findings of Fact, Conclusions of Law, or
Determinations contained herein. Nevertheless, Respondents agree
not to challenge said Findings, Conclusions or Determinations or
their bases for purposes of enforcing this Consent Order by EPA.
The participation of Respondents in this Consent Order shall not
be admissible against any Respondent; nevertheless, such
participation of Respondents shall be admissible in any action by
EPA in any judicial or administrative proceeding to enforce the
terms of this Consent Order against any Respondent.  In any
action to enforce this Consent Order, Respondents agree not to
challenge the basis for this Consent Order or its applicability
to Respondents.  Nothing in this Consent Order shall be construed
as prohibiting, altering, or in any way limiting the ability of
the United States to seek any remedy or sanction available by
virtue of Respondents' violation of this Consent Order or of the
statutes and regulations upon which it is based, including but
not limited to, penalties pursuant to Section 122(l) of CERCLA.


IN THE MATTER OF: LCP CHEMICALS - GEORGIA, Brunswick, Glynn
County, Georgia,;


IT IS SO AGREED:

RESPONDENT:            ATLANTIC RICHFIELD COMPANY
                         (Please Type)

BY:     _____    _6/29/95_
                 (Signature)                 Date

        Robert J. Trunek
          (Please Type Your Name)

        Vice President - Environmental Health & Safety
        _____
                  (Title)

26

of any hazardous substance.  By entering into this Consent Order or taking any action in accordance with it, Respondents do not admit any of the Findings of Fact, Conclusions of Law, or Determinations contained herein. Nevertheless, Respondents agree not to challenge said Findings, Conclusions or Determinations or their bases for purposes of enforcing this Consent Order by EPA. The participation of Respondents in this Consent Order shall not be admissible against any Respondent; nevertheless, such participation of Respondents shall be admissible in any action by EPA in any judicial or administrative proceeding to enforce the terms of this Consent Order against any Respondent.  In any action to enforce this Consent Order, Respondents agree not to challenge the basis for this Consent Order or its applicability to Respondents.  Nothing in this Consent Order shall be construed as prohibiting, altering, or in any way limiting the ability of the United States to seek any remedy or sanction available by virtue of Respondents' violation of this Consent Order or of the statutes and regulations upon which it is based, including but not limited to, penalties pursuant to Section 122(1) of CERCLA.


**IN THE MATTER OF: LCP CHEMICALS - GEORGIA, Brunswick, Glynn County, Georgia,;**


**IT IS SO AGREED:**

**RESPONDENT:**   Georgia Power Company
                  _____
                       (Please Type)

**BY:**   _C M Hob_____          6/28/95
              (Signature)                _____
                                          **Date**

          C. M. Hobson
          _____
          **(Please Type Your Name)**


          Manager, Environmental Affairs
          _____
                    **(Title)**

IN THE MATTER OF: LCP CHEMICALS - GEORGIA, Brunswick, Glynn County, Georgia, EPA Docket No.; 95-17-C

IT IS SO AGREED AND ORDERED:

BY: _____          JUL 0 6 1995
        Douglas F. Mundrick, P.E., Chief        _____
        South Superfund Remedial Branch              Date
        Waste Management Division
        Region IV
        U.S. Environmental Protection Agency

SCOPE OF WORK FOR THE
REMEDIAL INVESTIGATION AND FEASIBILITY STUDY
AT THE LCP CHEMICALS SITE

INTRODUCTION

The purpose of this Remedial Investigation/Feasibility Study
(RI/FS) is to investigate the nature and extent of contamination
at the LCP Chemicals Site (the "Site"), assess the current and
potential risk to public health, welfare, and the environment,
and to develop and evaluate potential Remedial Action
Alternatives.  The RI and FS are interactive and shall be
conducted concurrently so that the data collected in the RI
influences the development of Remedial Action Alternatives in the
FS, which in turn affects the data needs and the scope of
Treatability Studies.

The Respondents shall conduct the RI/FS (including the Baseline
Risk Assessment which shall consist of a Human Health Risk
Assessment and an Ecological Risk Assessment) and produce an
RI/FS Report that is in accordance with this Scope of Work, the
Guidance for Conducting Remedial Investigations and Feasibility
Studies Under CERCLA, (Interim Final) (U.S. EPA Office of
Emergency and Remedial Response, October 1988) (the "RI/FS
Guidance"), the National Oil and Hazardous Substances Pollution
Contingency Plan (March 8, 1990) and other guidances used by EPA
in conducting an RI/FS (the primary guidances are listed in
Attachment A), as well as any additional requirements in the
Administrative Order.  The RI/FS Guidance describes the report
format and the required report content.  Pertinent RI/FS Guidance
section numbers are denoted in parenthesis throughout this Scope
of Work.  The Respondents shall furnish all necessary personnel,
materials, and services needed, or incidental to, performing the
RI/FS, except as otherwise specified in the Administrative Order.

At the completion of the RI/FS, EPA shall be responsible for the
selection of a remedy to be implemented for the Site.  EPA will
document this selection of a remedy in a Record of Decision
(ROD).  The Remedial Action Alternative selected by EPA will meet
the cleanup standards specified in §121 of SARA.  That is, the
selected remedial action will be protective of human health and
the environment, will be cost-effective, will utilize permanent
solutions and alternative treatment technologies or resource
recovery technologies to the maximum extent practicable, will be
in compliance with, or include a waiver of, applicable or
relevant and appropriate requirements of other laws or
regulations, and will address the statutory preference for

1

on-site treatment which permanently and significantly reduces the volume, toxicity, or mobility of the hazardous substances, pollutants, and contaminants as a principal element. The Final Remedial Investigation and Feasibility Study Report(s), as adopted by EPA will, with the remainder of the Administrative Record, form the basis for the selection of the remedy to be implemented for the Site and will provide the information necessary to support the development of the ROD.

As specified in §104(a)(1) of CERCLA, as amended by SARA, EPA must provide oversight of the Respondents' activities throughout the RI/FS. The Respondents shall support EPA's initiation and conduct of activities related to the implementation of oversight activities. However, the primary responsibility for conducting an adequate RI/FS to enable and support the selection of a remedy shall lie with the Respondents. EPA review and approval of deliverables is a tool to assist this process and to satisfy, in part, EPA's responsibility to provide effective protection of public health, welfare, and the environment. EPA approval of a task or deliverable shall not be a guarantee as to the ultimate adequacy of such task or deliverable. A summary of the major deliverables that Respondents shall submit for the RI/FS is attached (Attachment B). For each draft and revised deliverable, Respondent must submit a copy of the deliverable on a 3.5 inch diskette in either WordPerfect® 5.1 or WordPerfect 6.0 for Windows® format. A general schedule of RI/FS activities is also attached (Attachment C).

**TASK 1 - SCOPING (RI/FS Guidance, Chapter 2)**

Scoping is the initial planning process of the RI/FS and has been initiated by EPA to determine the site-specific objectives of the RI/FS prior to negotiations between the Respondents and EPA. Scoping is continued, repeated as necessary, and refined throughout the RI/FS process. In addition to developing the Site Objectives of the RI/FS, EPA has developed a **Site Management Strategy**. Consistent with the Site Management Strategy, the specific project scope shall be planned by the Respondents and EPA. The Respondents shall document the specific project scope in a Work Plan. Because the work required to perform an RI/FS is not fully known at the onset, and is phased in accordance with a Site's complexity and the amount of available information, it may be necessary to modify the Work Plan during the RI/FS to satisfy the objectives of the study.

The Site Objectives for the LCP Chemicals Site have been determined preliminarily, based on available information, to be the following:

2

1.   Review of existing information pertaining to the Site.  This review includes Work Plans and the associated data generated by the EPA-ordered LCP Site Removal Action, EPA Site Inspection Reports, GaEPD Annual Compliance Inspection/Trip Reports for the LCP Site, GaEPD's RCRA Facility Assessment Report, EPA's Environmental Photographic Interpretation Center Site Analysis, the Preliminary Natural Resources Survey, other reports from local, State and Federal agencies, court records, information from local businesses such as local well drillers and waste haulers and generators, facility records, and information from past, present, and current facility owners, operators, and employees and nearby citizens.

2.   Review of relevant guidance (see attached references) to understand the remedial process.  This information shall be used in performing the RI/FS and preparing all deliverables under this SOW.

3.   Timely identification of all Federal and State applicable or relevant and appropriate requirements (ARARs).  For example, GaEPD's Hazardous Site Response Act contains statewide cleanup criteria that are anticipated to be ARARs for this Site.

4.   Determination of the nature and lateral and vertical extent of contamination (waste types, concentrations and distributions) for all affected media including air, groundwater, soil, surface water, sediment, and biota, etc.

5.   Performance of a well survey within a three mile radius of the Site including determining water uses, well construction methods used, the number and age of users, and the volume and rate of water usage.  The survey radius may be reduced or enlarged at EPA's sole discretion during the RI based upon:  (i) Results of previous surveys and sampling; (ii) the direction of groundwater flow in each contaminated aquifer; and (iii) the extent of groundwater contamination in each aquifer.

6.   Identification and screening of potential treatment technologies along with containment/disposal requirements for residuals or untreated wastes, including any stockpiles of material that may remain on-site once the removal action is completed.

7.   Assembly of technologies into Remedial Action Alternatives and screening of alternatives.

3

8.    Performance of bench or pilot Treatability Studies as necessary.

9.    Detailed analysis of Remedial Action Alternatives.

10.   Sample collection/data analysis of the information necessary to conduct an Ecological Risk Assessment.  These tasks are outlined in "<u>Ecological Risk Assessment Guidance for Superfund:  Process for Designing and Conducting Ecological Risk Assessments</u>".  The review draft dated September 26, 1994 is currently available and is to be used; the interim final version of this guidance is not anticipated in the near future.  Respondents will use a "food web model" for biomagnifiable contaminants, as well as other methods acceptable to EPA, to aid in determining cleanup goals based on the Ecological Risk Assessment.

11.   Due to the age of many of the structures on the Site, performance of a cultural resources survey is likely to be necessary to determine if Site structures have any archaeological or historic value under pertinent local, state, or federal law.  The need for conducting a cultural resources survey must be evaluated during the project planning stage of the RI/FS, and if determined by EPA to be necessary, strategy for developing the cultural resources survey must be included in the Remedial Investigation Work Plan.

The Site Management Strategy for the LCP Chemicals Site includes the following:

1.    A complete investigation of the Site including any and all off-site contamination which may have been caused by contaminants originating from the Site.

2.    Use of the RI to identify any other Potentially Responsible Parties that may be involved.

3.    The initial workplan must incorporate the existing and subsequent data gained from the Site Removal Action and initial evaluation of the Site as a whole.  It is anticipated that the Site will be partitioned into separate operable units, including: 1) the surface soil/subsurface soil/Site buildings/operations area; 2) Site groundwater; and, 3) the marsh/ecological portion of the Site.  It is further anticipated that several Records of Decision (RODs) will be prepared for the Site.

4

4.   A removal action is ongoing.  EPA expects that interim remedial measures will be required; examples of such measures include but are not limited to groundwater containment/remediation and containment/remediation of soil stockpiled from the removal action.

5.   EPA oversight of the Respondents' conduct of the work (i.e., the RI/FS and any response action) to ensure compliance with applicable laws, regulations and guidances and to ensure that the work proceeds in a timely fashion.

6.   Respondents' preparation of the Baseline Risk Assessment which shall consist of a Human Health Risk Assessment and a Ecological Risk Assessment.

7.   EPA management of the Remedy Selection and Record of Decision phase with input from State Agencies, Natural Resource Trustees and the Public (including the Respondents).

When scoping the specific aspects of a project, the Respondents must meet with EPA to discuss all project planning decisions and special concerns associated with the Site.  The following activities shall be performed by the Respondents as a function of the project planning process.

a.   Site Background (2.2)

The Respondents shall gather and analyze the existing background information regarding the Site and shall conduct a visit to the Site to assist in planning the scope of the RI/FS.

Collect and Analyze Existing Data and Document the Need for Additional Data (2.2.2; 2.2.6; 2.2.7)

Before planning RI/FS activities, all existing Site data shall be thoroughly compiled and reviewed by the Respondents.  Specifically, this compilation and review shall include currently available data relating to the varieties and quantities of hazardous substances at the Site and past disposal practices (what type of contaminants were dumped where, when, and by whom).  This compilation and review shall also include results from any previous sampling or other investigations that may have been conducted.  The Respondents shall refer to Table 2-1 of the RI/FS Guidance for a comprehensive list of data collection information sources.  This information shall be utilized in determining additional data needed for Site Characterization, better

5

defining potential applicable or relevant and appropriate
requirements (ARARs), and developing a range of
preliminarily identified Remedial Action Alternatives.
Subject to EPA approval, Data Quality Objectives (DQOs)
shall be established that specify the usefulness of existing
data.  Decisions on the necessary data and DQOs shall be
made by EPA.

Removal/Remedial Coordination

It is the intent of the parties to develop interim remedial
soil cleanup levels for the non-marsh area using the risk
assessment process outlined herein so that a single set of
cleanup levels can be used both for a future remedial action
at the Site and for the removal action currently on-going
under the Unilateral Administrative Order for Removal issued
by EPA on March 31, 1994 as amended March 27, 1995 (UAO for
Removal).  To achieve this goal and to aid in the
coordination of the removal and remedial actions, the
parties will work together to expedite the development of
interim remedial risk-based soil cleanup levels for the non-
marsh portions of the Site, to the extent practicable.

EPA anticipates the need for the standard minimum 30-day
document review period dependent upon the quality of the
document submitted; accordingly, Respondents may need to
commit and focus resources to an extent sufficient to
initiate work on the submittal(s) listed in this SOW's
Attachment B before EPA has approved prior submittal(s).  To
ensure timely review and to increase the likelihood of EPA
approval of any initial submittals, Respondents shall
incorporate and present risk assessment assumptions and
groundwater modelling in accordance with EPA policy and
guidance; EPA encourages open and timely communication
and/or meetings concerning each submittal.

The parties recognize that the marsh and non-marsh areas of
the Site are interconnected via both ground and surface
water and that an ecological risk assessment may affect a
cleanup on both marsh and non-marsh areas of the Site.
Remedial cleanup levels for the marsh area may be developed
after the removal is complete.  As a consequence, the
parties further recognize that the final cleanup levels for
the marsh may have a material impact on final remedial
cleanup levels for the non-marsh areas.

The expedited development of interim remedial soil cleanup
levels anticipated herein must not hinder or interfere with
the work to be performed pursuant to the UAO for Removal.

6

Failure to develop interim remedial soil cleanup levels for the non-marsh area in a timeframe sufficient for incorporation into the work to be performed under the UAO for Removal shall not in any way limit Respondents' obligations under this Consent Order nor shall it in any way delay commencement, performance, or completion of the excavation or other removal activities required by the UAO for Removal including, but not limited to, removal actions described in EPA-approved workplans and schedules. Respondents recognize that until final remedial cleanup levels are embodied as performance standards in a Record of Decision (ROD), the interim remedial soil cleanup levels are subject to change for various reasons, including, but not limited to, risk management decisions that are a part of the ROD development process, the ROD process itself, comments received from the State and the public, new information, and numerous requirements contained in the National Contingency Plan.

Conduct Site Visit

The Respondents shall conduct a visit to the Site with the EPA Remedial Project Manager (RPM) during the project scoping phase to assist in developing a conceptual understanding of sources and areas of contamination as well as potential exposure pathways and receptors at the Site. During the visit to the Site the Respondents shall observe the physiography, hydrology, geology, and demographics of the Site as well as related natural resource, ecological and cultural features. This information shall be utilized to better scope the project and to determine the extent of additional data necessary to characterize the Site, better define potential ARARs, and narrow the range of preliminarily identified Remedial Action Alternatives.

b.   Project Planning (2.2)

Once the Respondents have collected and analyzed existing data and conducted a visit to the Site, the specific project scope shall be planned. Project planning activities include those tasks described below as well as the development of specific required deliverables as described in paragraph c. The Respondents shall meet with EPA regarding the following activities and before the drafting of the scoping deliverables.

7

## Refine the Site Objectives and Develop Preliminary Remedial Action Objectives and Alternatives (2.2.3)

Once existing information about the Site has been analyzed and a conceptual understanding of the potential risks posed by the Site has been obtained, the Respondents shall review and, if necessary, refine the Site Objectives and develop preliminary remedial action objectives for each actually or potentially contaminated medium. Any revised Site Objectives shall be documented in a technical memorandum and are subject to EPA approval prior to development of the other scoping deliverables. The Respondents shall then identify a preliminary range of broadly defined potential Remedial Action Alternatives and associated technologies. The range of potential alternatives shall include, at a minimum, alternatives in which treatment is used to reduce the toxicity, mobility, or volume of the waste, but varying in the types of treatment, the amount treated, and the manner in which long-term residuals or untreated wastes are managed; alternatives that involve containment and treatment components; alternatives that involve containment with little or no treatment; and a no-action alternative.

## Document the Need for Treatability Studies (2.2.4)

If remedial actions involving treatment have been identified by the Respondents or EPA, Treatability Studies shall be required except where the Respondents can demonstrate to EPA's satisfaction that they are not needed. Where Treatability Studies are needed, identification of possible technologies and screening shall be done and the results submitted with the RI/FS Work Plan. Initial Treatability Study activities (such as research and study design) shall be planned to occur concurrently with Site Characterization activities (see Tasks 3 and 5).

## Begin Preliminary Identification of Potential ARARs (2.2.5)

The Respondents shall conduct a preliminary identification of potential State and Federal ARARs (chemical-specific, location-specific, and action-specific) to assist in the refinement of remedial action objectives and the initial identification of Remedial Action Alternatives and ARARs associated with particular actions. ARARs identification shall continue as conditions and contaminants at the Site and Remedial Action Alternatives are better defined.

8

c.   Scoping Deliverables (2.3)

At the conclusion of the project planning phase, the Respondents shall submit an RI/FS Work Plan, a Sampling and Analysis Plan, and a Health and Safety Plan.  The RI/FS Work Plan and Sampling and Analysis Plan must be reviewed and approved and the Health

and Safety Plan reviewed by EPA prior to the initiation of field activities.

RI/FS Work Plan (2.3.1)

A Work Plan documenting the decisions and evaluations completed during the scoping process shall be submitted to EPA for review and approval.  The Work Plan shall be developed in conjunction with the Sampling and Analysis Plan and the Health and Safety Plan, although each plan may be delivered under separate cover.  The Work Plan shall include a comprehensive description of the work to be performed, the medias to be investigated (i.e., Air, Groundwater, Surface Water, Biota, Surface and Subsurface Soils, and Sediments, etc.), the methodologies to be utilized, and the rationale for the selection of each methodology.  A comprehensive schedule for completion of each major activity and submission of each deliverable shall also be included.  This schedule shall be consistent with Attachment C.

Specifically, the Work Plan shall present the following:

- A statement of the problem(s) and potential problem(s) posed by the Site and the objectives of the RI/FS.

- A background summary setting forth the following:

- a description of the Site including the geographic location, and, to the extent possible, a description of the physiography, hydrology, geology, demographics, and the ecological, cultural, and natural resource features of the Site;

- a history of the Site including a description of past operating and disposal practices (what type of contaminants were dumped where, when, and by whom) and a description of previous responses that have been conducted by local, State, Federal, or private parties at the Site;

- a summary of the existing data in terms of physical and chemical characteristics of the contaminants identified and

9

their distribution among the environmental media at the Site.

- A description of the Site Management Strategy developed by EPA during scoping as discussed previously in this SOW and as may be modified with EPA's approval;

- A preliminary identification of Remedial Action Alternatives and data needs for evaluation of Remedial Action Alternatives.  This preliminary identification shall reflect coordination with Treatability Study requirements (see Tasks 1 and 5).

- A process for identifying Federal and State ARARs (chemical-specific, location-specific, and action-specific).

- A detailed description of the tasks to be performed, information needed for each task and for Respondents' preparation of the Baseline Risk Assessment, information to be produced during and at the conclusion of each task, and a description of the work products that shall be submitted to EPA.  This description must also include the deliverables set forth in the remainder of this Scope of Work.

- A schedule for each of the required activities which is consistent with Attachment C and the RI/FS Guidance.

- A project management plan, including a data management plan (e.g., requirements for project management systems and software, minimum data requirements, data format, and backup data management), monthly reports to EPA, and meetings and presentations to EPA at the conclusion of each major phase of the RI/FS.

The Respondents shall refer to Appendix B of the RI/FS Guidance for a comprehensive description of the contents of the required Work Plan.

Because of the unknown nature of the Site and iterative nature of the RI/FS, additional data requirements may be identified throughout the RI/FS process.  The Respondents shall submit a technical memorandum documenting any need for additional data along with the proposed DQOs whenever such requirements are identified.  In any event, the Respondents are responsible for fulfilling additional data and analysis needs identified by EPA consistent with the general scope and objectives of this RI/FS and the Administrative Order.

10

<u>Sampling and Analysis Plan</u> (2.3.2)

The Respondents shall prepare a Sampling and Analysis Plan
(SAP) to ensure that sample collection and analytical
activities are conducted in accordance with technically
acceptable protocols and that the data generated will meet
the DQOs established.  The SAP provides a mechanism for
planning field activities and consists of a Field Sampling
and Analysis Plan (FSAP) and a Quality Assurance Project
Plan (QAPP).

The FSAP shall define in detail the sampling and
data-gathering methods that shall be used on the project.
It shall include sampling objectives, sample location
(horizontal and vertical) and frequency, sampling equipment
and procedures, and sample handling and analysis.  The QAPP
shall describe the project objectives and organization,
functional activities, and quality assurance and quality
control (QA/QC) protocols that shall be used to achieve the
desired DQOs.  The DQOs will, at a minimum, reflect use of
analytical methods for identifying contamination and
addressing contamination consistent with the levels for
remedial action objectives identified in the proposed
National Contingency Plan, pages 51425-26 and 51433
(December 21, 1988).  In addition, the QAPP shall address
personnel qualifications, sampling procedures, sample
custody, analytical procedures, and data reduction,
validation, and reporting.  These procedures must be
consistent with the Region IV <u>Environmental Compliance</u>
<u>Branch Standard Operating Procedures and Quality Assurance</u>
<u>Manual</u> (February 1, 1991).  Field personnel shall be
available for EPA QA/QC training and orientation, as
required.

The Respondents shall demonstrate, in advance and to EPA's
satisfaction, that each laboratory it may use is qualified
to conduct the proposed work.  This demonstration must
include use of methods and analytical protocols for the
chemicals of concern (typically the Target Compound List
(TCL), the Target Analyte List (TAL), and a analyses for
dioxin/furans) in the media of interest within detection and
quantification limits consistent with both QA/QC procedures
and DQOs approved by EPA in the QAPP for the Site.  The
laboratory must have and follow an EPA-approved QA program.
The Respondents shall provide assurances that EPA has access
to laboratory personnel, equipment and records for sample
collection, transportation, and analysis.  EPA may require
that the Respondents submit detailed information to
demonstrate that the laboratory is qualified to conduct the

11

work, including information on personnel qualifications, equipment, and material specifications. In addition, EPA may require submittal of data packages equivalent to those generated in the EPA Contract Laboratory Program (CLP) and may require laboratory analysis of performance samples (blank and/or spike samples) in sufficient number to determine the capabilities of the laboratory. If a laboratory not currently participating in the CLP is selected, methods consistent with CLP methods that would be used at this Site for the purposes proposed and QA/QC procedures approved by EPA shall be used. In addition, if the laboratory is not in the CLP program, a laboratory QA program must be submitted for EPA review and approval granted prior to the shipment of Site samples to that laboratory for analysis.

<u>Health and Safety Plan</u> (2.3.3)

A Health and Safety Plan shall be prepared in conformance with the Respondents' health and safety program, and in compliance with OSHA regulations and protocols. The Health and Safety Plan shall include the eleven elements described in the RI/FS Guidance, such as a health and safety risk analysis, a description of monitoring and personal protective equipment, medical monitoring, and site control. It should be noted that EPA does not "approve" the Respondents' Health and Safety Plan, but rather EPA reviews it to ensure that all necessary elements are included, and that the plan provides for the protection of human health and the environment.

## TASK 2 - COMMUNITY RELATIONS (2.3.4)

The development and implementation of community relations activities are the responsibility of EPA. The critical community relations planning steps performed by EPA include conducting community interviews and developing a community relations plan. Although implementation of the community relations plan is the responsibility of EPA, the Respondents may be requested to assist by providing information regarding the history of the Site and participating in public meetings. The extent of the Respondents' involvement in community relations activities is left to the discretion of EPA. The Respondents' community relations responsibilities, if any, shall be specified in the community relations plan. All RI/FS community relations activities conducted by Respondents shall be subject to oversight by EPA.

12

**TASK 3 - SITE CHARACTERIZATION (RI/FS Guidance, Chapter 3)**

As part of the RI, the Respondents shall perform the activities described in this task, including the preparation of a Site Characterization Summary and a RI Report. The overall objective of Site Characterization is to describe areas of the Site that may pose a threat to human health or the environment. This objective is accomplished by first determining physiography, geology, and hydrology of the Site. Surface and subsurface pathways of migration shall also be defined. The Respondents shall identify the sources of contamination and define the nature, extent, and volume of the sources of contamination, including their physical and chemical constituents as well as their concentrations at incremental locations in the affected media. The Respondents shall also investigate the extent of migration of this contamination as well as its volume and any changes in its physical or chemical characteristics. This investigation will provide for a comprehensive understanding of the nature and extent of contamination at the Site. Using this information, contaminant fate and transport shall be determined and projected.

During this phase of the RI/FS, the Work Plan, SAP, and Health and Safety Plan shall be implemented. Field data shall be collected and analyzed to provide the information required to accomplish the objectives of the study. The Respondents shall notify EPA at least two weeks in advance of the field work regarding the planned dates for field activities, including installation of monitoring wells, installation and calibration of equipment, pump tests, field lay out of any sampling grid, excavation, sampling and analysis activities, and other field investigation activities. The Respondents shall demonstrate that the laboratory and type of laboratory analyses that will be utilized during Site Characterization meets the specific QA/QC requirements and the DQOs as specified in the SAP. In view of the unknown conditions at the Site, activities are often iterative and, to satisfy the objectives of the RI/FS, it may be necessary for the Respondents to supplement the work specified in the initial Work Plan. In addition to the deliverables below, the Respondents shall provide a monthly progress report and participate in meetings with EPA at major points in the RI/FS.

a.   Field Investigation (3.2)

The field investigation includes the gathering of data to define physical characteristics, sources of contamination, and the nature and extent of contamination at the Site. These activities shall be performed by the Respondents in accordance with the Work

13

Plan and SAP.  At a minimum, this investigation shall include the following activities:

### Implementing and Documenting Field Support Activities (3.2.1)

The Respondents shall initiate field support activities following approval of the Work Plan and SAP.  Field support activities may include obtaining access to the Site, property surveys, scheduling, and procuring equipment, office space, laboratory services, utility services and/or contractors.  The Respondents shall notify EPA at least one week prior to initiating major field support activities so that EPA may adequately schedule oversight tasks.  The Respondents shall also notify EPA in writing upon completion of field support activities.

### Investigating and Defining Site Physical and Biological Characteristics (3.2.2)

The Respondents shall collect data on the physical and biological characteristics of the Site and its surrounding areas including the physiography, geology, and hydrology, and specific physical characteristics identified in the Work Plan.  This information shall be ascertained through a combination of physical measurements, observations, and sampling efforts and shall be utilized to define potential transport pathways and receptor populations.  In defining the physical characteristics of the Site, the Respondents shall also obtain sufficient engineering data (such as pumping characteristics, soil particle size, permeability, etc.) for the projection of contaminant fate and transport and the development and screening of Remedial Action Alternatives, including information necessary to evaluate treatment technologies.

### Defining Sources of Contamination (3.2.3)

The Respondents shall locate each source of contamination. For each location, the lateral and vertical extent of contamination shall be determined by sampling at incremental depths on a sampling grid or in another organized fashion approved by EPA.  The physical characteristics and chemical constituents and their concentrations shall be determined for all known and discovered sources of contamination.  The Respondents shall conduct sufficient sampling to define the boundaries of the contaminant sources to the level established in the QA/QC plan and DQOs.  Sources of contamination shall be analyzed for the potential of

contaminant release (e.g., long term leaching from soil),
contaminant mobility and persistence, and characteristics
important for evaluating remedial actions, including
information necessary to evaluate treatment technologies.

Describing the Nature and Extent of Contamination (3.2.4)

The Respondents shall gather information to describe the
nature and extent of contamination as a final step during
the field investigation.  To describe the nature and extent
of contamination, the Respondents shall utilize the
information on Site physical characteristics and sources of
contamination to give a preliminary estimate of the
contaminants that may have migrated.  The Respondents shall
then implement an iterative monitoring program and any study
program identified in the Work Plan or SAP such that, by
using analytical techniques sufficient to detect and
quantify the concentration of contaminants, the migration of
contaminants through the various media at the Site can be
determined.  In addition, the Respondents shall gather data
for calculations of contaminant fate and transport.  This
process is continued until the lateral and vertical extent
of contamination has been determined to the contaminant
concentrations consistent with the established DQOs set
forth in the QAPP.  EPA shall use the information on the
nature and extent of contamination to determine the level of
risk presented by the Site.  Respondents shall use this
information to help to determine aspects of the appropriate
Remedial Action Alternatives to be evaluated.

b.   Data Analyses (3.4)

Evaluate Site Characteristics (3.4.1)

The Respondents shall analyze and evaluate the data to
describe: (1) physical and biological characteristics of the
Site; (2) contaminant source characteristics; (3) nature and
extent of contamination; and (4) contaminant fate and
transport.  The information on physical and biological
characteristics, source characteristics, and nature and
extent of contamination shall be used in the analysis of
contaminant fate and transport.  The evaluation shall
include the actual and potential magnitude of releases from
the sources and lateral and vertical spread of contamination
as well as mobility and persistence of contaminants.  Where
modeling is appropriate, such models shall be identified to
EPA in a technical memorandum prior to their use.  All data
and programming, including any proprietary programs, shall
be made available to EPA together with a sensitivity

15

analysis. All models shall be approved by EPA prior to
their use. The RI data shall be presented in a computer
disk format utilizing Lotus 1-2-3® or other equivalent
commonly used computer software to facilitate Respondents'
preparation of the Baseline Risk Assessment. Respondents
shall then collect any data identified by EPA as necessary
to fill data gaps that EPA determines are present during
preparation of the Baseline Risk Assessment (see "Guidance
for Data Useability in Risk Assessment," U.S. EPA, Office of
Emergency and Remedial Response, October 1990, OSWER
Directive No. 9285.7-05). Also, this evaluation shall
provide any information relevant to characteristics of the
Site necessary for evaluation of the need for remedial
action in the Baseline Risk Assessment, the development and
evaluation of Remedial Action Alternatives, and the
refinement and identification of ARARs. Analyses of data
collected for Site Characterization shall meet the DQOs
developed in the QAPP.

c.   <u>Data Management Procedures</u> (3.5)

The Respondents shall consistently document the quality and
validity of field and laboratory data compiled during the RI. At
a minimum, this documentation shall include the following
activities:

<u>Documenting Field Activities</u> (3.5.1)

Information gathered during characterization of the Site
shall be consistently documented and adequately recorded by
the Respondents in well maintained field logs and laboratory
reports. The method(s) of documentation must be specified
in the Work Plan and/or the SAP. Field logs must be
utilized to document observations, calibrations,
measurements, and significant events that have occurred
during field activities. Laboratory reports must document
sample custody, analytical responsibility, analytical
results, adherence to prescribed protocols, nonconformity
events, corrective measures, and/or data deficiencies.
Supporting documentation described as the "CLP Data Package"
must be provided with the sample analysis for all samples
split or duplicated with EPA.

<u>Maintaining Sample Management and Tracking</u> (3.5.2; 3.5.3)

The Respondents shall maintain field reports, sample
shipment records, analytical results, and QA/QC reports to
ensure that only validated analytical data are reported and
utilized in the development and evaluation of the Baseline

16

Risk Assessment and Remedial Action Alternatives. Analytical results developed under the Work Plan shall not be included in any characterization reports for the Site unless accompanied by or cross-referenced to a corresponding QA/QC report.  In addition, the Respondents shall establish a data security system to safeguard chain-of-custody forms and other project records to prevent loss, damage, or alteration of project documentation.

d.   Site Characterization Deliverables (3.7)

The Respondents shall prepare the Preliminary Site Characterization Summary and the Remedial Investigation Report.

Preliminary Site Characterization Summary (3.7.2)

After completing field sampling and analysis, the Respondents shall prepare a concise Site Characterization Summary.  This summary shall review the investigative activities that have taken place and describe and display data for the Site documenting the location and characteristics of surface and subsurface features and contamination at the Site including the affected medium, location, types, physical state, and quantity and concentrations of contaminants.  In addition, the location, dimensions, physical condition, and varying concentrations of each contaminant throughout each source and the extent of contaminant migration through each of the affected media shall be documented.  The RI data shall be presented in a computer disk format utilizing Lotus 1-2-3® or other equivalent commonly used computer software to facilitate Respondents' preparation of the Baseline Risk Assessment. The Site Characterization Summary shall provide Respondents with a preliminary reference for developing the Baseline Risk Assessment and remediation goals, evaluating the development and screening of Remedial Action Alternatives, and the refinement and identification of ARARs.

Remedial Investigation (RI) Report (3.7.3)

The Respondents shall prepare and submit a Draft RI Report to EPA for review and approval.  This report shall summarize results of field activities to characterize the Site, sources of contamination, nature and extent of contamination, and the fate and transport of contaminants. The Respondents shall refer to the RI/FS Guidance for an outline of the report format and contents.  Following comment by EPA, the Respondents shall prepare a Final RI Report which satisfactorily addresses EPA's comments.

17

## TASK 4 - BASELINE RISK ASSESSMENT (3.4.2)

A Baseline Risk Assessment shall identify and characterize the
toxicity and levels of hazardous substances present, contaminant
fate and transport, the potential for human and environmental
exposure, and the risk of potential threats to human health and
the environment (including both flora and fauna).  It will
provide a basis for determining whether remedial action is
necessary and a justification for performing remedial action that
may be required.  The procedures to perform a Baseline Risk
Assessment for human health are outlined in EPA's <u>Risk Assessment
Guidance for Superfund (RAGS)</u>, and in the <u>Supplemental Guidance
to RAGS: Region IV Bulletin</u> dated March 1994.  These procedures
are outlined below and shall be followed by the Respondents.  The
procedures to perform a Baseline Risk Assessment for ecological
health that Respondents shall follow are outlined in the
<u>Ecological Risk Assessments Guidance for Superfund:  Process for
Designing and Conducting Ecological Risk Assessments</u> dated
September 26, 1994, authored by EPA's Environmental Response
Team, Edison, New Jersey.  Other resources that the Respondents
shall utilize when performing the Baseline Risk Assessment
include the Integrated Risk Information System (IRIS), and the
<u>Interim Final Risk Assessment Guidance for Superfund -
Environmental Evaluation Manual</u>.

a.    <u>Human Health Risk Assessment Components</u>

- The Risk Assessment process is divided into the components listed
below.  During the scoping of the Baseline Risk Assessment, the
Respondents shall discuss with EPA the format of the Baseline
Risk Assessment Report (both the Human Health and Ecological Risk
portions) as well as the references to be utilized during the
Baseline Risk Assessment.

### <u>Contaminant Identification and Documentation</u>

The Respondents shall review the information that is
available on the hazardous substances present at the Site
and shall identify the contaminants of concern.  The
contaminants of concern, also known as indicator chemicals,
are not chosen solely on the basis of chemical-specific
ARARs.  Rather, they are selected based on quantity, the
concentration of contaminants on-site as compared to levels
that pose a risk, relative toxicity, and critical exposure
pathways, such as drinking water. . The Respondents shall
submit to EPA for review and comment a technical memorandum
listing all the hazardous substances present at the Site and
the indicator chemicals with the known corresponding ambient
concentrations of these contaminants.  The data shall be

18

tabulated to show the frequency of detection, the arithmetic
mean and range of concentrations, and the sample collection
date(s).  In calculating the arithmetic mean, a chemical not
detected in a sample shall be assumed to be present at a
concentration of one-half its respective quantification
limit as set forth in the QAPP.  Chemical-specific ARARs
shall also be identified at this time.

Exposure Assessment and Documentation

Using the information in the RAGS, the Respondents shall
identify actual and potential exposure points and pathways.
Exposure assumptions must be supported with validated data
and shall be consistent with Agency policy.  Validation of
data that have not previously undergone Agency review may be
conducted as long as it does not delay the RI/FS schedule.
For each exposure point, the release source, the transport
media (e.g., groundwater, surface water, air, etc.) and the
exposure route (oral, inhalation, dermal) must be clearly
delineated.  The current number of people at each exposure
point must be estimated and both sensitive and potentially
exposed populations must be characterized.  Both present and
future risk at the Site must be considered and both current
and maximum reasonable use scenarios weighed.  The
Respondents shall submit to EPA for review and comment a
technical memorandum describing the exposure scenarios with
a description of the assumptions made and the use of data.
In addition, the Respondents shall include a description of
the fate and transport models that will be utilized,
including a summary of the data that will be used with these
models.  Representative data must be utilized and the
limitations and uncertainties associated with the models
employed shall be documented.

Toxicity Assessment and Documentation

The Respondents shall utilize the information in IRIS and
other similar data bases and other information sources to
provide a toxicity assessment of the indicator chemicals.
This assessment shall include the types of adverse health
and/or environmental effects associated with chemical
exposures (including potential carcinogenicity), the
relationships between magnitude of exposures and adverse
effects, and the related uncertainties of contaminant
toxicity (e.g., the weight of evidence for a chemicals's
carcinogenicity).

19

Risk Characterization

The Respondents shall integrate the ambient concentrations and reasonable worst case assumptions with the information developed during the exposure and toxicity assessments to characterize the current and potential risks to human health and the environment posed by the Site.  This risk characterization must identify any uncertainties associated with contaminants, toxicities, and exposure assumptions.

b.   Ecological Risk Assessment Components

In addition to the human health component of the Baseline Risk Assessment, the risks to the environment (non-human receptors) from the exposure to the contaminants must be addressed.  A technical memorandum providing a problem formulation shall be submitted by Respondents to EPA for review and comment.  The Ecological Risk Assessment shall include an assessment of any critical habitats and any endangered species or habitats of endangered species affected by contamination at the Site.  It shall also provide the information necessary to adequately characterize the nature and extent of environmental risk or threat resulting from the Site.  The Respondents shall utilize the Ecological Risk Assessments Guidance for Superfund:  Process for Designing and Conducting Ecological Risk Assessments dated September 26, 1994, authored by EPA's Environmental Response Team, Edison, New Jersey.  The following sections shall be submitted by Respondents in the Ecological Risk Assessment of the Baseline Risk Assessment along with the Problem Formulation stage which may require revision upon the review of information contained in the RI:

Problem Formulation (Chapter 4 of the Ecological Risk Assessment Guidance for Superfund:  Process for designing and Conducting Ecological Risk Assessments)

The problem formulation stage shall include the identification and definition of the objectives and scope of the Ecological Risk Assessment (ERA).  Identification of the ecological Chemicals of Concern (COCs) shall involve a weighing of three factors: (1) the comparison of contaminant levels to conservative screening values, (2) frequency of detection, and (3) comparison to appropriate background levels.  The problem formulation technical memorandum shall provide a summary of the known effects of the COCs, information concerning the release, migration, and fate of the ecological COCs, exposure pathways, and potential receptors (including the occurrence of any threatened and endangered species utilizing the site, or the presence of

20

any of their critical habitat).  Information to be utilized
by Respondents in the problem formulation technical
memorandum shall include, but not be limited to, previous
site investigation documents and reports, as well as
appropriate reference material, databases, literature, and
site reconnaissance.  The Respondents shall insure that
identified data needs for the ERA will be provided by the
RI.  A site reconnaissance should be conducted as part of
the Problem Formulation stage to assist in the development
of the conceptual model.  Screening values, or other
appropriate conservative levels for contaminants without
screening values, must be submitted as Ecological
Preliminary Remedial Goals (PRGs) in the Preliminary
Remedial Action Objectives Memorandum.

The development of the Problem Formulation Ecological
Technical Memorandum shall include the first four steps
listed on page 8 of the Ecological Risk Assessment Guidance.
These steps are: (1) Preliminary Problem Formulation and
Ecological Effects Evaluation; (2) Preliminary Exposure
Estimate and Risk Calculation; (3) Problem Formulation;
Assessment Endpoint Selection Testable Hypothesis; and (4)
Conceptual Model Development:  Conceptual Model Measurement
Endpoint Selection and Study Design.  As noted on page 8 of
the guidance, three Scientific\Management Decision Points
(SMDPs) shall occur during this initial Problem Formulation
stage. Discussions shall occur with EPA concerning each SMDP
before proceeding to the next step of the Problem
Formulation stage.  The Problem Formulation Ecological
Technical Memorandum shall summarize the results of these
four steps and SMDPs.

Steps 5, 6, and 7 noted on page 8 of the Ecological Risk
Assessment Guidance shall be performed by Respondents prior
to submittal of, and shall be included in, the Ecological
Risk Assessment.

Exposure Assessment

The Respondents shall evaluate the information obtained
during the RI to determine contaminant characterization, and
receptor characterization to develop exposure point
concentrations for the ecological receptors.  Both current
and future scenarios shall be developed.

Ecological Effects Assessment

The Respondent shall utilize available resources to expand
the preliminary ecological effects profile contained in the

21

conceptual model.  The results of any field studies and
toxicity tests conducted during the RI shall be reported.

Risk Characterization

The Respondent shall integrate the exposure assessment and
effects assessment to develop the risk characterizations.
The uncertainties associated with the Ecological Risk
Assessment shall be outlined in an Uncertainty Section.

Remedial Goal Option

The result of the Ecological Risk Assessment shall be the
identification of site-specific contaminant of concern
concentrations which would be protective of ecological
receptors by media (soil, surface water, groundwater,
sediment, biota, and air).

c.    Baseline Risk Assessment Deliverables

The Respondents shall prepare the three technical memoranda
listed in Tasks 4a and 4b of this SOW.  The three technical
memoranda may be combined or submitted contemporaneously.  The
Baseline Risk Assessment Report (for both Human Health and for
Ecological Health) shall be submitted at the completion of Site
Characterization and included in the Draft RI Report (see Task
3).

Baseline Risk Assessment Chapter of the RI Report

The Baseline Risk Assessment Report shall be included in the
RI Report and submitted to EPA for review and approval.  The
report shall include a comprehensive description of the
components of the Baseline Risk Assessment (both for human
health and environmental risk) and shall follow the
principles established in the RAGS, the Supplemental
Guidance to RAGS: Region IV Bulletin dated March 1994, and
in the Ecological Risk Assessments Guidance for Superfund:
Process for Designing and Conducting Ecological Risk
Assessments dated September 26, 1994, published by EPA's
Environmental Response Team, Edison, New Jersey.  A
discussion of sources of uncertainty, data gaps, incomplete
toxicity information, and modeling characteristics must be
included.  The Respondents shall refer to the RAGS for an
outline of the report format.  The Respondents shall
calculate human health cleanup goals as part of the human
health risk assessment based upon both a future on-site
residential scenario and an industrial scenario.  The
Respondents shall include a table in the risk assessment

22

which includes cleanup levels for the $10^{-4}$, $10^{-5}$, and $10^{-6}$ risk levels for each contaminant of concern for each media and exposure scenario, as well as hazard quotients of 0.1, 1.0, and 10.0 for each contaminant of concern. This table must also include any chemical-specific ARARs values (state and federal).

## TASK 5 - TREATABILITY STUDIES (RI/FS Guidance, Chapter 5)

Treatability Studies shall be performed by the Respondents to assist in the detailed analysis of alternatives. If applicable, study results and operating conditions will later be used in the detailed design of the selected remedial technology. The following activities shall be performed by the Respondents.

a.  Determination of Candidate Technologies and the Need for Treatability Studies (5.2; 5.4)

The Respondents shall identify in a technical memorandum, subject to EPA review and comment, candidate technologies for a Treatability Studies program during project planning (Task 1). The listing of candidate technologies shall cover the range of technologies required for alternatives analysis (Task 6a). The specific data requirements for the Treatability Studies program shall be determined and refined during Site Characterization and the development and screening of Remedial Action Alternatives (Tasks 3 and 6, respectively).

Conduct Literature Survey and Determine the Need for Treatability Studies (5.2)

The Respondents shall conduct a literature survey to gather information on performance, relative costs, applicability, removal efficiencies, operation and maintenance (O&M) requirements, and implementability of candidate technologies. If practical candidate technologies have not been sufficiently demonstrated, or cannot be adequately evaluated for the Site on the basis of available information, Treatability Studies shall be conducted. EPA shall determine whether Treatability Studies will be required.

Evaluate Treatability Studies (5.4)

Where EPA has determined that Treatability Studies are required, the Respondents and EPA shall decide on the type of Treatability Studies to use (e.g., bench versus pilot).

23

Because of the time required to design, fabricate, and install pilot scale equipment as well as to perform testing for various operating conditions, the decision to perform pilot testing shall be made as early in the process as possible to minimize potential delays of the FS.  To assure that a Treatability Study program is completed on time, and with accurate results, the Respondents shall either submit a separate Treatability Study Work Plan or an amendment to the original RI/FS Work Plan for EPA review and approval.

b.   Treatability Study Deliverables (5.5; 5.6; 5.8)

In addition to the memorandum identifying candidate technologies, the deliverables that are required when Treatability Studies are to be conducted include a Treatability Study Work Plan, a Treatability Study Sampling and Analysis Plan, and a Final Treatability Study Evaluation Report.  EPA may also require a Treatability Study Health and Safety Plan, where appropriate.

Treatability Study Work Plan (5.5)

The Respondents shall prepare a Treatability Study Work Plan or amendment to the original RI/FS Work Plan for EPA review and approval.  This Plan shall describe the background of the Site, remedial technologies to be tested, test objectives, experimental procedures, treatability conditions to be tested, measurements of performance, analytical methods, data management and analysis, health and safety, and residual waste management.  The DQOs for Treatability Studies shall be documented as well.  If pilot-scale Treatability Studies are to be performed, the Treatability Study Work Plan shall describe pilot plant installation and start-up, pilot plant operation and maintenance procedures, and operating conditions to be tested.  If testing is to be performed off-site, permitting requirements must be addressed.

Treatability Study Sampling and Analysis Plan (5.5)

If the original QAPP or FSAP is not adequate for defining the activities to be performed during the Treatability Studies, a separate Treatability Study SAP or amendment to the original RI/FS SAP shall be prepared by the Respondents for EPA review and approval.  It shall be designed to monitor pilot plant performance.  Task 1c of this Scope of Work provides additional information on the requirements of the SAP.

24

## Treatability Study Health and Safety Plan (5.5)

If the original RI/FS Health and Safety Plan is not adequate for defining the activities to be performed during the Treatability Studies, a separate or amended Health and Safety Plan shall be developed by the Respondents.  Task 1c of this Scope of Work provides additional information on the requirements of the Health and Safety Plan.  EPA does not "approve" the Treatability Study Health and Safety Plan.

## Treatability Study Evaluation Report (5.6)

Following completion of Treatability Studies, the Respondents shall analyze and interpret the testing results in a technical report to EPA.  Depending on the sequence of activities, this report may be a part of the RI/FS Report or a separate deliverable.  The report shall evaluate each technology's effectiveness, implementability, cost, and actual results as compared with predicted results.  The report shall also evaluate full-scale application of the technology, including a sensitivity analysis identifying the key parameters affecting full-scale operation.

## TASK 6 - DEVELOPMENT AND SCREENING OF REMEDIAL ACTION ALTERNATIVES (RI/FS Guidance, Chapter 4)

The development and screening of Remedial Action Alternatives is performed to select an appropriate range of waste management options to be evaluated.  This range of options shall include, at a minimum, alternatives in which treatment is used to reduce the toxicity, mobility, or volume of the waste, but varying in the types of treatment, the amount treated, and the manner in which long-term residuals or untreated wastes are managed; alternatives that involve containment and treatment components; alternatives that involve containment with little or no treatment; and a no-action alternative.  The following activities shall be performed by the Respondents as a function of the development and screening of Remedial Action Alternatives.

a.   Development and Screening of Remedial Action Alternatives (4.2)

The Respondents shall begin to develop and evaluate, concurrent with the RI Site Characterization task, a range of appropriate waste management options that, at a minimum, ensure protection of human health and the environment and comply with all ARARs.

25

## Refine and Document Remedial Action Objectives (4.2.1)

The Respondents shall review and, if necessary, propose refinement to the Site Objectives and preliminary remedial action objectives that were established during the Scoping phase (Task 1). Any revised Site Objectives or revised remedial action objectives shall be documented in a technical memorandum as discussed in Task 1b. These objectives shall specify the contaminants and media of interest, exposure pathways and receptors, and an acceptable

contaminant level or range of levels (at particular locations for each exposure route).

## Develop General Response Actions (4.2.2)

The Respondents shall develop general response actions for each medium of interest defining containment, treatment, excavation, pumping, or other actions, singly or in combination, to satisfy the remedial action objectives.

## Identify Areas and Volumes of Media (4.2.3)

The Respondents shall identify areas and volumes of media to which general response actions may apply, taking into account requirements for protectiveness as identified in the remedial action objectives. The chemical and physical characterization of the Site and the Baseline Risk Assessment and remediation goals shall also be taken into account.

## Identify, Screen, and Document Remedial Technologies (4.2.4; 4.2.5)

The Respondents shall identify and evaluate technologies applicable to each general response action to eliminate those that cannot be implemented at the Site. General response actions shall be refined to specify remedial technology types. Technology process options for each of the technology types shall be identified either concurrent with the identification of technology types or following the screening of the considered technology types. Process options shall be evaluated on the basis of effectiveness, implementability, and cost factors to select and retain one or, if necessary, more representative processes for each technology type. The technology types and process options shall be summarized for inclusion in a technical memorandum. The reasons for eliminating alternatives must be specified.

26

<u>Assemble and Document Alternatives</u> (4.2.6)

The Respondents shall assemble selected representative
technologies into alternatives for each affected medium or
operable unit.  Together, all of the alternatives shall
represent a range of treatment and containment combinations
that shall address either the Site or the operable unit as a
whole.  A summary of the assembled alternatives and their
related action-specific ARARs shall be prepared by the
Respondents for inclusion in a technical memorandum.  The

reasons for eliminating alternatives during the preliminary
screening process must be specified.

<u>Refine Alternatives</u>

The Respondents shall refine the Remedial Action
Alternatives to identify contaminant volumes to be
addressed by the proposed process and sizing of critical
unit operations as necessary.  Sufficient information shall
be collected for an adequate comparison of alternatives.
Remedial action objectives for each medium shall also be
refined as necessary to incorporate any new risk assessment
information presented in the Baseline Risk Assessment
Report.  Additionally, action-specific ARARs shall be
updated as the Remedial Action Alternatives are refined.

<u>Conduct and Document Screening Evaluation of Each
Alternative</u> (4.3)

The Respondents may perform a final screening process based
on short and long term aspects of effectiveness,
implementability, and relative cost.  Note that the
evaluation of effectiveness involves evaluating the
long-term and short-term risks - among other factors -
associated with a remedial alternative.  Generally, this
screening process is only necessary when there are many
feasible alternatives available for detailed analysis.  If
necessary, the screening of alternatives shall be conducted
to assure that only the alternatives with the most favorable
composite evaluation of all factors are retained for further
analysis.

As appropriate, the screening shall preserve the range of
treatment and containment alternatives that was initially
developed.  The range of remaining alternatives shall
include options that use treatment technologies and
permanent solutions to the maximum extent practicable.  The
Respondents shall prepare a technical memorandum summarizing

27

the results and reasoning employed in screening, arraying
alternatives that remain after screening, and identifying
the action-specific ARARs for the alternatives that remain
after screening.

b.   Alternatives Development and Screening Deliverables (4.5)

The Respondents shall prepare a technical memorandum summarizing
the work performed and the results of each task above, including
an alternatives array summary.  This alternatives array shall be
modified by the Respondents when conducting Task 7 if required by
EPA's comments to assure identification of a complete and
appropriate range of viable alternatives to be considered in the
detailed analysis.  This deliverable shall document the methods,
rationale, and results of the alternatives screening process.

**TASK 7 - DETAILED ANALYSIS OF REMEDIAL ACTION ALTERNATIVES (RI/FS
Guidance, Chapter 6)**

The detailed analysis shall be conducted by the Respondents to
provide EPA with the information needed to allow for the
selection of a remedy for the Site.

a.   Detailed Analysis of Alternatives (6.2)

The Respondents shall conduct a detailed analysis of remaining
alternatives.  This analysis shall consist of an assessment of
each option against a set of nine evaluation criteria and a
comparative review of all options using the same nine evaluation
criteria as a basis for comparison.

   Apply Nine Criteria and Document Analysis (6.2.1 - 6.2.4)

   The Respondents shall apply nine evaluation criteria to the
   assembled Remedial Action Alternative to ensure that the
   selected Remedial Action Alternative will be protective of
   human health and the environment; will be in compliance
   with, or include a waiver of, ARARs; will be cost-effective;
   will utilize permanent solutions and alternative treatment
   technologies, or resource recovery technologies, to the
   maximum extent practicable; and will address the statutory
   preference for treatment as a principal element.  The
   evaluation criteria include: (1) overall protection of human
   health and the environment; (2) compliance with ARARs; (3)
   long-term effectiveness and permanence; (4) reduction of
   toxicity, mobility, or volume; (5) short-term effectiveness;
   (6) implementability; (7) cost; (8) State acceptance; and
   (9) community acceptance.  Criteria 8 and 9 are considered
   after the RI/FS Report has been released to the general

28

public.  For each alternative, the Respondents shall
provide: (1) a description of the alternative that outlines
the waste management strategy involved and identifies the
key ARARs associated with each alternative; and (2) a
discussion of the individual criterion assessment.  Since
the Respondents do not have direct input on criteria (8)
State acceptance and (9) community acceptance, these two
criteria will be addressed by EPA after completion of the
Draft FS Report.

Compare Alternatives Against Each Other and Document the
Comparison of Alternatives (6.2.5; 6.2.6)

The Respondents shall perform a comparative analysis among
the Remedial Action Alternatives.  That is, each alternative
shall be compared against the others using the nine
evaluation criteria as a basis of comparison.  **No
alternative shall be identified by Respondents as the
preferred alternative in the Feasibility Study.**
Identification and selection of the preferred alternative is
conducted by EPA.

b.   Detailed Analysis Deliverables (6.5)

The Respondents shall prepare a Draft FS Report for EPA review
and comment.  This report, as ultimately adopted or amended by
EPA, provides a basis for remedy selection by EPA and documents
the development and analysis of Remedial Action Alternatives.
The Respondents shall refer to the RI/FS Guidance for an outline
of the report format and the required report content.  The
Respondents shall prepare a Final FS Report which satisfactorily
addresses EPA's comments.  Once EPA's comments have been
addressed by the Respondents to EPA's satisfaction and EPA
approval has been obtained or an amendment has been furnished by
EPA, the Final FS Report may be bound with the Final RI Report.

ATTACHMENT A
REFERENCES

The following list, although not comprehensive, comprises many of
the regulations and guidance documents that apply to the RI/FS
process:

1.  The National Oil and Hazardous Substances Pollution
    Contingency Plan, March 8, 1990.

2.  "Guidance for Conducting Remedial Investigations and
    Feasibility Studies Under CERCLA, Interim Final" U.S. EPA,
    Office of Emergency and Remedial Response, October 1988,
    OSWER Directive No. 9355.3-01.

3.  "Interim Guidance on Potentially Responsible Party
    Participation in Remedial Investigation and Feasibility
    Studies," U.S. EPA, Office of Waste Programs Enforcement,
    Appendix A to OSWER Directive No. 9355.3-01.

4.  "Guidance on Oversight of Potentially Responsible Party
    Remedial Investigations and Feasibility Studies," U.S. EPA,
    Office of Waste Programs Enforcement, OSWER Directive No.
    9835.3.

5.  "A Compendium of Superfund Field Operations Methods," Two
    Volumes, U.S. EPA, Office of Emergency and Remedial
    Response, EPA/540/P-87/001a, August 1987, OSWER Directive
    No. 9355.0-14.

6.  "EPA NEIC Policies and Procedures Manual," May 1978, revised
    November 1984, EPA-330/9-78-001-R.

7.  "Data Quality Objectives for Remedial Response Activities,"
    U.S. EPA, Office of Emergency and Remedial Response and
    Office of Waste Programs Enforcement, EPA/540/G-87/003,
    March 1987, OSWER Directive No. 9335.0-7B.

8.  "Guidelines and Specifications for Preparing Quality
    Assurance Project Plans," U.S. EPA, Office of Research and
    Development, Cincinnati, OH, QAMS-004/80, December 29, 1980.

9.  "Interim Guidelines and Specifications for Preparing Quality
    Assurance Project Plans," U.S. EPA, Office of Emergency and
    Remedial Response, QAMS-005/80, December 1980.

10. "Users Guide to the EPA Contract Laboratory Program," U.S.
    EPA, Sample Management Office, December 1986.

30

11. "Interim Guidance on Compliance with Applicable or Relevant and Appropriate Requirements," U.S. EPA, Office of Emergency and Remedial Response, July 9, 1987, OSWER Directive No. 9234.0-05.

12. "CERCLA Compliance with Other Laws Manual," Two Volumes, U.S. EPA, Office of Emergency and Remedial Response, August 1988 (Draft), OSWER Directive No. 9234.1-01 and -02.

13. "Guidance on Remedial Actions for Contaminated Groundwater at Superfund Sites," U.S. EPA, Office of Emergency and Remedial Response, (Draft), OSWER Directive No. 9283.1-2.

14. "Draft Guidance on Preparing Superfund Decision Documents," U.S. EPA, Office of Emergency and Remedial Response, March 1988, OSWER Directive No. 9355.3-02

15. "Interim Final Risk Assessment Guidance for Superfund - Volume I - Human Health Evaluation Manual, Part A," U.S. EPA, Office of Emergency and Remedial Response, EPA/540/1-89/002A, December 1989, OSWER Directive No. 9285.7-01a.

16. "Interim Final Risk Assessment Guidance for Superfund - Volume I - Human Health Evaluation Manual, Part B," U.S. EPA, Office of Emergency and Remedial Response, EPA/540/1-89/002B, OSWER Directive No. 9285.7-01b.

17. "Interim Final Risk Assessment Guidance for Superfund - Volume I - Human Health Evaluation Manual, Part C," U.S. EPA, Office of Emergency and Remedial Response, EPA/540/1-89/002C, OSWER Directive No. 9285.7-01c.

18. "Interim Final Risk Assessment Guidance for Superfund - Volume II - Environmental Evaluation Manual," U.S. EPA, Office of Emergency and Remedial Response, EPA/540/1-89/001, March 1989, OSWER Directive No. 9285.7-01.

19. "Superfund Exposure Assessment Manual," U.S. EPA, Office of Emergency and Remedial Response, EPA/540/1-88/001, April 1988, OSWER Directive No. 9285.5-1.

20. "Guidance for Data Useability in Risk Assessment," U.S. EPA, Office of Emergency and Remedial Response, EPA/540/G-90/008, October 1990, OSWER Directive No. 9285.7-05.

21. "Role of the Baseline Risk Assessment in Superfund Remedy Selection Decisions," April 22, 1991, OSWER Directive No. 9355.0-30.

22.   "Health and Safety Requirements of Employees Employed in
      Field Activities," U.S. EPA, Office of Emergency and
      Remedial Response, July 12, 1981, EPA Order No. 1440.2.

23.   OSHA Regulations in 29 CFR 1910.120 (<u>Federal Register</u> 45654,
      December 19, 1986).

24.   "Interim Guidance on Administrative Records for Selection of
      CERCLA Response Actions," U.S. EPA, Office of Waste Programs
      Enforcement, March 1, 1989, OSWER Directive No. 9833.3A.

25.   "Community Relations in Superfund:  A Handbook," U.S. EPA,
      Office of Emergency and Remedial Response, June 1988, OSWER
      Directive No. 9230.0-3B.

26.   "Community Relations During Enforcement Activities And
      Development of the Administrative Record," U.S. EPA, Office
      of Waste Programs Enforcement, November 1988, OSWER
      Directive No. 9836.0-1A.

27.   "Environmental Compliance Branch Standard Operating
      Procedures and Quality Assurance Manual", U.S. EPA Region
      IV, Environmental Services Division, February 1, 1991
      (revised periodically).

28.   "USEPA Contract Laboratory Program Statement of Work for
      Organics Analysis", U.S. EPA, Office of Emergency and
      Remedial Response, February 1988.

29.   "USEPA Contract Laboratory Program Statement of Work for
      Inorganics Analysis", U.S. EPA, Office of Emergency and
      Remedial Response, July 1988.

30.   "Ecological Risk Assessment Guidance for Superfund:  Process
      for Designing and Conducting Ecological Risk Assessments",
      U.S. EPA, Environmental Response Team, (Review Draft)
      September 26, 1994.

31.   "Supplemental Guidance to RAGS; Region IV Bulletin", March,
      1994.

32

**ATTACHMENT B**
**SUMMARY OF THE MAJOR DELIVERABLES FOR THE**
**REMEDIAL INVESTIGATION AND FEASIBILITY STUDY AT**
**THE LCP CHEMICALS SITE**

| TASK | DELIVERABLE | EPA RESPONSE |
|---|---|---|
| TASK 1 | SCOPING | |
| | - RI/FS Work Plan (20) | Review and Approve |
| | - Field Sampling and Analysis Plan (20) | Review and Approve |
| | - Quality Assurance Project Plan (10) | Review and Approve |
| | - Site Health and Safety Plan (10) | Review and Comment |
| TASK 3 | SITE CHARACTERIZATION | |
| | - Technical Memorandum on Contaminant Fate and Transport Modeling (where appropriate) (10) | Review and Approve |
| | - Preliminary Site Characterization Summary (20) | Review and Comment |
| | - Remedial Investigation (RI) Report (20) | Review and Approve |
| TASK 4 | BASELINE RISK ASSESSMENT | |
| | - Technical Memorandum Listing Hazardous Substances and Indicator Chemicals (10) | Review and Comment |
| | - Technical Memorandum Describing Exposure Scenarios and Fate and Transport Models (10) | Review and Comment |

33

|  | | |
|---|---|---|
| - | Ecological Technical Memorandum containing Problem Formulation (10) | Review and Comment |
| - | Baseline Risk Assessment Chapter of the RI Report for Human Health (20) | Review and Approve |
| - | Baseline Risk Assessment Chapter of the RI Report for Environmental Health (20) | Review and Approve |

**TASK 5     TREATABILITY STUDIES**

|  | | |
|---|---|---|
| - | Technical Memorandum Identifying Candidate Technologies (15) | Review and Comment |
| - | Treatability Study Work Plan (or amendment to original Work Plan) (15) | Review and Approve |
| - | Treatability Study SAP (or amendment to original SAP) (15) | Review and Approve |
| - | Treatability Study Evaluation Report (15) | Review and Approve |

**TASK 6     DEVELOPMENT AND SCREENING OF REMEDIAL ACTION ALTERNATIVES**

|  | | |
|---|---|---|
| - | Technical Memorandum Documenting Revised Remedial Action Objectives (10) | Review and Approve |
| - | Technical Memorandum on Remedial Technologies, Alternatives, and Screening (10) | Review and Comment |

34

TASK 7     DETAILED ANALYSIS OF REMEDIAL ACTION ALTERNATIVES

-      Feasibility Study                Review and Approve
       (FS) Report (20)


Note: The number in parenthesis indicates the number of copies to
be submitted to EPA by Respondents.  One copy shall be unbound,
the remainder shall be bound.  In addition to the number of hard
copies listed on Attachment B, Respondents shall submit two
copies of each submittal to the Georgia Environmental Protection
Division.  For each draft and revised deliverable, Respondent
must submit a copy of the deliverable on a 3.5 inch diskette in
either WordPerfect® 5.1 or WordPerfect 6.0 for Windows® format.
Also, see the Administrative Order on Consent for additional
reporting requirements and further instructions on submittal and
dispositions of deliverables.

## ATTACHMENT C
## GENERAL SCHEDULE FOR THE MAJOR
## REMEDIAL INVESTIGATION AND FEASIBILITY STUDY ACTIVITIES
## AT THE LCP CHEMICALS SITE

| ACTIVITY | SCHEDULE DATE (DAYS) |
|---|---|
| Effective Date of AOC | X |
| Supervising Contractor Selected | X+15 |
| Draft RI/FS Workplan and Associated Documents Submitted | X+60 |
| Draft FS and Draft Treatability Study Report Submitted | X+540 |

Note: Other deliverables listed in Attachment B shall also be incorporated into the schedule to be submitted as part of the RI/FS Work Plan.

# Exhibit E

Copies of all process, pleadings, and orders from the State Court Action

FILED - MB
GLYNN CO. CLERK'S OFFICE
Filed 11/1/2022 12:23 PM
Accepted 11/1/2022 1:43 PM
CASE # CE22-01086

*Rondel M Adams*

CLERK SUPERIOR COURT

## IN THE SUPERIOR COURT OF GLYNN COUNTY
## STATE OF GEORGIA

CITY OF BRUNSWICK, by     )
and through its MAYOR AND BOARD     )
OF COMMISSIONERS,     )
    )
    Plaintiff,     )
    )
v.     )  CIVIL ACTION FILE
    )  NO. CE22-01086
HONEYWELL INTERNATIONAL,     )
INC., formerly known as     )
ALLIED CHEMICAL CORPORATION,     )
and as ALLIEDSIGNAL, INC., and THE     )
GEORGIA POWER COMPANY,     )
    )
    Defendants.     )

## ACKNOWLEDGMENT OF SERVICE

As counsel for Honeywell International, Inc., I hereby acknowledge service of the

Summons and Complaint in the above action on behalf of Defendant Honeywell International,

Inc.

This _1st_ day of _November_, 2022.

GILBERT HARRELL
SUMERFORD & MARTIN PC

_____
Mark Johnson
Georgia State Bar No. 395041
PO Box 190
Brunswick, GA 31521-0190
mjohnson@ghsmlaw.com

***Counsel for Honeywell International, Inc.***

FILED - VM
GLYNN CO. CLERK'S OFFICE
Filed 11/15/2022 4:16 PM
Accepted 11/17/2022 10:26 AM
CASE # CE22-01086

*Rondel M Adams*

CLERK SUPERIOR COURT

## IN THE SUPERIOR COURT OF GLYNN COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| CITY OF BRUNSWICK, by and through its MAYOR AND BOARD OF COMMISSIONERS, <br><br> Plaintiff, <br><br> v. <br><br> HONEYWELL INTERNATIONAL, INC., formerly known as ALLIED CHEMICAL CORPORATION, and as ALLIEDSIGNAL, INC., and THE GEORGIA POWER COMPANY, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    Civil Action File No.: CE22-01086 |

## <u>ACKNOWLEDGMENT OF SERVICE</u>

I, Benjamin H. Brewton, attorney for Defendant Georgia Power Company, do hereby acknowledge service of the Summons and Complaint in the above-captioned matter. Service of the Summons and Complaint is hereby acknowledged and waived pursuant to O.C.G.A. § 9-11-4(d)(5). No other defenses are waived by Defendant Georgia Power Company, and all defenses not related to sufficiency of process or service of process are hereby specifically preserved. Pursuant to O.C.G.A. § 9-11-4(d)(5), Defendant Georgia Power Company is not required to serve an Answer to the Plaintiff's Complaint until sixty (60) days after the date on which the request for waiver was sent.

**[CONTINUED ON FOLLOWING PAGE]**

Respectfully submitted this **28** day of October, 2022.

/s/

BENJAMIN H. BREWTON
Georgia Bar No. 002530
T. JOSHUA R. ARCHER
Georgia Bar No. 021208
BALCH & BINGHAM LLP
801 Broad Street, Suite 800
Augusta, GA 30901
Telephone:   (706) 842-3711
Facsimile:    (866) 258-8984

*Attorneys for Defendant Georgia Power Company*

2

FILED MB
GLYNN CO. CLERK'S OFFICE
Filed 10/20/2022 2:58 PM
Accepted 10/21/2022 8:56 AM
CASE # CE22-01086

IN THE SUPERIOR COURT OF GLYNN COUNTY
STATE OF GEORGIA

*Ronald M. Adams*

CLERK SUPERIOR COURT

CITY OF BRUNSWICK, by                    )
and through its MAYOR AND BOARD          )
OF COMMISSIONERS,                        )
                                         )
        Plaintiff,                  )
                                         )
v.                                       )  CIVIL ACTION FILE
                                         )  NO. CE22-01086
HONEYWELL INTERNATIONAL,                 )
INC., formerly known as                  JUDICIAL OFFICER: JUDGE KELLEY
ALLIED CHEMICAL CORPORATION,             )
and as ALLIEDSIGNAL, INC., and THE       )
GEORGIA POWER COMPANY,                   )
                                         )
        Defendants.                 )

## COMPLAINT

COMES NOW the City of Brunswick through counsel and shows the Court the following:

### PARTIES, JURISDICTION AND VENUE

1.

The Plaintiff, the City of Brunswick, by and through its Mayor and Commissioners, is a municipal corporation in Glynn County, Georgia. Plaintiff, by and through its mayor, commissioners and attorney, brings this action to protect and enforce the rights, interests and duties of the City and as trustee of the citizens, taxpayers and properties of the City of Brunswick. The city limits of the City of Brunswick are deleneated on the attached map. Ex. A.

2.

Claims sought by the City of Brunswick are brought on behalf of the Plaintiff by Plaintiff's counsel in their role as attorneys for the City of Brunswick.

3.

The Defendant Honeywell International, Inc. is a corporation incorporated under the laws of

the State of Delaware. Its principal place of business is 855 S. Mint Street, Charlotte, North Carolina

29201. This Defendant may be served by service upon its registered agent for service, Corporation

Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092. It is subject to the

jurisdiction of this Court. This corporation was formerly named AlliedSignal, Inc. and, before being

named AlliedSignal, Inc., was named Allied Chemical Corporation and Allied Chemical and Dye

Corporation. This company is referred to herein as "Honeywell."

4.

The Defendant Georgia Power Company (hereinafter "Georgia Power") is a Georgia

corporation with its principal place of business at 241 Ralph McGill Blvd., N.E., Bin #10180,

Atlanta, Georgia 30308-3374. This Defendant may be served by service upon its registered agent

for service, Kristi Dow, 241 Ralph McGill Blvd., N.E., Bin # 10180, Atlanta, Georgia 30308. It is

subject to the jurisdiction of this Court.

5.

This action arises out of acts and injuries which occurred in Glynn County, Georgia.

Jurisdiction and venue lie in the Superior Court of Glynn County, Georgia.

**GENERAL ALLEGATIONS**

6.

The City of Brunswick owns properties that lie west of Newcastle Street and east of the

Turtle River that include high ground, marshes and creek and river bottoms; property that lies east

of Glynn Avenue, south of the F.J. Torras Causeway, and west of the Mackay River that includes

high ground, marshes and creek bottoms; property lying both north and south of the F.J. Torras

Causeway, east of the Back River and west of the Little River that includes high ground, marshes

and creek bottoms; property that encompasses the southern portion of the Altimaha Canal that

-2-

includes high ground and the now non-navigable canal; and property that lies on the east side of Andrews Island that includes high ground, marshes and river bottom.

7.

In 1955, Defendant Honeywell, then operating as Allied Chemical and Dye Corporation, purchased land abutting Purvis Creek for use as a site for construction and operation of a chlor-alkalai chemical plant. The tract of land purchased by Honeywell included 480 acres of marshland. This property is referred to herein as the Honeywell Plant Site and as the Plant Site. Numerous documents refer to this tract of land as the "LCP Site" even though the site is owned by Defendant Honeywell.

8.

Prior to beginning construction of the chlor-alkalai plant, Honeywell assured the State of Georgia "that there will be no significant discharge of industrial waste from our plant" into the waters at Brunswick. Ex. B.

9.

Defendant Honeywell built and operated the chlor-alkalai plant on the Plant Site from 1956 through December 1979, at which time it sold the Plant to Linden Chemicals and Plastics Corp., herein referred to as "LCP." LCP subsequently changed its corporate name to Hanlin GP, Inc., but continued to do business under the trade name LCP until the Plant was closed in 1994.

10.

At the Plant, Defendant Honeywell manufactured chlorine gas, caustic soda, bleach and hydrogen gas in a process using metallic mercury in large processing areas called cell rooms.

11.

By design, waste and waste water contaminated with mercury were discharged through a

-3-

ditch that emptied into Purvis Creek.  The mercury dumped into Purvis Creek spread in the tidal water throughout the Turtle River estuary and into waters within the City of Brunswick.

12.

Between 1956 and 1979, Defendant Honeywell discharged tons of vaporized mercury into the air of Glynn County.  Approximately one million pounds of mercury was wrongfully released into the environment by Defendant Honeywell.

13.

Mercury discharged into the air and water by Defendant Honeywell precipitated and flowed within the City of Brunswick and onto property of the City of Brunswick.

14.

Between 1962 and 1972, Defendant Honeywell used graphite anodes impregnated with Aroclor 1268 poly-chlorinated byphenals (PCBs) in its chlorine manufacturing process.

15.

Each PCB-impregnated anode contained from 8.5 to 10 pounds of Aroclor-1268 (PCBs). Between 1962 and 1972, Defendant Honeywell utilized at its Brunswick Plant approximately twenty-five percent of the amount of Aroclor-1268 (PCBs) produced annually in the United States.

16.

Between 1962 and 1972, Defendant Honeywell consumed thirty to sixty tons of Aroclor-1268 (PCBs) per year at the Plant.

17.

Defendant Honeywell was the only company in Georgia to purchase Aroclor-1268 (PCBs) for use in its manufacturing process.

-4-

18.

During the manufacturing process, mercury was also absorbed by the graphite anodes.

19.

During the manufacturing process, the anodes eroded into dust. The eroded graphite dust that was contaminated with mercury and Aroclor-1268 (PCBs) was discharged into Purvis Creek or captured in filters and backwashed through the plant sewer into Purvis Creek or dumped on site.

20.

An anode was considered "spent" or no longer usable after eighty to ninety percent of the anode had eroded into the cell. Defendant Honeywell stacked contaminated spent anodes around the Plant Site, dumped spent anodes in the marsh, built berms in the marsh out of spent anodes, and filled in potholes in roads at the Plant Site with spent anodes.

21.

The anodes that were dumped in the marsh and used to build berms contained Aroclor-1268 (PCBs) and mercury.

22.

Defendant Honeywell dumped hundreds of tons of Aroclor-1268 (PCBs) in filter backwash sent to Purvis Creek, in the trash dump in and near the marsh behind the cell rooms, and in berms and in other construction and fill at the Plant Site.

23.

PCBs were banned for use in the United States by the U.S. Environmental Protection Agency in the 1970's.

24.

Between 1956 and 1978, Defendant Honeywell dumped used cell room parts in the marsh

-5-

and on land to the west of the Plant. These used parts were contaminated with mercury. Mercury was visible on the ground in the areas where the old parts were dumped in the marsh.

25.

Defendant Honeywell used a bulldozer to fill portions of the marsh where it had dumped used parts and spent anodes containing mercury and Aroclor-1268 (PCBs).

26.

In 1973, Defendant Honeywell discovered that its cell rooms were sinking because caustic soda that it had dumped was chemically dissolving the earth under the Plant. The sinking foundation caused the cell room floors to crack and sink, thus facilitating further discharge of mercury into the environment.

27.

No later than 1969, management of Defendant Honeywell knew that metallic mercury dumped into a salt water estuary would methylize into the food chain, bioaccumulate and biomagnify, with the result that fish in the estuary would acquire levels of methylmercury toxic to people who ate the fish.

28.

No later than 1969, management of Defendant Honeywell knew that people living near Minamata Bay in Japan had been poisoned by methylmercury in fish they had eaten, and that the source of this toxic mercury was a chemical plant that had dumped metallic mercury into Minamata Bay.

29.

Copies of studies documenting the methylization and bioaccumulation of mercury and the Minamata Bay tragedy were furnished to the management of Defendant Honeywell's Brunswick

-6-

Plant and kept in the Plant files. At least since 1969, management of Defendant Honeywell knew that metallic mercury dumped into the Turtle River Estuary would methylize, bioaccumulate in the fish and poison people who ate the fish.

30.

Despite the notice and knowledge of the toxic consequences of dumping metallic mercury into the Turtle River salt water estuary, Defendant Honeywell intentionally continued to dump more metallic mercury into the Turtle River Estuary and made no effort to recover the mercury that it had already wrongfully dumped and released.

31.

No later than 1970, management of Defendant Honeywell knew that PCBs released into the environment are strongly absorbed on particles, concentrate in animal fat, and are transferred through the food chain.

32.

No later than 1970, management of Defendant Honeywell knew that PCBs in very low concentrations cause death in fish, crab and oyster populations, with toxic effects found at levels as low as one part per billion in an aquatic environment, the equivalent of one pint of PCBs dumped into 300 acres of water one foot deep.

33.

No later than 1970, management of Defendant Honeywell knew that PCBs should never be disposed of in a manner in which the PCBs could enter an aquatic environment.

34.

Despite actual notice and knowledge of the severe toxic consequences of releasing PCBs into an aquatic environment, Defendant Honeywell intentionally continued to dump PCB waste at a rate

of tens of thousands of pounds of PCBs each year onto its Brunswick Plant Site, into ponds on the Site, into marshlands and into its outfall canal that led to Purvis Creek and the Turtle River Estuary.

35.

Despite actual notice and knowledge of the severe toxic consequences of releasing PCBs into an aquatic environment, Defendant Honeywell took no action to remove any of the tens of thousands of pounds of PCBs that it had already dumped on its Site, into the marshlands and in the outfall canal that leads to Purvis Creek, the Turtle River Estuary and beyond.

36.

No later than 1971, management of Defendant Honeywell had learned that its mercury had, in fact, methylized, entered the food chain and was in fish, crabs and other marine life in the Turtle River Estuary and beyond at levels that posed a risk of injury to people eating the seafood.

37.

Despite the knowledge and notice to Defendant Honeywell of the dire potential consequences of its wrongdoing, Defendant Honeywell elected to hide its wrongdoing and to take no action to notify and warn its neighbors, the City of Brunswick, or the citizens of the City of Brunswick or those who fished and crabbed in the waters of Glynn County or those who ate seafood from the waters of Glynn County.

38.

In 1978, management of Defendant Honeywell directed managers of each Honeywell unit to evaluate the cost of complying with environmental laws for each unit. Management of Honeywell had decided to discontinue ownership and operation of plants where the cost of environmental stewardship was found to be "uneconomical."

-8-

39.

In December, 1979, Defendant Honeywell sold its Brunswick chlor-alkalai plant to Linden Chemicals and Plastics Corporation (LCP) for the purpose of shedding Defendant Honeywell's responsibilities for environmental stewardship.

40.

Defendant Honeywell sold its Brunswick Plant and Plant Site to LCP without disclosing to LCP that Defendant Honeywell had dumped many tons of mercury and PCBs on and off the Site, and that the Plant buildings were slowly sinking because of caustic soda and mercury that Defendant Honeywell had dumped under the buildings.

41.

Defendant Honeywell sold the Brunswick Plant and Plant Site for the purpose of continuing the nuisance and trespasses that it had created by releasing mercury and PCBs that were spreading into the Turtle River Estuary and beyond, including waters within the City of Brunswick and onto property of the City of Brunswick.

42.

Defendant Honeywell's sale of the Brunswick Plant and Plant Site had the effect of continuing the nuisance and trespasses that it had created by releasing mercury and PCBs that were spreading into the Turtle River Estuary and nearby waters and marshes within the City of Brunswick and onto property of the City of Brunswick.

43.

Defendant Honeywell financed, in part, the sale of its Brunswick Plant and Plant Site to LCP and was, at all times relevant, a creditor of LCP.

44.

Defendant Honeywell used the power that it held as a creditor of LCP as a tool to keep the

Plant in operation for the express purpose of avoiding and delaying removal of the tons of mercury

and tons of PCBs that it had dumped on the Plant Site, in adjacent marshes and waters within the

City of Brunswick and onto property of the City of Brunswick. It thereby maintained and aggravated

the nuisance and trespasses that it had created.

45.

In 1981, Defendant Honeywell filed a required report with the U.S. Environmental Protection

Agency that stated that 4500 tons of material containing trace amounts of mercury had been disposed

at the Plant Site. Defendant Honeywell did not inform the U.S. Environmental Agency that it had

disposed of hundreds of tons of PCBs, that it had created an uncontained dump site containing PCBs

and mercury in the marsh, or that it had discharged many tons of mercury into Purvis Creek.

Defendant Honeywell represented in documents submitted to the U.S. Environmental Agency before

1981, in 1981, and after 1981, that the wastes that it had dumped at its Brunswick Plant Site did not

contain PCBs.

46.

The false representations contained in reports that Defendant Honeywell filed with the U.S.

E.P.A. and the Georgia E.P.D. were done with the purpose and with the effect of continuing the

nuisance and trespasses that Defendant Honeywell had create. False statements made to the Georgia

E.P.D. and other agencies of the State of Georgia were in violation of O.C.G.A. § 16-10-20.

47.

By 1985, LCP was in financial difficulty. From 1985 to 1994, Defendant Honeywell used

its power as a creditor of LCP to keep the Plant in operation for the purpose and with the effect of

continuing the nuisance and trespasses that Defendant Honeywell had created.

48.

In 1988, LCP contacted Defendant Honeywell to complain about sinking of the mercury cell rooms and other environmental misdeeds that Defendant Honeywell had not disclosed to LCP prior to the sale of the Plant to LCP.

49.

In 1988, Defendant Honeywell formed a conspiracy with LCP to hide environmental misdeeds, and to facilitate the continued operation of the Plant for the purpose and with the effect of continuing and aggravating the nuisance that Defendant Honeywell had created.

50.

When management of Defendant Honeywell learned that the State of Georgia had discovered some of the tons of PCBs that Defendant Honeywell had illegally dumped at the Plant Site, Defendant Honeywell conspired with LCP to assist Defendant Honeywell's effort to illegally hide its responsibility for the PCBs dumped at the Site by requesting that insolvent LCP claim responsibility for the PCBs, with Defendant Honeywell secretly reimbursing LCP for costs, even though LCP had never used PCB's at the Brunswick Plant. Defendant Honeywell thus sought to pay LCP to deceive government agents for the purpose of hiding illegal, criminal conduct on the part of Defendant Honeywell and to avoid full financial responsibility for its misdeeds, all in violation of O.C.G.A. § 16-10-20.

51.

In 1991, the Georgia Department of Natural Resources ("the DNR") discovered that fish and other marine life in the Turtle River estuary and beyond were contaminated with mercury and Aroclor-1268 (PCBs).

52.

Following the discovery of contaminated fish, the D.N.R. closed Purvis Creek and a portion of the Turtle River and Gibson Creek to commercial fishing and shellfish/seafood harvesting because of the presence of mercury and Aroclor-1268 (PCBs) in marine life in those waters.

53.

The D.N.R. issued a seafood consumption advisory for these waters. The D.N.R. advisory recommended that seafood caught in these waters not be consumed because of the presence of mercury and Aroclor-1268 (PCBs) in the marine life.

54.

In 1992, the Environmental Protection Division of the Georgia Department of Natural Resources ("E.P.D.") learned that anodes containing Aroclor-1268 (PCBs) had been used to build berms for the Plant outfall. E.P.D. ordered LCP to begin removal of the anodes.

55.

Defendant Honeywell's efforts to hide this portion of its wrongful conduct failed. The Georgia E.P.D. learned that Defendant Honeywell, and not LCP, had used the PCBs and had dumped the anodes and decomposed particles from anodes contaminated with Aroclor-1268 (PCBs) in the marsh and water. E.P.D. ordered Defendant Honeywell to remove the contaminated anodes.

56.

As a result of a negotiated consent order with E.P.D., Defendant Honeywell agreed to do further testing to delineate the extent of Aroclor-1268 (PCBs) contamination at the Plant Site. As a result, E.P.D. did not discover at that time the extent of Aroclor-1268 (PCBs) contamination that existed in the old Honeywell trash, elsewhere at the Plant Site, and in the waters and marshes throughout Glynn County. Defendant Honeywell was thus able to continue to wrongfully hide large

-12-

amounts of the PCBs that it had dumped and left in Brunswick.

57.

By 1993, Defendant Honeywell determined that it could save over $20,000,000 if it could keep the Brunswick Plant in operation so that it could "defer" environmental remediation costs and thus leave its mercury and PCBs on and off the Site, thereby continuing and expanding the ongoing nuisance and trespasses. Defendant Honeywell believed that if the Brunswick Plant closed, the environmental regulators would move quickly to make Defendant Honeywell remediate the contamination at the Plant Site.

58.

Defendant Honeywell attempted to keep the Brunswick Plant in operation despite LCP's financial difficulty. Defendant Honeywell and HoltraChem, Inc. began negotiating a prospective purchase of the Brunswick Plant and the other chlor-alkalai plants from LCP. Defendant Honeywell wanted to purchase the Brunswick Plant in order to further delay environmental remediation costs and save millions of dollars.

59.

In June 1993, the Georgia E.P.D. notified LCP of its intent to revoke the environmental permits at the Brunswick Plant.

60.

In 1993, Defendant Honeywell provided millions of dollars to LCP to keep the Plant in operation so that Defendant Honeywell could continue to postpone environmental remediation of the Plant Site, with the effect of continuing and expanding the nuisance that Defendant Honeywell had created.

-13-

61.

During 1993, Defendant Honeywell's expenditures to keep the Brunswick Plant in operation included guarantee of the Plant power bill, without which the Plant power would have been cut off and the plant would have shut down.

62.

In October 1993, Defendant Honeywell took control of operations at the Brunswick Plant and sent its employee, Mark White, to serve as plant manager of the Brunswick Plant.

63.

Between September 1993, and February 1994, Defendant Honeywell opposed Georgia E.P.D.'s attempt to revoke LCP's environmental permits.  Defendant Honeywell claimed that it possessed sufficient interest in the Brunswick Plant during this time to give it standing to oppose the permit revocation proceedings.

64.

In October 1993, Defendant Honeywell sent James Kavney, a Honeywell employee, to take charge of maintenance at the Plant.

65.

Between October 1993, and February 1994, numerous Honeywell employees worked in operations and maintenance at the Plant.

66.

The prolonged operation of the Plant made possible by the efforts of Defendant Honeywell caused additional releases of mercury and PCBs from the Plant Site to the marsh and  surrounding waters.

-14-

67.

Defendant Honeywell kept the Plant in operation in order to avoid having to spend money to remediate its releases of mercury and PCBs, and thus continued and aggravated the ongoing and expanding nuisance and trespasses.

68.

In February 1994, the Brunswick Plant shut down.

69.

A Unilateral Administrative Order was issued to Defendant Honeywell, LCP, and Mark White ordering them to remove the chemicals remaining at the Plant, to determine the extent of contamination at the Plant, and to begin the environmental remediation of the Plant and the Plant Site.

70.

Following the shutdown, the U.S. E.P.A. discovered tons of mercury underneath the cell rooms, in the soil around the Plant Site, in the marsh in front of the old Honeywell trash dump, in the old Honeywell trash dump and in the waters surrounding the Plant Site. Testing of marine life in waters adjacent to the Plant again confirmed that the seafood in this area was contaminated with mercury and was not safe to eat. The sediment in creeks and rivers adjacent to the Plant was found to be contaminated with mercury.

71.

The U.S. E.P.A. discovered tons of Aroclor-1268 (PCBs) in the soil around the Plant, in the marsh in front of the old Honeywell trash dump, in the old Honeywell trash dump and in the waters surrounding the Plant Site and beyond. Testing of marine life in waters adjacent to the Plant confirmed that the fish and crabs in this area were contaminated with Aroclor-1268 (PCBs) and

-15-

therefore were not safe to eat.  The sediment in creeks and rivers adjacent to the Plant and beyond

was found to be contaminated with Aroclor-1268 (PCBs).

72.

The U.S. E.P.A. concluded that large amounts of mercury and Aroclor-1268 (PCBs)

continued to be discharged from the Plant Site into the adjacent waters.  In 1998, U.S. E.P.A.

required Defendant Honeywell to remove one foot of soil from thirteen acres of the marsh and

sediment in creeks in front of the old Honeywell trash dump.  Large amounts of mercury and PCBs

had continued to be discharged from the thirteen acres of marsh and creek.

73.

Mercury and PCBs released from the Plant and the Plant Site have entered the food chain in

the Turtle River estuary and the waters and marshes within the City of Brunswick and onto property

of the City of Brunswick.

74.

Mercury and PCB contamination of the food chain in the Turtle River Estuary and adjacent

waters and marshes will continue to spread.

75.

Defendant Honeywell's activities at the Plant Site caused and continue to cause toxic mercury

and PCBs to be spilled, discharged and deposited into the Turtle River, its tributaries, surrounding

marshlands and onto property of the City of Brunswick in amounts, concentrations and combinations

that are harmful to health, safety and welfare of the citizens of the City of Brunswick, and to animals,

birds and aquatic life.

76.

Defendant Honeywell has stored, disposed, discharged and released its hazardous wastes onto

-16-

property of the City of Brunswick and in the waters and marshlands abutting property of the City of Brunswick in order to avoid the costs of safe storage and safe disposal of its hazardous wastes.

77.

Mercury and PCB contamination of the water, sediment, and marine life in the Turtle River Estuary and adjacent waters and marshes within the City of Brunswick has interfered with and will continue to damage the value and usefulness of property in the City of Brunswick, and interfere with use and enjoyment, and rental value of these properties until contaminants are removed from the land, marsh and sediment of the waters, creek and river bottoms.

78.

As a waterfront property owner, the City of Brunswick has the right to construct docks into the creeks and rivers.

79.

As a result of Defendant Honeywell's widespread disposal of mercury and PCBs, the usefulness, enjoyment and rental value of docks of the City of Bunswick have been diminished.

80.

The City of Brunswick owns properties that abut and are inundated by tidal waters in which commercial and recreational fishing, crabbing and shrimping have been prohibited or severely restricted.

81.

Animals, birds, aquatic life and vegetation living within the Turtle River Estuary and surrounding waters and marshlands have been poisoned as a result of Defendant Honeywell's pollution.

-17-

82.

Mercury and PCBs wrongfully released by Defendant Honeywell have been ingested by fish, crabs and other wildlife.

83.

As a result of the wrongful acts of Defendant Honeywell, the crabs, oysters, fish and other wildlife that inhabit the Turtle River area and adjacent waters and marshes within the City of Brunswick have dangerously high levels of mercury and PCBs.

84.

The fish, oysters and crabs in the area of the Turtle River and adjacent waters are unfit for human consumption as a result of Defendant Honeywell's contamination.

85.

Defendant Honeywell knew at all times that mercury and PCBs were harmful to the environment.

86.

Defendant Honeywell knew at all times that it should not allow its mercury and PCB waste to enter into any body of water, including the Turtle River Estuary and adjacent waters and marshes.

87.

For many years, the Defendant Georgia Power Company owned and operated an electrical generator station that abutted the Turtle River and known as Plant McManus. The Georgia Power Plant was coal fired, and emitted mercury into the air, the waters and the marshes of Glynn County.

88.

The mercury released by Georgia Power has, in part, migrated onto marshes and shoreline owned by the City of Brunswick thereby contributing to the pollution of property of the City of

-18-

Brunswick.

89.

The Defendant Georgia Power has acknowledged joint responsibility for the mercury pollution of the Marshes of Glynn, as evidenced by the Consent Decree agreed to by Georgia Power. *United States of America v. Honeywell International Inc. and Georgia Power Company*, Civil Action No. 2:16-CV-00112, U.S. District Court, S.D. GA, DKT. 3-1, 07-29-16.

90.

Defendants had a duty to the City of Brunswick to manage, store and contain their hazardous wastes in a reasonable manner.

91.

Defendants had a duty to the City of Brunswick to operate their plants in a manner that did not pollute the waters and marshlands on and abutting property of the City of Brunswick.

92.

Defendants had a duty to the City of Brunswick to design and maintain all hazardous waste storage and disposal areas so that hazardous wastes would not seep into the marshlands and waters on and abutting property of the City of Brunswick.

93.

The above-described actions of Defendants were in violation of the Georgia Water Quality Control Act. O.C.G.A. § 12-5-29(a),(b). Such wrongful acts constitute repeated violations of the criminal prohibitions of the Act. O.C.G.A. § 12-5-53.

94.

Defendants' dumping of mercury and PCBs into public waters was, at all times, illegal and criminal.

-19-

95.

Having wrongfully and knowingly discharged toxic chemicals into the Turtle River and the creeks, canals and marshes on and adjacent to property of the City of Brunswick, Defendants are and have been under a duty to notify the City of Brunswick and to warn the City of Brunswick of the dangers that they have created.

96.

Defendants and U.S. E.P.A. have defined the boundaries of the site subject to remediation under the Comprehensive Environmental Response and Liability Act, 42 U.S.C. § 9601, et seq. The property within this site is referred to as the Allied/LCP CERCLA Site as shown of Exhibit C to this Complaint.

97.

Property, waters and marshland outside the area of the Allied/LCP CERCLA Site are not part of a CERCLA superfund site.

98.

Defendants has polluted land, water and marshland outside the boundaries of the Allied/LCP CERCLA Site.

99.

As a result of the actions of Defendants, property of the City of Brunswick has been damaged and reduced in value.

100.

As a direct result of Defendants' wrongful actions, the City of Brunswick owns properties containing hazardous and toxic wastes that render the City of Brunswick potentially liable for the remediation of the waste on its property.  Defendants are liable for all such remediation costs and

-20-

damages.

### 101.

The actions of Defendants have interfered with the value, use and enjoyment of property of the City of Brunswick. The properties of the City of Brunswick have been poisoned and contaminated.

### 102.

Defendants have ratified the conduct of their employees, agents, and contractors that benefitted each Defendant and that caused and or contributed to the City of Brunswick's damage and injury.

### 103.

At all times relevant hereto, it was foreseeable to Defendants that their conduct would harm the City of Brunswick.

### 104.

Defendants acted in concert to accomplish the tortious conduct about which Plaintiff complains.

### 105.

Defendants' fault in this case is indivisible. Plaintiff's injury and damage in this case are indivisible.

### 106.

Defendants are jointly and severally liable to Plaintiff for the full amount of Plaintiff's damages.

### 107.

At all times relevant hereto, it was foreseeable to Defendants that their failure to prevent their

pollutant discharges could harm the City of Brunswick and its property.

108.

At all times relevant hereto, it was foreseeable to Defendants that their failure to permanently remove their pollutants from property of the City of Brunswick could harm the City of Brunswick and its property.

## COUNT ONE

## CONTINUING TRESPASS

109.

Plaintiff restates and incorporates by reference, as if fully set forth herein, paragraphs 1 through 108.

110.

The continuing unpermitted presence and spread of Defendants' pollution at and about property of the City of Brunswick, unreasonably and substantially interferes with the City's right to exclude others and the pollutants of others from its property.

111.

Defendants' continuing failure and refusal to permanently remove their pollution from property of the City of Brunswick, unreasonably and substantially interferes with the City's right to exclude others and the pollutants of others from its property.

112.

By their conduct above-described, each Defendant maintained and maintains a continuing trespass on property of the City of Brunswick.

113.

By their conduct above-described, each Defendant procured, assisted, or induced the commission of the trespasses alleged in this Complaint.

114.

The continuing trespass that Defendants have maintained and are maintaining here is an actual and proximate cause of aggravation, inconvenience and other damage and injury to the City of Brunswick.

115.

The City of Brunswick was and is specially damaged by Defendants' continuing trespasses.

116.

Because of Defendants' continuing trespasses, Defendants are liable to the City of Brunswick in dollar amounts to be determined by the enlightened conscience of the jury.

117.

Defendants' conduct set out above was reckless, showed willful misconduct, malice, wantonness, oppression, an entire want of care, and that conscious indifference to the consequences of their conduct to the City of Brunswick.

118.

Because Defendants' conduct set out above showed willful misconduct, malice, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences, O.C.G.A § 51-12-5.1 entitles the City of Brunswick to an award of punitive damages against each Defendant sufficient to punish, penalize and deter each Defendant from further like conduct.

-23-

119.

Within the meaning of O.C.G.A. § 13-6-11, Defendants have acted in bad faith, thereby entitling the City of Brunswick to recover its expenses of this litigation including reasonable attorney's fees, expert fees, and other litigation costs from Defendants.

**COUNT TWO**

**CONTINUING NUISANCE**

120.

Plaintiff restates and incorporates by reference, as if fully set forth herein, paragraphs 1 through 108.

121.

The continuing unpermitted presence and spread of Defendants' pollution at and about property of the City of Brunswick unreasonably and substantially interferes with the City's use and enjoyment of its property.

122.

Defendants' continuing failure and refusal to permanently remove their pollution from property of the City of Brunswick unreasonably and substantially interferes with the City's use and enjoyment of its property.

123.

The City of Brunswick is entitled to the full use and enjoyment of its property free from the Defendants' continuing nuisances.

124.

Defendants' continuing nuisances cause the City of Brunswick hurt, inconvenience and damage within the meaning of O.C.G.A. § 41-1-1.

-24-

125.

Defendants' failure and refusal to permanently abate their continuing nuisances and damage is continuance or maintenance of the nuisance.

126.

Defendants' nuisances are continuing and abatable.

127.

Defendants cause or are a contributing cause of the continuing abatable nuisances, about which the City of Brunswick here complains.

128.

The continuing nuisances are an actual and proximate cause of the City of Brunswick's damage and injury.

129.

The rental or use value of property of the City of Brunswick is reduced by Defendants' continuing abatable nuisances.

130.

The City of Brunswick is specially damaged by the loss of rental or use value of its property, by its annoyance, aggravation and inconvenience, by its loss of use and enjoyment, and by its lawsuit expenditures including attorney's fees and expenses, resulting from Defendants' maintenance of the nuisances.

131.

Defendants are liable to the City of Brunswick in dollar amounts to be determined by the enlightened conscience of the jury.

132.

Defendants' conduct set out above was reckless, showed willful misconduct, malice, wantonness, oppression, an entire want of care, and that conscious indifference to the consequences of their conduct to the City of Brunswick.

133.

Because Defendants' conduct set out above showed willful misconduct, malice, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences, O.C.G.A § 51-12-5.1 entitles the City of Brunswick to an award of punitive damages against each Defendant sufficient to punish, penalize and deter each Defendant from further like conduct.

134.

Within the meaning of O.C.G.A. § 13-6-11, Defendants have acted in bad faith, thereby entitling the City of Brunswick to recover its expenses of this litigation including reasonable attorney's fees, expert fees, and other litigation costs from Defendants.

WHEREFORE, Plaintiff respectfully prays that this Court:

[a]     Issue Service of Process and grant Plaintiff a trial by Jury;

[b]     Enter Judgment in favor of Plaintiff, against Defendants on all of Plaintiff's Claims;

[c]     Award punitive damages to Plaintiff against each Defendant, in an amount determined by the jury;

[d]     Enter Judgment against Defendants and in favor of Plaintiff, awarding Plaintiff its

reasonable O.C.G.A. § 13-6-11 attorney's fees, costs, and other expenses of litigation in amounts

determined by the jury;

[e]     Grant Plaintiff such other relief as this Court deems just and proper.

Respectfully submitted,


_s/ John C. Bell, Jr._
John C. Bell, Jr. – Ga. Bar # 048600
Pamela S. James – Ga. Bar # 389015
THE BELL FIRM
PO Box 1547
Augusta, GA 30903-1547
(706) 722-2014
john@bellfirm.net
pam@bellfirm.net


_s/ Brian Donald Corry_
Brian Donald Corry – Ga. Bar #165557
McQUIGG SMITH & CORRY
504 Beachview Drive Suite 3D
Saint Simons Island, GA 31522
(912) 638-1174
brian@msclawga.com


_s/ Robert P. Killian_
Robert P. Killian – Ga. Bar # 417575
KILLIAN LAW FIRM LLC
47 Professional Drive
Brunswick, GA   31520
(912) 263-9520
bob@killianlawfirm.com

_s/ Robert B. Jackson, IV_
Robert B. Jackson, IV - Ga. Bar # 387750
ROBERT B. JACKSON, IV, LLC
260 Peachtree Street - Suite 2200
Atlanta, Georgia  30303
(404) 313-2039
rbj4law@gmail.com

COUNSEL FOR PLAINTIFF

# Exhibit A



Brunswick, GA

City of Brunswick Boundary Map | Brunswick, GA

Visit

Images may be subject to copyright. Learn More

Related images

See more

# Exhibit B

STATE OF GEORGIA
Department of Public Health
ATLANTA

August 16, 1955

Mr. H. W. Causey, Branch Manager
Solvay Process Division
Allied Chemical and Dye Corporation
503 North College Street
Charlotte, North Carolina

Dear Mr. Causey:

No information has been supplied to us on the control of wastes from the plant to be constructed at Brunswick. It is our assumption from a general knowledge of the electrochemical process involved in the production of chlorine and caustic soda from sodium chloride by the mercury cell method that there would not be any significant waste material to be discharged into the water at Brunswick. However, we desire confirmation of this or information to the contrary if our assumption is incorrect.

Please give me a statement or report on the plant process in regard to its effect or lack of effect on the waters in the vicinity of the Brunswick plant site.

Very truly yours,


(s) W. H. Weir, Director
Water Pollution Control


C O P Y

SOLVAY PROCESS DIVISION

ALLIED CHEMICAL & DYE CORPORATION

*8178*

October 11, 1955

Mr. W. H. Weir, Director
Water Pollution Control
Department of Public Health
State of Georgia
Atlanta, Georgia

Dear Sir:

Further reference is made to your letter
of August 16, 1955, inquiring whether we expect to
discharge industrial waste from our chlorine-caustic
plant to be constructed on the Turtle River near
Brunswick, Georgia.

I am advised by our research and engineer-
ing people that you are correct in your assumption
that there will be no significant discharge of in-
dustrial waste from our plant.

Very Truly yours,

(Orig. signed
Harold P. Book)

Assistant Secretary

bc: Mr. Hackett

# Exhibit C



FILED - MB
GLYNN CO. CLERK'S OFFICE
Filed 10/20/2022 2:58 PM
Accepted 10/21/2022 8:56 AM
CASE #  CE22-01086

*Rendel M. Adams*

CLERK SUPERIOR COURT

**IN THE SUPERIOR COURT OF GLYNN COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| CITY OF BRUNSWICK, by and through its MAYOR AND BOARD OF COMMISSIONERS,<br><br>    Plaintiff,<br><br>v.<br><br>HONEYWELL INTERNATIONAL, INC., formerly known as ALLIED CHEMICAL CORPORATION, and as ALLIEDSIGNAL, INC. and THE GEORGIA POWER COMPANY,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION FILE
NO. CE22-01086 _____

**PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS**
**FOR PRODUCTION OF DOCUMENTS TO**
**DEFENDANT GEORGIA POWER COMPANY**

    In accordance with the applicable rules and statutes governing practice and procedure relating to discovery, you are required to answer separately and fully in writing and to produce separately and fully, under oath and within the time required by law, the interrogatories attached hereto as Exhibit "A" and to produce the items requested in the requests for production of documents attached hereto as Exhibit "B".

    These interrogatories and requests for production shall be deemed continuing so as to require supplemental answers and production if further information is obtained between the time answers are served and the time of trial.

    For any objection, set forth all grounds and reasons for each objection made.  If you claim any evidentiary privilege or discovery privilege as a ground for objection, set forth the factual as well as the legal basis of the claim of privilege.

    Whenever you are asked in an interrogatory to "identify" a document, you may in lieu of following this definition, attach to your answers true, correct, and complete copies of the document.  Where any such document had been executed, notarized, time-stamped or formalized in any way, you must attach formalized copies of the documents.

<u>DEFINITIONS</u>

1.      "You" and "your" refer to the Defendant and any predecessor entities or "alleged predecessor entities" that owned or operated at the Allied/LCP Site.   "You" and "your" also include all persons acting in your interest or on your behalf in this action including your attorneys, employees and investigators.

2.      "Person" or "persons," as used herein, refers to natural persons as well as to all other entities, including, but not limited to, corporations, associations, institutions, joint ventures, professional associations, partnerships, firms, organizations, and governmental agencies or bodies.

3.      "Disposal" is defined as the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air of discharged into any waters, including groundwaters. 42 U.S.C. § 9601(29).

4.      "Release" is defined in pertinent part, as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment..." 42 U.S.C. §9601(22).

5.      A "hazardous substance," "hazardous waste," or "hazardous material" refers to a substance, waste or material which is defined as Section 101(4) of the Comprehensive Environmental Response, Compensation and Liability Act "Superfund Act," 42 U.S.C. §9601(14), or which poses characteristics which otherwise render such substance, waste, or material hazardous, frightful, and/or toxic.

6.      "Waste" includes any and all liquid, solid or gaseous material stored or disposed of on defendant's land and includes "hazardous waste."

7.      "Generate" or "generated" refers to each and every means by which materials, hazardous materials, substances or wastes were produced, manufactured, made, assembled, packaged, placed or otherwise handled.

8.      "Policy," as used herein, shall mean all, each, every and any, rule, procedure, or directive, formal or informal, and each common understanding of any course of conduct which is or was recognized as such by you or your present or former officers, directors, agents, employees, or other persons acting or purporting to act on you behalf, which was in effect at any time during the period covered by these interrogatories.

9.      "Communication," as used herein, shall include any utterance heard or overheard whether in person, by telephone, radio or otherwise, as well as every docent and every other mode of intentionally conveying meaning.

10.      "Document" or "documents," as used herein, include all communications as well as any and all letters, correspondence, memoranda, notes, pamphlets, reports, ledgers, charts, papers, drawings, sketches, graphs, data sheets, data processing cards, tapes, sound or video recording and every manner of written, printed, or recorded graphic or photographic matter, sound production or computer entry however any of the above may be produced, reduced, punched, stored, taped, transcribed or received, during the relevant time period which are now in your possession, custody or subject to your control, including documents at any time in the possession, custody or subject to the control of the defendant as that term is defined above.

11.      (a) "Identify," "identity" or "identification."   When used in reference to a natural person, the words "identify," "identity" or "identification" mean to state such person's full name and present or last known address, his present or last known position or business affiliation, and each of his positions during the applicable time period hereinafter defined.

        (b)   When used in reference to a document, the words "identify," "identity", or "identification" mean to state the date of the document, title, type of document and author.

12.      Unless otherwise specified, each interrogatory requests information from the date on which any predecessor entity or <u>alleged predecessor entity</u>, initiated operations at the LCP Site to the present date.

13.      "Predecessor," as used herein, means any person, as defined herein, through which you previously transacted business or are alleged to have previously transacted business;

14.      "State" shall mean to describe, specify and set forth, fully and unambiguously, using engineering, medical or scientific terms or words of art where necessary, each and every fact known to you relevant and responsive to the interrogatory.

15.      Off-site is intended to refer to any marsh, water, soil, sediment, air that is not located on the Allied/LCP CERCLA site.

16.      "LCP Site" shall refer to the 813 acres LCP Chemicals Superfund Site in Brunswick, Glynn County, Georgia and which is the subject of the Complaint.   Reference to the "LCP Site" includes any part of the site leased, owned and/or operated by any named Defendant and any operations conducted on the site by any named Defendant, its employees, or its agents.

<u>RELEVANT TIME PERIOD</u>

       The relevant time period for purposes of these interrogatories is from the date you or a predecessor entity operated at the site to the present date.

       *s/ John C. Bell, Jr.*
John C. Bell, Jr. – Ga. Bar # 048600
Pamela S. James – Ga. Bar # 389015
THE BELL FIRM
PO Box 1547
Augusta, GA 30903-1547
(706) 722-2014
john@bellfirm.net
pam@bellfirm.net


       *s/ Brian Donald Corry*
Brian Donald Corry – Ga. Bar #165557
McQUIGG SMITH & CORRY
504 Beachview Drive Suite 3D
Saint Simons Island, GA 31522
(912) 638-1174
brian@msclawga.com


       *s/ Robert P. Killian*
Robert P. Killian – Ga. Bar # 417575
KILLIAN LAW FIRM LLC
47 Professional Drive
Brunswick, GA    31520
(912) 263-9520
bob@killianlawfirm.com


       *s/ Robert B. Jackson, IV*
Robert B. Jackson, IV - Ga. Bar # 387750
ROBERT B. JACKSON, IV, LLC
260 Peachtree Street - Suite 2200
Atlanta, Georgia   30303
(404) 313-2039
rbj4law@gmail.com

COUNSEL FOR PLAINTIFF

## EXHIBIT "A"

1.    Please identify and provide the office/position held with the defendant of each person answering these interrogatories on your behalf and any person assisting in answering the interrogatories.

2.    Please identify every person known to you who has any knowledge regarding the facts or circumstances for the events described in the Complaint.

3.    Please identify every picture, photograph, drawing, recording, tangible object or other document, pertaining to any issue or fact involved in this controversy or to the occurrence referred to in the Complaint, and identify the possessor of each such document.

4.    Please identify all statements in any form taken from any person pertaining to any issue or fact involved in or related to this case, naming the person from whom the statement was taken, the date on which the statement was taken, the form in which the statement was taken, whether or not the statement has been transcribed and identify all persons having possession of the statement or any transcription or copy thereof.

5.    Identify any statements made by anyone on behalf of the City of Brunswick relating to the allegations in the complaint including the person who made the statement, the date of the statement, the form of the statement and whether the statement was recorded, written or transcribed.

6.    Please identify all expert witnesses you intend to call at trial, listing the subject matter on which each expert is expected to testify, the substance of the facts and opinions to which each expert is expected to testify, a summary of the grounds for each opinion and an itemization of all documents, facts and assumptions that form a foundation of the opinions.

7.    As to each expert listed in response to the above interrogatory, please give a resume of his training, qualifications and experience, including a list of schools of higher learning that he has attended, the degrees that he received, any licenses that he holds, any honors that he has received, the professional societies of which he is a member and the identity and location of all publications that he has authored or contributed.

8.    Identify all non-expert witnesses whom you intend to call at trial and provide the subject matter on which they may testify and identify any documents and facts on which they rely for any testimony.

9.    Please identify all insurance policies known by you to provide coverage for the claims set out in the Complaint. As to each such policy, please set forth the issuer of the policy, the policy number, the limits of coverage and any defenses to coverage.

10.    Set forth and identify all facts, documents and witnesses that you contend support any defenses that you assert to the claims set forth in the Complaint.

11.     Please identify all statutes, rules or regulations that you contend provide any limitations or defenses to liability in this case.

12.     Explain in detail why you are identified as a PRP for the LCP site.

13.     At this time what is your understanding of how hazardous waste/contaminants left on-site by you or any predecessor entity moved into the water, soil or sediment off-site from the LCP property.

14.     Identify who on your behalf has the most information of the present state of on-site contamination and off-site contamination from the LCP site.

15.     Identify the geographical scope you contend delineates all off-site contamination from the LCP site into any marsh, river, creek, soil, sediment, air, fish, and shellfish.

16.     Identify each hazardous substance, contaminant, regulated chemical, etc. released by you or any predecessor entity on or from the LCP Site.

17.     Describe your present role in the clean-up, monitoring and remediation of the LCP site and clean-up, monitoring and remediation of any contamination that has spread into water, soil, sediment and air off-site.

18.     Identify who on your behalf has the most information and knowledge about your present activities at the LCP site and with most knowledge of any off-site contamination.

19.     How much money by year since you have been identified as a PRP have you reimbursed either EPA or EPD for costs to identify, delineate, remove, clean-up, remediate, test, and monitor the LCP site contamination both on-site and off-site.

20.     Identify by date and source all valuations you have that provide the value assigned for coastal marshlands including who performed such valuations.

21.     Identify by date and source all valuations you have for costs to remediate and costs to restore contaminated coastal marshlands including who performed such valuations.

## EXHIBIT "B"

1.      Each and every statement taken by you or someone on your behalf from any of the parties or witnesses or anyone having information relevant to this litigation.

2.      Each and every report or correspondence between you or a representative on your behalf and any insurance carrier, experts retained on your behalf or any other entity regarding the incident which is the subject matter of this litigation.

3.      Copies of all documents and tangible things which are in any way relevant to this action or are calculated to lead to the discovery of relevant information, including:  all writings, emails, drawings, graphs, charts, correspondence, memoranda, notes, diaries, reports, summaries, statements and worksheets, whether made or obtained by you, any other party to this action, your attorneys, consultants of your attorneys, your insurance company or its agents.

4.      Copies of all documents that you believe support any contentions made by you and any defenses asserted by you with regard to the events described in the Complaint.

5.      Copies of all documents identified in response to the interrogatories served contemporaneously with these requests for production of documents.

6.      Copies of all documents obtained through non-parties related or relevant to the allegations set forth in the complaint.

7.      A current curriculum vitae of all experts retained by you to testify.

8.      A copy of all documents and reports prepared by each expert retained by you to testify.

9.      Copies of documents provided to any expert retained by you to testify at trial and all documents relied upon by such expert.

10.     Copies of all documents reflecting any data or information considered by Georgia Power Company's experts in forming their opinions.

11.     Copies of all documents for each testifying expert reflecting disqualification from serving/testifying as an expert in any case or that limited the permitted scope of his testimony.

12.     Copies of all exhibits to be used by Georgia Power Company's testifying experts, including summaries.

13.     All documents reflecting each testifying experts' compensation charged or paid to date.

14.     Copies of trial or deposition testimony for cases where Georgia Power Company's experts have testified as an expert at trial or by deposition for the last four years.

15.    Copies of all emails or other written correspondence between Georgia Power Company, its counsel and any testifying experts.

16.    Copies in the files/library/possession of counsel or Georgia Power Company's experts of all publications authored by Georgia Power Company's witness experts within the preceding ten years.

17.    All documents regarding any sampling conducted within the city limits of the City of Brunswick, including documents identifying all samples taken and analyzed, the results of all samples taken, field notes and logs, photographs, back-up sampling data and the identification of all persons present during the sampling.

18.    All documents in your possession regarding conveyance or acquisition of any portion or part of properties that lie west of Newcastle Street and east of the Turtle River that include high ground, marshes and creek and river bottoms, including deeds, grants and purchase/sale documents.

19.    All documents in your possession regarding conveyance or acquisition of any portion or part of property that lies east of Glynn Avenue, south of the F.J. Torras Causeway, and west of the Mackay River that includes high ground, marshes and creek bottoms, including deeds, grants and purchase/sale documents.

20.    All documents in your possession regarding conveyance or acquisition of any portion or part of property lying both north and south of the F.J. Torras Causeway, east of the Back River and west of the Little River that includes high ground, marshes and creek bottoms, including deeds, grants and purchase/sale documents.

21.    All documents in your possession regarding conveyance or acquisition of any portion or part of property that encompasses the southern portion of the Altamaha Canal that includes high ground and the now non-navigable canal, including deeds, grants and purchase/sale documents.

22.    All documents in your possession regarding conveyance or acquisition of any portion or part of property that lies on the east side of Andrews Island that includes high ground, marshes and river bottom, including deeds, grants and purchase/sale documents.

23.    Copies of all valuations for coastal marshland.

24.    Copies of all valuations evaluating the cost to remediate and restore contaminated coastal marshland.

FILED - MB
GLYNN CO. CLERK'S OFFICE
Filed 10/20/2022 2:58 PM
Accepted 10/21/2022 8:56 AM
CASE #  CE22-01086

CLERK SUPERIOR COURT

## IN THE SUPERIOR COURT OF GLYNN COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| CITY OF BRUNSWICK, by and through its MAYOR AND BOARD OF COMMISSIONERS, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| HONEYWELL INTERNATIONAL, INC., formerly known as ALLIED CHEMICAL CORPORATION, and as ALLIEDSIGNAL, INC. and THE GEORGIA POWER COMPANY, | ) ) ) ) ) ) |
| Defendants. | ) |

CIVIL ACTION FILE NO. CE22-01086 _____

## PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS
## FOR PRODUCTION OF DOCUMENTS TO
## DEFENDANT HONEYWELL INTERNATIONAL, INC.

In accordance with the applicable rules and statutes governing practice and procedure relating to discovery, you are required to answer separately and fully in writing and to produce separately and fully, under oath and within the time required by law, the interrogatories attached hereto as Exhibit "A" and to produce the items requested in the requests for production of documents attached hereto as Exhibit "B".

These interrogatories and requests for production shall be deemed continuing so as to require supplemental answers and production if further information is obtained between the time answers are served and the time of trial.

For any objection, set forth all grounds and reasons for each objection made.   If you claim any evidentiary privilege or discovery privilege as a ground for objection, set forth the factual as well as the legal basis of the claim of privilege.

Whenever you are asked in an interrogatory to "identify" a document, you may in lieu of following this definition, attach to your answers true, correct, and complete copies of the document.   Where any such document had been executed, notarized, time-stamped or formalized in any way, you must attach formalized copies of the documents.

<u>DEFINITIONS</u>

1.        "You" and "your" refer to the Defendant and any predecessor entities or "alleged predecessor entities" that owned or operated at the Allied/LCP Site.   "You" and "your" also include all persons acting in your interest or on your behalf in this action including your attorneys, employees and investigators.

2.        "Person" or "persons," as used herein, refers to natural persons as well as to all other entities, including, but not limited to, corporations, associations, institutions, joint ventures, professional associations, partnerships, firms, organizations, and governmental agencies or bodies.

3.        "Disposal" is defined as the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air of discharged into any waters, including groundwaters. 42 U.S.C. § 9601(29).

4.        "Release" is defined in pertinent part, as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment..." 42 U.S.C. §9601(22).

5.        A "hazardous substance," "hazardous waste," or "hazardous material" refers to a substance, waste or material which is defined as Section 101(4) of the Comprehensive Environmental Response, Compensation and Liability Act "Superfund Act," 42 U.S.C. §9601(14), or which poses characteristics which otherwise render such substance, waste, or material hazardous, frightful, and/or toxic.

6.        "Waste" includes any and all liquid, solid or gaseous material stored or disposed of on defendant's land and includes "hazardous waste."

7.        "Generate" or "generated" refers to each and every means by which materials, hazardous materials, substances or wastes were produced, manufactured, made, assembled, packaged, placed or otherwise handled.

8.        "Policy," as used herein, shall mean all, each, every and any, rule, procedure, or directive, formal or informal, and each common understanding of any course of conduct which is or was recognized as such by you or your present or former officers, directors, agents, employees, or other persons acting or purporting to act on you behalf, which was in effect at any time during the period covered by these interrogatories.

9.        "Communication," as used herein, shall include any utterance heard or overheard whether in person, by telephone, radio or otherwise, as well as every docent and every other mode of intentionally conveying meaning.

10.     "Document" or "documents," as used herein, include all communications as well as any and all letters, correspondence, memoranda, notes, pamphlets, reports, ledgers, charts, papers, drawings, sketches, graphs, data sheets, data processing cards, tapes, sound or video recording and every manner of written, printed, or recorded graphic or photographic matter, sound production or computer entry however any of the above may be produced, reduced, punched, stored, taped, transcribed or received, during the relevant time period which are now in your possession, custody or subject to your control, including documents at any time in the possession, custody or subject to the control of the defendant as that term is defined above.

11.     (a) "Identify," "identity" or "identification."   When used in reference to a natural person, the words "identify," "identity" or "identification" mean to state such person's full name and present or last known address, his present or last known position or business affiliation, and each of his positions during the applicable time period hereinafter defined.

        (b)   When used in reference to a document, the words "identify," "identity", or "identification" mean to state the date of the document, title, type of document and author.

12.     Unless otherwise specified, each interrogatory requests information from the date on which any predecessor entity or <u>alleged predecessor entity</u>, initiated operations at the LCP Site to the present date.

13.     "Predecessor," as used herein, means any person, as defined herein, through which you previously transacted business or are alleged to have previously transacted business;

14.     "State" shall mean to describe, specify and set forth, fully and unambiguously, using engineering, medical or scientific terms or words of art where necessary, each and every fact known to you relevant and responsive to the interrogatory.

15.     Off-site is intended to refer to any marsh, water, soil, sediment, air that is not located on the Allied/LCP CERCLA site.

16.     "LCP Site" shall refer to the 813 acres LCP Chemicals Superfund Site in Brunswick, Glynn County, Georgia and which is the subject of the Complaint.   Reference to the "LCP Site" includes any part of the site leased, owned and/or operated by any named Defendant and any operations conducted on the site by any named Defendant, its employees, or its agents.

<u>RELEVANT TIME PERIOD</u>

       The relevant time period for purposes of these interrogatories is from the date you or a predecessor entity operated at the site to the present date.

     *s/ John C. Bell, Jr.*
John C. Bell, Jr. – Ga. Bar # 048600
Pamela S. James – Ga. Bar # 389015
THE BELL FIRM
PO Box 1547
Augusta, GA 30903-1547
(706) 722-2014
john@bellfirm.net
pam@bellfirm.net


     *s/ Brian Donald Corry*
Brian Donald Corry – Ga. Bar #165557
McQUIGG SMITH & CORRY
504 Beachview Drive Suite 3D
Saint Simons Island, GA 31522
(912) 638-1174
brian@msclawga.com


     *s/ Robert P. Killian*
Robert P. Killian – Ga. Bar # 417575
KILLIAN LAW FIRM LLC
47 Professional Drive
Brunswick, GA    31520
(912) 263-9520
bob@killianlawfirm.com


     *s/ Robert B. Jackson, IV*
Robert B. Jackson, IV - Ga. Bar # 387750
ROBERT B. JACKSON, IV, LLC
260 Peachtree Street - Suite 2200
Atlanta, Georgia   30303
(404) 313-2039
rbj4law@gmail.com

COUNSEL FOR PLAINTIFF

## EXHIBIT "A"

1.     Please identify and provide the office/position held with the defendant of each person answering these interrogatories on your behalf and any person assisting in answering the interrogatories.

2.     Please identify every person known to you who has any knowledge regarding the facts or circumstances for the events described in the Complaint.

3.     Please identify every picture, photograph, drawing, recording, tangible object or other document, pertaining to any issue or fact involved in this controversy or to the occurrence referred to in the Complaint, and identify the possessor of each such document.

4.     Please identify all statements in any form taken from any person pertaining to any issue or fact involved in or related to this case, naming the person from whom the statement was taken, the date on which the statement was taken, the form in which the statement was taken, whether or not the statement has been transcribed and identify all persons having possession of the statement or any transcription or copy thereof.

5.     Identify any statements made by anyone on behalf of the City of Brunswick relating to the allegations in the complaint including the person who made the statement, the date of the statement, the form of the statement and whether the statement was recorded, written or transcribed.

6.     Please identify all expert witnesses you intend to call at trial, listing the subject matter on which each expert is expected to testify, the substance of the facts and opinions to which each expert is expected to testify, a summary of the grounds for each opinion and an itemization of all documents, facts and assumptions that form a foundation of the opinions.

7.     As to each expert listed in response to the above interrogatory, please give a resume of his training, qualifications and experience, including a list of schools of higher learning that he has attended, the degrees that he received, any licenses that he holds, any honors that he has received, the professional societies of which he is a member and the identity and location of all publications that he has authored or contributed.

8.     Identify all non-expert witnesses whom you intend to call at trial and provide the subject matter on which they may testify and identify any documents and facts on which they rely for any testimony.

9.     Please identify all insurance policies known by you to provide coverage for the claims set out in the Complaint. As to each such policy, please set forth the issuer of the policy, the policy number, the limits of coverage and any defenses to coverage.

10.    Set forth and identify all facts, documents and witnesses that you contend support any defenses that you assert to the claims set forth in the Complaint.

11.    Please identify all statutes, rules or regulations that you contend provide any limitations or defenses to liability in this case.

12.    Explain in detail why you are identified as a PRP for the LCP site.

13.    At this time what is your understanding of how hazardous waste/contaminants left on-site by you or any predecessor entity moved into the water, soil or sediment off-site from the LCP property.

14.    Identify who on your behalf has the most information of the present state of on-site contamination and off-site contamination from the LCP site.

15.    Identify the geographical scope you contend delineates all off-site contamination from the LCP site into any marsh, river, creek, soil, sediment, air, fish, and shellfish.

16.    Identify each hazardous substance, contaminant, regulated chemical, etc. released by you or any predecessor entity on or from the LCP Site.

17.    Describe your present role in the clean-up, monitoring and remediation of the LCP site and clean-up, monitoring and remediation of any contamination that has spread into water, soil, sediment and air off-site.

18.    Identify who on your behalf has the most information and knowledge about your present activities at the LCP site and with most knowledge of any off-site contamination.

19.    How much money by year since you have been identified as a PRP have you reimbursed either EPA or EPD for costs to identify, delineate, remove, clean-up, remediate, test, and monitor the LCP site contamination both on-site and off-site.

20.    Identify by date and source all valuations you have that provide the value assigned for coastal marshlands including who performed such valuations.

21.    Identify by date and source all valuations you have for costs to remediate and costs to restore contaminated coastal marshlands including who performed such valuations.

## EXHIBIT "B"

1.     Each and every statement taken by you or someone on your behalf from any of the parties or witnesses or anyone having information relevant to this litigation.

2.     Each and every report or correspondence between you or a representative on your behalf and any insurance carrier, experts retained on your behalf or any other entity regarding the incident which is the subject matter of this litigation.

3.     Copies of all documents and tangible things which are in any way relevant to this action or are calculated to lead to the discovery of relevant information, including:  all writings, emails, drawings, graphs, charts, correspondence, memoranda, notes, diaries, reports, summaries, statements and worksheets, whether made or obtained by you, any other party to this action, your attorneys, consultants of your attorneys, your insurance company or its agents.

4.     Copies of all documents that you believe support any contentions made by you and any defenses asserted by you with regard to the events described in the Complaint.

5.     Copies of all documents identified in response to the interrogatories served contemporaneously with these requests for production of documents.

6.     Copies of all documents obtained through non-parties related or relevant to the allegations set forth in the complaint.

7.     A current curriculum vitae of all experts retained by you to testify.

8.     A copy of all documents and reports prepared by each expert retained by you to testify.

9.     Copies of documents provided to any expert retained by you to testify at trial and all documents relied upon by such expert.

10.    Copies of all documents reflecting any data or information considered by Honeywell's experts in forming their opinions.

11.    Copies of all documents for each testifying expert reflecting disqualification from serving/testifying as an expert in any case or that limited the permitted scope of his testimony.

12.    Copies of all exhibits to be used by Honeywell's testifying experts, including summaries.

13.    All documents reflecting each testifying experts' compensation charged or paid to date.

14.    Copies of trial or deposition testimony for cases where Honeywell's experts have testified as an expert at trial or by deposition for the last four years.

15. Copies of all emails or other written correspondence between Honeywell, its counsel and any testifying experts.

16. Copies in the files/library/possession of counsel or Honeywell's experts of all publications authored by Honeywell's witness experts within the preceding ten years.

17. All documents regarding any sampling conducted within the city limits of the City of Brunswick, including documents identifying all samples taken and analyzed, the results of all samples taken, field notes and logs, photographs, back-up sampling data and the identification of all persons present during the sampling.

18. All documents in your possession regarding conveyance or acquisition of any portion or part of properties that lie west of Newcastle Street and east of the Turtle River that include high ground, marshes and creek and river bottoms, including deeds, grants and purchase/sale documents.

19. All documents in your possession regarding conveyance or acquisition of any portion or part of property that lies east of Glynn Avenue, south of the F.J. Torras Causeway, and west of the Mackay River that includes high ground, marshes and creek bottoms, including deeds, grants and purchase/sale documents.

20. All documents in your possession regarding conveyance or acquisition of any portion or part of property lying both north and south of the F.J. Torras Causeway, east of the Back River and west of the Little River that includes high ground, marshes and creek bottoms, including deeds, grants and purchase/sale documents.

21. All documents in your possession regarding conveyance or acquisition of any portion or part of property that encompasses the southern portion of the Altamaha Canal that includes high ground and the now non-navigable canal, including deeds, grants and purchase/sale documents.

22. All documents in your possession regarding conveyance or acquisition of any portion or part of property that lies on the east side of Andrews Island that includes high ground, marshes and river bottom, including deeds, grants and purchase/sale documents.

23. Copies of all valuations for coastal marshland.

24. Copies of all valuations evaluating the cost to remediate and restore contaminated coastal marshland.

**IN THE SUPERIOR COURT OF**_<u>GLYNN</u>_**COUNTY**
**STATE OF GEORGIA**

<u>City of Brunswick by and through</u>

<u>its Mayor and Board of</u>

<u>Commissioners</u>

PLAINTIFF

**CIVIL ACTION NUMBER** <u>CE22-01086</u>

VS.

<u>Honeywell International, Inc.</u>

<u>and The Georgia Power Company</u>

DEFENDANT S

SUMMONS

TO THE ABOVE NAME DEFENDANT: S

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney whose name and address is:

John C. Bell, Jr.
The Bell FIrm
PO Box 1547
Augusta, GA  30903-1547

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of sercice.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This  <u>20th</u>  day of  <u>October, 2022.</u>

Clerk of Superior Court

BY  /s/ Madison Browning

Deputy Clerk